IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

IN RE:

Paul L. Leongas

                    Debtor

PNC Bank, N.A.,

                    Plaintiff,

        v.

Paul L. Leongas,

                    Defendant.

Chapter 7

15-B-27967

The Honorable Judge
Janet S. Baer

Adversary Proceeding No.
16-00489

**PNC BANK N.A. PROPOSED FINDINGS OF AND CONCLUSIONS OF LAW**

**I. Description of the Parties and Relevant People/Entities Related to Debtor**

1.      PNC Bank, N.A. ("PNC") is a national bank.  It possesses two judgments against Debtor Paul Leongas "Debtor" that total $9,403,155.49 ("Judgments") and therefore is a creditor of Debtor.   Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶1.

2.      Debtor Paul L. Leongas is the individual who filed this Chapter 7 bankruptcy. He resides in Park Ridge, Illinois.  Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶2.

3.      Debtor graduated from Michigan State in 1990 with a degree in hotel/restaurant management.  Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶3.

4.      Debtor has worked in the restaurant business for almost his entire life.  Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶4.

5.      Sharise Leongas is Debtor's wife. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶5.

6.      Debtor and his family have resided 921 Broadway, Park Ridge, IL ("Residence") since 2009. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶6.

**II.      The Curragh Irish Pubs and Related Entities**

7.      From August 16, 2014 to August 16, 2015, (hereafter "Relevant Time" unless otherwise stated) the Curragh Irish Pub had four locations, Chicago, IL (referred to the "Edison Park Location" since it's in the Chicago neighborhood of Edison Park), Glenview, IL ("Glenview Location"), Skokie, IL ("Skokie Location") and Holland, MI

("Holland Location"). The Edison Park Location, Skokie Location, Glenview Location, and Holland Location are hereafter collectively referred to as "Four Curragh Bars"). Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶7.

8.      During the Relevant Time Holland Pub, LLC owned and operated the Curragh bars/restaurants at the Edison Park Location and Holland Location Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶8.

9.      During the Relevant Time and continuing to the present Debtor and his sister Sophia Leongas were the only members of Holland Pub, LLC. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶9.

10.      During the Relevant Time, Curragh Glen, LLC owned and operated the Curragh pub/restaurant at the Glenview Location. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶11.

11.      During the Relevant Time Debtor's other sister Lydia Leongas was the sole member of Curragh Glen, LLC. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶12.

12.      During the Relevant Time, Skokie Curragh, LLC owned and operated the Curragh pub/restaurant at the Skokie Location   Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶13.

13.      Until January 2014 Debtor owned a one-third membership interest in both Skokie Curragh LLC and 8266 Lincoln LLC, which owned the real property at which Skokie Curragh was located. Tr. 3/5/20, 68:9-18.

14.      On January 21, 2014 Debtor transferred his one-third membership interests in both Skokie Curragh LLC and 8266 Lincoln LLC to EGIO Consulting LLC, a Delaware limited liability company. *Id.*; PNC Ex. 4, at 22; Tr. 3/4/20 34:5-12.

15.      After Debtor's January 21, 2014 transfers of his membership interests Skokie Curragh LLC and 8266 Lincoln LLC had had three one-third owners: a) EGIO Consulting LLC ("EGIO") b) an entity related to Glenn Udell, and c) the Estate of Sheldon Kaufmann. Tr. 3/4/20, 33:20-34:4.

16.      EGIO's sole member is a trust whose sole beneficiaries are Debtor's three children. Tr. 3/4/20 35:15-22.

17.      During the Relevant Time, the real estate where Edison Park Curragh is located, 6701-09 N Northwest Hwy. Chicago, IL ("Edison Park Real Estate") was owned by EPC Properties, LLC ("EPC"). Tr. 3/4/20 32:7-16.

18.      During the Relevant Time, Sophia Leongas was the sole member of EPC. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶16.

19.      At the Relevant Time, the real estate where Holland, Michigan Curragh is located, 73 East. 8th Street, Holland, MI, was owned by Downtown Holland Properties, LLC ("DHP"). Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶17.

20.      During the Relevant Time the only members of DHP were Debtor and Sophia Leongas. Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶18.

**III.      Services Debtor Performs for the Four Curragh Bars**

21.     During the Relevant Time, Debtor performed work for the Four Curragh Bars Tr. 3/4/20 p 88:5-25.

22.     Debtor worked very hard for the restaurants. Tr. 3/4/20 48:6-7, 19-22.

23.     Debtor stated that only he, not his sisters, is capable of running Debtor's family's restaurant businesses to a point they can 'put food on the table.' Tr. 3/4/20, 49:9-11.

24.     Debtor listed restaurant manager as his occupation on his 2013 tax return.  PNC Ex. 57 0006; Tr. 3/5/20 72:24-73:7, and has described himself as a real estate developer.  Tr. 3/5/20 86:8-10.

25.     On average, Debtor spends a majority of his time, on average at least 40 plus hours per week, consulting for the Four Curragh Bars.  Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶39; Tr. 3/4/20  50:6-10; 88:5-8.

26.     Debtor admitted he performs a number of tasks for the Four Curragh Bars and further admitted he "do[es] everything for these bars. And it's not just Edison Park." Tr. 3/4/20  88:5-25.

27.     Debtor admitted that he does not get paid for the work he performs by way of a traditional salary.  Tr. 3/4/20 p 89:1-3.

28.     Debtor and his sisters did not make Debtor a W2 employee of any of the Four Curragh Bars Tr. 3/4/20 46:18-23, 50: 6-16.

29.     Debtor and his sisters did not pay Debtor as a 1099 contractor for his work at the Four Curragh Bars.  Tr. 3/4/20, 47: 12-15.

30.     Instead of receiving a salary for the worked he performed, the Four Curragh Bars directly paid Debtor's living expenses.  Tr. 3/4/20, 48:23 – 49:22; 51:24 – 52:11.

31.     Debtor claims the payment of his personal living expenses by the Four Curragh Bars are "loans" from the Four Curragh Bars to Debtor.  Tr. 3/4/20  50:12-20; 51:24 – 52:11.

**IV.     Payment of Debtor's Living Expenses by the Four Curragh Bars or Related Entities**

**A.   Ownership of the Residence and Payment of Loans Secured by the Residence**

32.     Until 2011 Debtor and his wife Sharise ("Sharise") owned the Residence  in Tenancy by the Entirety. Tr. 3/4/20, 66:8-11; 83:14-20.

33.     Debtor judicially admitted Jody Libman ("Libman") is a childhood friend of Debtor who purchased the Residence in a short sale transaction in 2011, and then on June 5, 2015, two months before Debtor filed this bankruptcy, Libman quit claimed the Residence to Judith Iovino (Debtor's mother-in-law) as trustee for the 921 South Broadway Land Trust, of which Debtor's three minor children own the beneficial interest. Tr. 3/4/20  68: 18–69:1-3, 83:23-84:13.  Av. Doc. 182-1 ¶84 (Debtor's Response to PNC Rule 7056 Amended Statement of Facts).

3

34.     During the Relevant Time Bridgeview Bank had a first lien priority mortgage dated September 23, 2011 secured by the Residence related to mortgage loan to Jody Libman ending in account number x10301 used to complete Libman's short sale purchase ("First Mortgage"). Tr. 3/4/20 69:1–70:12.

35.     Debtor introduced Libman to Bridgeview Bank and Libman obtained the First Mortgage from Bridgeview Bank secured by the Residence to complete his short sale purchase.  Tr. 3/4/20 69:23 – 70:4.

36.     Libman took title to the Residence in his own name.  Tr. 3/4/20 70:5-6.

37.     Debtor and Libman agreed that as long as Debtor took care of paying all of the expenses for the Residence, including the First Mortgage, insurance, and utilities, Libman would purchase the Residence and Debtor and his family could continue to live in the Residence rent free. Tr. 3/4/20 70:22–71:13, 85:13-14.

38.     During the Relevant Time, the monthly payment on the First Mortgage was $6,270.22.  Stipulation 2; PNC Ex. 15.

39.     Every month since October 1, 2011 one of the Four Curragh Bars or related entities paid Libman's monthly $6,270.22 installment on the First Mortgage.  Tr. 3/4/20  72:17 –  73;5, 165:24-166-2; 234:19-23, 238:25-239:4, 243:9-16. Stipulation 2; PNC Ex. 15 (copies of payments produced by Bridgeview Bank).

40.     In addition to the First Mortgage Bridgeview Bank held a junior mortgage secured by the Residence dated December 16, 2013 related to a Home Equity Line of Credit ("HELOC") in the original principal amount of $536,648.13 extended to Debtor and his wife with an account number ending in x23001.  PNC Ex. 38.2, 38.3; Tr. 3/4/20  73:6-13.

41.     Debtor and his wife were the borrowers on the HELOC.  PNC Ex. 38.2, 38.3  11 defining borrower as Paul and Sharise Leongas); Tr. 3/4/20 73:19-24.

42.     Debtor admits he was personally responsible for making payments on the HELOC.  Tr. 3/4/20  73:25 – 74:6.

43.     Debtor did not provide any evidence, other than his own testimony, to support his claim that the proceeds of the HELOC were used for a business purpose.

44.     At the Relevant Time, the monthly payment on Debtor's HELOC was $3,175.66 per month.  Stipulation 1; Tr. 3/4/20  226: 23-25; PNC Ex. 38.2  (showing payments of $3,175.66 in the "Payment" paragraph and showing the loan number as ending in x23001 on page 2); Trial Ex 14 (payment records on account x23001 produced by Bridgeview Bank).

45.     During the Relevant Time, the Four Curragh Bars, entities related thereto, or Edison Park Acquisition LLC ("EPA"), which acquired in Edison Park Real Estate, paid the monthly installments due on the HELOC on Debtor's behalf. Tr. 3/4/20  227:18-24; 234:19-23; 233:14-20.

46.     Funds that Debtor's wife received from EPA were used to pay real estate taxes for the Residence.  PNC Ex. 52 PRCB 00153 (showing payment to Cook County Treasurer of $10,699.28 after Sharise received $125,000 from EPA for PIN 09-34-400-116-0000); PNC Ex. 38-3 (mortgage showing PIN 09-34-400-116-0000 for Residence).

### B. Two American Express Cards

47.     During the Relevant Time Debtor had at least two American Express cards on which his name appears and for which he was an authorized user. The first, ending in x4005; the second ending in x71002.  Stipulations 5 and 6; PNC Ex. 17, PNC Ex. 64 (Copies of the monthly statements for Debtor's cards x4005 and x71002).

48.     Debtor's is the only name on card x4005 and the monthly statements are addressed solely to Debtor at his Residence. PNC Ex. 17.

49.     All of the charges listed in the statements for card x4005 are within the category "Paul Leongas." Ex 17 (Amx 1160, 1171, and approx.  p. 3 of every monthly statement thereafter)

50.     Debtor's wife was the primary user of x4005. Tr. 3/4/20, 124:23 – 125:6.

51.     Debtor's wife used x4005 primarily for Debtor and his wife's household purchases and expenses and all of the charges made using this card were by a member of Debtor's immediate family. Tr. 3/4/20, 124:23 – 125:6; 161:2-5.

52.     The transaction details for Card x4005, in the statements, show Debtor's wife used this card for personal use. PNC Ex. 17 (as an example: numerous purchases at restaurants and numerous purchases at apparel stores and grocery stores: LuluLemon, Marianos, Victoria Secret, Sephora, AE Outfitters, Dick's Sporting Goods, Starbucks, Coach, ULTA, Williams Sonoma, Target, Zappos, Walgreens, as well as travel expenses such as $347.63 and $1,092.78 at the Waldorf Orlando (Amex 1232 and Amx 1251), purchases at Disneyworld (Amx 1251), $2,002.12 for a reservation at Grand Traverse Resort in Michigan one month before this bankruptcy was filed (Amer BK 180) and baggage fees for a trip to Florida (Amx 1243).

53.     During the Relevant Time one of the Four Curragh Bars, EPA, or related entities made the monthly payments for purchases made using American Express Card x4005.  Stipulations 3, 6; Tr. 3/4/20, 246:22-247:7.

54.     As for the second card, card x71002 is in the name of Debtor and Irish Sprits, LLC (p 124:16) and the statements are addressed to Debtor and Irish Spirits, LLC. Trial Ex 64.

55.     All of the charges detailed in the statements for card x71002 are under the category of "Paul Leongas" Trial Ex 64 (Amx 1924, 1937, and approx. p. 3 of every statement thereafter).

56.     Irish Spirits, LLC has been dissolved and out of business since 2006. Tr. 3/4/20  94:13-15.

57.     Irish Spirits, LLC operated a Curragh Bar located in Schaumburg that has been closed since 2006.  Tr. 3/4/20  94:13-15.

58.     For American Express card x 71002 the statements show Debtor used this card for personal use.  PNC Ex. 64 (showing airfare to Florida (Amx 1925). American Express Vacation Package (Amx 1967), airfare to Florida (Amx 1977-82, 1995) airfare to Greece allegedly for Debtor's parents (Amx 2003), airfare to Florida (Amx 2012), payment to Benjamin Legal Services (Amx 2022), airfare to Boston (Amer BK 126-27), travel to New York, Massachusetts and New

Hampshire in the month before Debtor filed this bankruptcy (Amer Bk 127-129), and numerous purchases at sporting stores, Starbucks, restaurants, and gas stations). Debtor annotated the statements During the Relevant Time for card X71002 what he claims are the only personal expenses with a "P" and "B" denoting a business charge. Tr. 3/4/20 p 127:20-23.

59.     Card x71002 was used to pay for Debtor and his extended family to go to Greece in 2014.  Tr. 3/4/20 257: 9-11.

60.     During the Relevant Time, Debtor admits the Four Curragh Bars, EPA, or related entities, rather than Debtor, paid the for American Express card x71002  Stipulations 3, 6; PNC Ex. 32; Tr. 3/4/20 p 138:17-25.

61.     Debtor testified that someone at the Four Curragh Bars would receive the x71002 invoice, pay the invoice using funds from one of the Four Curragh Bars, and then reconcile Debtor's personal charges on that month's statement in Curragh's Business Works accounting software as a loan to Debtor. Tr. 3/4/20 p 130:6-21, 132:23-133:7, 138:17-25.

62.     Debtor did not introduce any documentary evidence in support of his testimony that personal charges made on Amex Card x71002 were reconciled by the Four Curragh Bars and classified as a loan to Debtor.

63.     During the Relevant Time, the Four Curragh Bars, EPA or entities related to the Four Curragh Bars, rather than Debtor, paid the for American Express card x4005 except that Debtor stated he was not sure if this card was ever paid out of his wife's personal account.  Tr. 3/4/20  161:17-162:13.

64.     The invoices for card x4005 were paid the same way as card x71002 except that the x4005 invoice was mailed to Debtor's Residence, so someone had to take the physical invoice to one of the Four Curragh Bars.  Tr. 3/4/20 161:17-23.

65.      During the Relevant time Card x4005 had charges of $56,149.38 ($4,679.11 per month) and payments of $57,557.68 ($4,796.47 per month).  PNC Ex. 17;  Stipulation 5.

66.     After failing to disclose the American Express cards and amounts spent thereon, this Court ordered (See Av. Doc. 248 (order for Debtor to answer Intg. 6) and Av. Doc. 219-2 p. 9 (Intg. 6) Debtor to separate the charges as business and personal on card x71002.  Trial Exhibit 64.   Business expenses are marked with a "B" and personal are marked with a "P".  Tr. 3/4/20 p 127:20-23.

67.     During the Relevant Time, the amounts paid on Card x71002 total $246,269.36 which averages to $20,522.45 per month.  Stipulation 6; PNC Ex. 64.

68.     The charges Debtor marked as P or 'unknown' or 'blank' on card  x71002 total $32,266.46 and average to $2,688.87 per month.  Stipulation 6; PNC Ex. 64.

69.     Debtor did not identify any restaurants, gas, or toll payments charged to the Amex cards as personal. Adding charges for restaurants, gas, toll roads, and Starbucks (all of which Debtor marked as "B") increases Debtor's monthly use of the x71002 American Express Card $873.59 per month for a total of $3,562.46 per month for personal use during the Relevant Time.  See PNC Ex. 64.

70.     Debtor's wife's personal checking account shows that during the Relevant Time funds from her account were use to make one payment of $19,351.67 for card x71002 on January 22, 2015 despite Debtor's claim that card x71002 was primarily used for business purchases.  PNC Ex. 52 PRCB 000176, PNC Ex. 64 Amx 1975.

## C.     Automobile Provided for Debtor's Use

71.     The Four Curragh Bars paid $720 per month to lease an Infiniti which was exclusively driven by Debtor During the Relevant Time.  Tr. 3/4/20, 167:18–168:12.

## D.  Debtor's Wife's Credit Cards and Miscellaneous Household Expenses

72.     Debtor's wife paid for a number of Debtor and Debtor's wife's household expenses.  Tr. 3/5/20  81:16-85:25.

73.     Debtor consulted with his wife about their household expenses prior to filing bankruptcy.  Tr. 3/5/20 36:20 – 37:1-5; 80:17-20.

74.     During the Relevant Time, Debtor's wife maintained a checking account at Park Ridge Community Bank ending in x9701 ("PRCB Account").  PNC Ex. 52; Stipulation 4.

75.     Debtor was aware of the PRCB Account prior to filing bankruptcy.  Tr. 3/5/20  80:13-25 (Debtor stating that his wife manages household budget and that he consulted with her before filing bankruptcy); Tr. 3/4/20 259:5-17 (Debtor stating that $125,000 check to his wife from EPA was deposited into wife's account in error while Debtor and his family were in Greece, and that they transferred $100,000 out, and used the remaining $25,000 to pay for household expenses); PNC Ex. 52 PRCB 0037.

76.     During the Relevant Time, Debtor's wife paid for numerous household expenses, including credit cards used to pay household expenses, and using her PRCB Account for direct payment of expenses. PNC Ex. 52 PRCB 150-205; Tr. 3/5/20 81:16-85:25

77.     During the Relevant Time, Debtor's wife's PRCB Account (PNC Ex. 52 PRCB 150-205) shows reoccurring monthly expenses totaling an average of at least $4,553.53.  This includes an average of:

a.  $2,310.82 for three of Debtor's wife's credit cards (Nordstrom, Macy's, and Chase) Tr. 3/5/20 82:13-24,  81:25 – 82:4 (Debtor stating he has no idea if payment to Nordstrom is household expense) (paid monthly by ACH), PRCB 00145-00210;

b.  $728.52 for a U.S. Bank loan Tr. 3/5/20  83:14 – 84:11 (Debtor admitting that U.S. Bank loan was assistance from Debtor's sister Lydia and that Debtor's wife makes the $728.52 payment every month by ACH).  PRCB 00145-00210;

c.  $1,080.70 to a dance studio entitled Studio 22 High Tek Dance Studio. Tr. 3/5/20  85:1-8 (Debtor admitting dance studio was a household expense) (paid every month by check) PRCB 00145-00210;

d.  $433.49 for Debtor's Park Ridge County Club membership. Tr. 3/5/20 84:23-25 (Debtor admitting his family had membership to Park Ridge County Club) (paid every month by check). PRCB 00145-00210;

78.     Debtor was aware of the expenses paid by his wife prior to filing bankruptcy.  Tr. 3/5/20 80:13-25 (Debtor stating that his wife manages household budget and that he consulted with her before filing bankruptcy).

79.     Debtor's attorney Kevin Benjamin ("Benjamin") does not believe that Debtor gave him the PRBC Account records. Tr. 3/5/20 128: 4-11, 181:1-6.

80.     Benjamin testified that if he would have known about the U.S. Bank loan he would have asked Debtor for more information to determine if it should be scheduled in the bankruptcy. Tr. 3/5/20 182:8-9.

81.     Benjamin testified that Debtor did not tell him that Debtor's wife spent approximately $2,000 per month on personal credit cards. Tr. 3/5/20 182:14-20.

82.     Benjamin testified that he does not think Debtor told him about Debtor's family's Park Ridge County Club membership and that he "probably" would have scheduled it if Debtor had told him about it.  Tr. 3/5/20  183:22 – 184:3

83.     Benjamin testified that Debtor did not tell him about his wife's payment of around $1,200 per month for their daughter's dance lessons.  Tr. 3/5/20  184: 4-8.

84.     Benjamin testified that if he would have known about the dance lessons he would have thought about scheduling it. Tr. 3/5/20  184:15-22.

85.     Debtor claimed he changed his lifestyle after filing bankruptcy but later admitted his wife obtained a 2016 Mercedes subsequent to his bankruptcy filing. Tr. 3/5/20  93:5

**V.     Debtor's Bankruptcy Schedules:**

86.     Debtor filed his Bankruptcy Schedules and Statement of Financial Affairs ("SOFA") on September 20-21, 2015 (PNC Ex 4 and 5).

87.     Debtor included two Schedule Js in his filed Schedules. PNC Ex. 5, at 5-8.

88.     Debtor filed one schedule J for himself and one schedule J for his non-filing spouse.  PNC Ex. 5  5-9 (bk. doc. 18). Tr. 3/5/20 134:22–135:5; 135:13–139:12.

89.     Debtor testified that his and wife's schedules contain IRS Standard Expenses rather than their actual household expenses.   PNC Ex. 5  7-8.; Tr. 3/5/20  44: 3-7; 135:13–139:12 (generally discussing Debtor used IRS Standard expenses rather than actual expenses).

90.     Neither of the schedule Js filed by Debtor disclose the mortgage payments for Debtor's Residence (¶38,44 above), the payment for Debtor's car (¶71 above), the amounts spent on expenses by Debtor and his wife every month using the two American Express cards (¶65,68 above), or the amounts spent on expenses by Debtor's wife using her various credit cards and other household expense payments paid from her Park Ridge Community Bank checking

account (¶77 below).  PNC Ex. 5  5-8.

91.     Debtor scheduled $2,517.57 in regular monthly contributions received from Holland Pub/Sophia Leongas on line 11 of Schedule I. PNC. Ex 5.

92.     Debtor's first Schedule J itemizes all but $190.00 of the $2,517.57 in regular monthly contributions received as various insurance paid on Debtor's behalf.  $1,503.16 for health insurance, $391.66 for vehicle insurance, life insurance of $432.75, and life insurance of $190.  PNC Ex. 5; Tr. 3/5/20  123:4–124:15.

93.     Debtor's second Schedule J itemizes $190.00 in life insurance payments.  PNC Ex. 5.

94.     According to Debtor, none of the $5,561.00 of monthly expenses depicted in Debtor's second Schedule J are actual expenses; they instead represent IRS Standard expenses for a household of five. Tr. 3/4/20 108:13-109:1; Tr. 3/5/20 43:19-44:7.

95.     Debtor did not list the monthly expense for the HELOC on either of the schedule Js he filed.  PNC Ex. 5  5-8; Tr. 3/4/20  107:10-13.

96.     Debtor did not list the monthly expense for the First Mortgage on either of the schedule Js he filed.  PNC Ex. 5  5-8; Tr. 3/4/20  107:2-9.

97.     Debtor did not list the payments made by the Four Curragh Bars for the HELOC or First Mortgage as income or regular monthly contributions on his Bankruptcy Schedules.  PNC Ex. 5 5-8; Tr. 3/4/20  107:5-13.

98.     Debtor did not list the $720.00 monthly Infiniti car lease payment made on his behalf each month as regularly received contributions on Schedule I or as expenses on either Schedule J. PNC. Ex. 5.

99.     Despite the HELOC, Debtor did not list Bridgeview Bank as a secured creditor on his schedules.  PNC Ex. 4 6; Tr. 3/4/20  82:5-24.

100.     Debtor did not list the actual property taxes, utilities, and housing upkeep for the Residence as expenses on either schedule J.  PNC Ex. 5.

101.     Debtor admitted he was required to pay the household expenses for Libman. Tr. 3/4/20  70:22-71:13.

102.     Debtor did not list the amounts he and his wife spent for personal, household, purchases using the American Express cards on either of the schedule Js.  PNC Ex. 5 p.  5-8.

103.     Debtor did not list the amounts the Four Curragh Bars or related entities pay for the personal expenses on Debtor and his wife's American Express cards as income on his bankruptcy schedules.  PNC Ex. 5 at 3, PNC Ex. 4, at 18, Tr. 3/5/20  36:5-9.

104.     [omitted]

**VI. Income**

## A. Debtor's Income

105.    Debtor listed no personal income from 2014 to 2015 in his bankruptcy schedules.  PNC Ex. 4 (Debtor's Bankruptcy Schedules), Bk. Doc. 16 at 18.

106.    Debtor did not disclose in his bankruptcy schedules the payments made by the Four Curragh Bars which directly pay Debtor and his wife's personal living expenses.  PNC Ex 4,5.

107.    During the Relevant Time Debtor's monthly expenses paid by the Four Curragh Bars were at least $6,270.22 for the First Mortgage,$3,175.66 for the HELOC, $3,562.46 for Debtor's American Express,$4,679.11 for the American Express used by Debtor's wife, and $720.00 for the Debtor's 2015 Infiniti.  ¶90 above.

108.    This regular payments made on Debtor's behalf total $18,857.45 at least per month that Debtor did not disclose as regularly received contributions in his Schedules. During the Relevant Time this amount would total $226,289.40.

109.    In his bankruptcy schedules, Debtor disclosed total monthly household income of $7,473.62 comprised of his wife's annual $75,000 salary from one of the Four Curragh Bars and $2,517.57 per month in "contributions" from Holland Pub and Sophia Leongas.  PNC Ex. 5 (Summary of Schedules) PNC Ex. 4 at 4.

110.    The $2,517 is for payment of various insurance by the Four Curragh Bars. Tr. 3/5/20  123:4–124:15.

111.    Debtor stated that he understood that he was supposed to list regular contributions to household expenses in his current monthly income but that he didn't do so.  PNC Ex 54; Tr. 3/4/20 p 120:9-15.

112.    Debtor did not list an employer on his bankruptcy schedules.  PNC Ex. 5 p. 3.

113.    Debtor received and cashed $28,700 in checks payable to 'cash' in the one year before his bankruptcy. Stipulation 7; PNC Ex. 40 Tr. 3/4/20 262:1–268:25.

114.    Debtor did not produce any evidence records tracking the use or whereabouts of this cash.

## B.  Debtor's Wife's Income

115.    Debtor's wife was a W-2 employee of one of the Four Curragh Bars in 2014 and 2015 and Debtor disclosed a gross salary of $6,250.01.  p 60: 1-11; see PNC Ex. 5  p. 3.

116.    Statements for Debtor's Wife's one checking account at Park Ridge Community Bank ("PRCB") from July of 2014 to November of 2015 identify average monthly deposits of $26,737.65.  PNC Ex. 52 PRBC 00145, 00150, 00155, 00158, 00162, 00167, 00172, 00176, 00183, 00188, 00192, 00198, 00204, Removing the alleged $100,000 error related to the $125,000 check from EPA, the average is still $16,074.47.

117.    From January of 2014 to March of 2015 Debtor's wife received at least $168,000 in checks drawn on – Edison Park Acquisition, LLC's account.  PNC Ex. 52 PRCB_00028-29, 00035, 00037, 00049, 00050.

118.    Debtor signed Dan Touhy's name all but three of these checks on behalf of EPA. Stipulation. ¶4.  PNC Ex. 52 PRCB 28 (Debtor signed his own name), PRCB_00029 (Debtor signed his own name), PRCB_00035 (signed by Touhy), PRCB_00037 (signed by Touhy), PRCB_00049 (Debtor signed Touhy's name.  Tr. 3/4/20  200:15-24) PRCB_00050 (Debtor signed Touhy's name. Tr. 3/4/20 210:18-211:2.

119.    Debtor claims the money EPA paid to his wife were loans.  Tr. 3/4/20 200:5–201:17.

120.    Debtor claims EPA 'mistakenly' paid the $125,000 to Sharise rather than EPC and that Sharise issued a $100,000 check to EPC to correct the mistake in July of 2014.  Tr. 3/4/20 258:22–259:12.

121.    Debtor testified "we were in Greece" when the error occurred.  Tr. 3/4/20 259:10.

122.    Sharise retained $25,000 of the $125,000 which Debtor admits was used for household expenses. Tr. 3/4/20 259:13-17.

123.    Debtor and his wife did not schedule any monies paid to Sharise from EPA as income on his SOFA or bankruptcy schedules.  PNC Ex. 4, at 18, PNC Ex. 5.

124.    Debtor listed his wife's 2013 income as zero in his SOFA.  PNC Ex. 4, p. 18.

125.    In 2013, Debtor's wife received approximately $21,100 in checks signed by Debtor from an account owned by 635 Belden, LLC, which Debtor solely managed.  Stipulation 4; PNC Ex. 52 PRCB_00004, 00012, 00015, 000016, 00017, 00019, 00022, 00023, 00026.

126.    In 2013, Debtor's wife received approximately $21,000 from an account owned by EP Curragh, Stipulation 4, PNC Ex. 52 PRCB_00007-00009, 00013, 00014, 00017.

127.    In 2013, Debtor's wife had cash deposits totaling $16,500 into her PRCB account. Stipulation, 4; PNC Ex. 52 PRCB 00003-00027 noted by "Cash In" ticket).

**VII. Expenses**

128.    The amount of expenses Debtor failed to disclose totals $18,857.45 (set forth supra ¶108) plus $4,553.53 in expenses paid from Debtor's wife's PRCB Account (infra ¶77) for a total of $23,410.98

**VIII. Edison Park Acquisition, LLC**

129.    EPA is allegedly owned solely by Dan Touhy.  Tr. 3/4/20  219:24–220:5.

130.    Debtor managed a construction project for EPA at the Edison Park Real Estate.  Tr. 3/4/20 190:5-19.

131.    Dan Touhy was the sole member and manager of EPA. Tr. 3/4/20, 219:24-220:5.

132.    Debtor did not receive a salary or and claims he did not receive any direct payments from EPA for this

work.  Tr. 3/4/20  192:3-6.

133.    From January 1, 2013 to August 16, 2015, Debtor's Wife, Sharise Leongas, received at least $160,000 from Edison Park Acquisition, LLC. Stipulation 4; PNC Ex. 52 PRCB_00028-29, 00035, 00037, 00049, 00050;  Tr. 3/4/20 192:7-8, 200:15-18 ($10,000 check to wife), 210:18-211:5 ($10,000 check to wife), 244:21-245:5 ($15,000 check to wife) 258:22-259:17 (Debtor asserts that $100,000 of the $125,000 was immediately paid to EPC, but admits that $25,000 was used to pay household expenses),

134.    Debtor's wife did not perform any services for EPA and EPA did not owe her any money. Tr. 3/4/20, 201:13-17.

135.    Debtor claims the money his wife received from EPA was a loan.  Tr. 3/4/20, 200:25 – 201:1.

136.    EPA funds were used to pay the First Mortgage and HELOC on Debtor's Residence.  Stipulation 3; Tr. 3/4/20  204:1-24,  205:23-207:5.

137.    During the Relevant Time EPA paid a total of at least $6,351.32 on the HELOC. Stipulation 3; PNC Ex. 32 Belmont_000191.

138.    During the Relevant Time EPA paid a total of at least $11,967.27 on the First Mortgage. Stipulation3; PNC Ex. 32 Belmont_000194.

139.    EPA Funds were used to make payments on behalf 5331 Cicero, LLC in which Debtor was a member.  Tr. 3/4/20 203:1-22; Stipulation 3; PNC Ex. 32 Belmont_000191.

140.    During the Relevant Time, at least $194,508.42 of EPA funds were used to pay Amex card x71002 and $34,674.03 of EPA funds were used to pay Amex x4005 as set forth in the below table.  Stipulation 3; Tr. 3/4/20 246:22 – 247:21.

| Bates No | Method | Date | Payee | Amount | Payment Posted On |
|---|---|---|---|---|---|
| Belmont_000170 | ACH | 09/24/14 | AMEX x71002 | $25,430.79 | PNC Ex. 64 Amex 1937 |
| Belmont_000174 | ACH | 10/21/14 | AMEX x71002 | $24,062.08 | PNC Ex. 64 Amex 1937 |
| Belmont_000179 | ACH | 11/07/14 | AMEX x4405 | $ 8,800.73 | PNC Ex. 17 Amx 1191 |
| Belmont_000179 | ACH | 11/14/14 | AMEX x71002 | $28,958.52 | PNC Ex. 64 Amex 1947 |
| Belmont_000184 | ACH | 12/03/14 | AMEX x4005 | $ 2,522.08 | PNC Ex. 17 Amx 1204 |
| Belmont_000184 | ACH | 12/05/14 | AMEX | $ 6,067.95 | Unknown |
| Belmont_000184 | ACH | 12/17/14 | AMEX x71002 | $18,991.04 | PNC Ex. 64 Amex 1965 |
| Belmont_000186 | ACH | 01/08/15 | AMEX | $ 5,961.87 | PNC Ex. 17 Amx 1213 |

| | | | x4005 | | |
|---|---|---|---|---|---|
| Belmont_000188 | ACH | 02/17/15 | AMEX x4005 | $ 2,131.48 | PNC Ex. 17 Amx 1220 |
| Belmont_000188 | ACH | 02/17/15 | AMEX x71002 | $36,579.55 | PNC Ex. 64 Amex 1988 |
| Belmont_000192 | ACH | 03/04/15 | AMEX x4005 | $ 5,948.81 | PNC Ex. 17 Amx 1231 |
| Belmont_000192 | ACH | 03/16/15 | AMEX x71002 | $18,882.68 | PNC Ex. 64 Amex 2001 |
| Belmont_000197 | ACH | 04/06/15 | AMEX x4005 | $ 5,250.61 | Trail Ex. 17 Amx 1242 |
| Belmont_000197 | ACH | 04/09/15 | AMEX x71002 | $22,112.55 | PNC Ex. 64 Amex. 2012 |
| Belmont_000200 | ACH | 05/05/15 | AMEX x4005 | $ 4,058.45 | PNC Ex. 17 Amx 1249 |
| Belmont_000200 | ACH | 05/07/15 | AMEX x71002 | $19,491.21 | PNC Ex. 64 Amex 2021 |

141.    EPA paid Debtor's and his wife's personal expenses on the American Express cards and Debtor claims that EPC would later reconcile personal expenses it paid and book those as a loan to Debtor because the money belonged to one of the entities related to the Four Curragh Bars.  Tr. 3/4/20 246:22–247:21; 249:4-11, 250:4-22, 251:18-23, 260:9-261:9.

142.    Debtor testified EPA made the Amex card x71002 payments because all of the charges were related to the Edison Park Real Estate construction project. Tr. 3/4/20, 192:11-14

143.    Debtor did not produce and has not seen any documents to show that reconciliation with EPA took place. Tr. 3/4/20 252:2-13.

144.    Touhy authorized Debtor to sign Touhy's name on checks written from Belmont EPA account.  Tr. 3/4/20 200:20-21.

145.    Debtor did not disclose the payments his wife received from EPA as income on his Bankruptcy Schedules. PNC Ex. 4, 5.

146.    Debtor not did disclose the payments EPA made on the HELOC, First Mortgage, or American Express cards as income on his bankruptcy schedules.  PNC Ex. 4 and 5.

147.    Debtor previously filed an affidavit claiming he received no funds from EPA.  Av. Doc. 146-14 ¶5-6 (Affidavit of Debtor attached to Response to Mot to Compel) ¶5-6.

## IX. Debtor's Residence

148.    During the relevant time, Debtor's household consisted of Debtor, his wife, and his three children.  PNC

Ex. 57 000005.

149.    On May 6, 2016, Debtor's wife and Debtor's friend/attorney Glenn Udell obtained a $1,325,852.47 loan from Bridgeview Bank (the "2016 Mortgage") to payoff the First Mortgage. Stipulation 9;, PNC Ex. 37;  Tr. 4/3/20  84:14 – 85:3. The appraised value on the refinance shows $1,846,000.  PNC Ex. 37.

150.    The proceeds of the 2016 Mortgage also paid off the HELOC.   PNC Ex. 37 (Bridgeview Bank loan approval referencing refinance of x23001); see also PNC Ex. 38.2 p 2 showing the HELOC loan number as x23001).

151.    Debtor failed to list the Residence, or mortgage payments related to the Residence, on his bankruptcy schedules.   Trial Exs. 4,5.

152.    Debtor and his wife have resided at the Residence continuously since 2009 and owned as tenanties in the entirety.  Tr. 3/4/20  36:16-18, 66:8-11.

## X. Discovery

153.    PNC's 2004 subpoena for document production to Debtor required production of, *inter alia*, Debtor's emails related to his Residence, the trust which took ownership of his residence, bank accounts, money paid for Debtor's living expenses, automobiles, insurance, gifts, wills and trusts, EPA's purchase of the Edison Park Real Estate, and Debtor's assets. Av. Doc. 182-1 ¶88 (Debtor's Resp. R7056 Facts).

154.    Debtor did not voluntarily produce the documents showing the payment of his personal expenses (the HELOC, First Mortgage, American Express statements, and his wife's PRCB Account), Rather, in response to PNC's subpoenas to Bridgeview Bank, Belmont Bank, Park Ridge Community Bank, and American Express , i) Debtor filed an objection (bk. doc. 36) and ii) Debtor's wife and the Four Curragh Bars filed a motion to quash attempting to prevent PNC from obtaining these records from Bridgeview Bank, Belmont Bank, Park Ridge Community Bank.  Bk. Doc. 53. The Court denied the motion to quash and overruled the objection and directed the third parties to turnover the documents for a limited timeframe to PNC.  Bk. Doc. 70.

155.    Additionally, in response to PNC's 2004 subpoena, Debtor did not produce emails but instead provided an affidavit of completeness attesting that had produced all required documents on April 27, 2016. Av. Doc. 175-48 (Debtor's Affidavit attached to R 7056 Smnt Facts).

156.    After a motion to compel (av. doc. 66) on May 18, 2017, this Court ordered Debtor to produce emails related to his "assets including his residence, bars and restaurants owned and/or operated by his family members, and communications with financial institutions related to payment of his family living expenses." Av. Doc. 83 ¶1.

157.    PNC renewed its motion to compel (av. doc. 88) and this Court again ordered Debtor to produce emails by September 6, 2017.  Doc. 92.

158.    Thereafter, Debtor produced 1311 pages of emails dating back to 2015 stamped Leongas 00001-01311. Av. Doc 182-1 ¶93 (Debtor's Res R 7056 Facts).

## XI. Kevin Benjamin

**A. General Background**

159.    Attorney Kevin Benjamin ("Benjamin") filed bankruptcy for Debtor. Tr. 3/5/20  98:16-19

160.    Benjamin has been practicing bankruptcy law for almost thirty years and bankruptcy is the primary area in which he practices.  Tr. 3/5/20  98:20-25.

161.    Benjamin has known Debtor since kindergarten and considers him a "life-long" friend.  Tr. 3/5/20  120:3-6, 169:24-25.

162.    Benjamin said he's been friends with Libman, Glenn Udell, and Debtor since childhood.   Tr.  3/5/20 153:19-154:13.

163.    Prior to filing Debtor's bankruptcy, Benjamin provided Debtor with a document entitled Benjamin's "Rules for Filing Bankruptcy."  PNC Ex. 53; Tr. 3/4/20  92: 16-21.

164.    Debtor admits he received the Rules for Filing Bankruptcy. Tr. 3/4/20  92: 16-21.

165.    The Rules for Filing Bankruptcy provide that everything Debtor provides to Benjamin, the Court, or trustee must be "complete, accurate, and truthful."  PNC Ex. 53, Rule #1.

166.    Based on the language in this documents Debtor admitted he knew "it was important, again, that [he] fully disclose and accurately disclose all of [his] debts."  Tr. 3/4/20  93:18-21.

167.    Prior to filing Debtor's bankruptcy, Benjamin provided Debtor with a document entitled "Chapter 7 Process Information." PNC Ex. 54.

168.    Debtor admits he received the Chapter 7 Process Information.  Tr. 3/4/20, 117: 65–118:1.

169.    Prior to filing Debtor's bankruptcy, Benjamin provided Debtor with a document entitled "Debt Assistance Initial Consultation Agreement."  PNC Ex. 55; Tr. 3/4/20, 92: 4-8.

170.    Debtor admits he received the Debt Assistance Initial Consultation Agreement document. Tr. 3/4/20  92: 6-22.

171.    Prior to filing Debtor's bankruptcy, Benjamin provided Debtor with an online Questionnaire.  Ex. 56; Tr. 3/4/20, 95:16-96:11.

172.    Debtor admits he received the Questionnaire and stated that he filled it out to the best of his knowledge. Tr. 3/4/20, 96:15-20.

**B. Debtor's Claim that He Disclosed all of his Household Income, Expenses, and Assets to Benjamin**

173.    Debtor alleges he was forthcoming with all of his financial information and gave Benjamin "everything."

Tr. 3/4/20, 98:19-20, 111:20-23.

174.    Benjamin testified that he does not believe Debtor concealed anything.  Tr. 3/5/20, 152:23-153:3.

175.    Debtor did not introduce any documentary evidence to support his claim that he advised Benjamin of all of his assets, income, expenses, and alleged loans from family members.

176.    Debtor testified that he uses an accountant and relies on his accountant.  Tr. 3/4/20  155:3-6, Tr. 3/5/20 27:25-28:5.

177.    In the Questionnaire produced by Benjamin, as referenced in Benjamin's September 20, 2015 email (PNC Ex. 69), Debtor did not list any employment, spouse employment, business income, contributions to household expenses, residences, expected tax refunds, or credit cards. PNC Ex. 56.  KB 102-114.

178.    Debtor filed his bankruptcy on August 16, 2015 without schedules A-J. Bk. Doc. 1.

179.    On September 20, 2015 at 4:04 M. Benjamin emailed Debtor and stated that Debtor had not yet provided any of Debtor's household expenses despite Benjamin requesting the information in the Questionnaire and in several subsequent correspondences.  Trail Ex. 69.

180.    Based on the September 20, 2015 email, Debtor had not provided a substantial amount of information to Benjamin.  Specifically, Benjamin thought that Libman had a lease with Debtor, Benjamin did not understand the HELOC because Debtor "supposedly" did not own any real estate in 2013, Debtor had not provided any household expenses, Benjamin didn't understand how Debtor did not have a mortgage or pay any rent, and Benjamin didn't understand how Debtor was paying a mortgage on only his wife's salary, PNC Ex. 69

181.    Benjamin testified that on September 20, 2015, the same evening the schedules were filed, he was frustrated with Debtor because Debtor had not given him the information he needed to file the schedules.  Tr. 3/5/20 168:5-170:3.

182.    In the September 20, 2015 email Benjamin stated in relevant part:

You list Jody as someone we have a lease with though you told me in August to remove him from notices so what is the lease terms, dates.

The HELOC is listed as 2013 debt but you supposedly did not own any real estate in 2013. – Jody did.

BUDGET:

We have Sharise income for the budget but no expenses. What is the elect bill, gas, utilities, insurance, the household expenses you listed zero for everything, how can that be

What is the number for the mortgage or rent payment? You say you live for free? How is that – if you rent to who?  If mortgage payment Shari is making how is that number paid with you making zero, as I am sure its more than her check.

The Questions in the questionnaire I sent in August and resent several times that you did not answer prevents us from preparing proper schedules….I would like to file tonight but the business questions were answered half ass and the rest of the questionnaire you just finished the other day is finished with answers that leave more questions than answers

I am not filling it out for you and filing it – you will be signing under penalty of perjury.  Get me answers…

PNC Ex. 69.

183.    Debtor did not introduce the 'questionnaire he finished the other day' referenced in the September 20 email to show what he allegedly disclosed to Benjamin.

184.    Debtor did not offer any evidence that he provided the information Benjamin requested on the evening of September 20, 2015 (by email PNC Ex. 69) before the schedules were filed later that night.

185.    Benjamin testified that Debtor did not tell him about his wife's payment of approximately $2,000 per month for credit cards in her name or $1,200 per month for dance lessons paid out of Sharise's PRCB Account. Supra¶81,83

186.    Benjamin does not believe Debtor game him the PRCB Account statements, or told him about the U.S Bank loan payments and their Park Ridge County Club membership  Supra ¶79,80,82.

187.    Benjamin could not recall whether Debtor disclosed the American Express card used by Sharise to him. Tr. 3/5/20, 132:20-25, 133:10-16.

188.    Debtor did not give Benjamin any documents showing the loan balances Debtor owed to his family.  Tr. 3/4/20  163:9-13.

## C.  Benjamin's Assertion That He Believes Debtors Are Allowed to List Standard IRS Expenses Rather that Actual Household Expenses on Schedule J

189.    Benjamin testified that Debtor did not have any actual expenses and that even if he did, he was entitled to use the Standard IRS expenses rather than disclose actual household expenses.  Tr. 3/5/20  135:16-139:12.

190.    Debtor's schedule J reflects regular monthly contributions received only for expenses of health insurance, vehicle insurance, and life insurance totaling $2,327.57.  PNC Ex. 5  6.

191.    At the Relevant time, Debtor had three minor dependents ages 12,14, and 16. PNC Ex. 5  5.

192.    Debtor's schedule J includes an expense for vehicle insurance even though Debtor did not disclose the 2015 Infiniti paid for by the bars. PNC Ex. 4, 5.

193.    Debtor claims he used standard IRS expenses on the second schedule J but did not know which expenses were the standard expenses when asked during trial.  Tr. 3/4/20, 112:8-113:18.

194.    Debtor's wife's schedule J contains an unchecked box for "Non-filing Spouse." PNC. Ex. 5.

195.    The Non-filing Spouse box does not appear on Debtor's schedule J or the 12/13 Schedule J on the US Court's website. PNC Ex. 5, at  5; https://www.uscourts.gov/sites/default/files/b_6j.pdf

196.    Benjamin's own intake Chapter Seven information provides that on the bankruptcy forms debtors must disclose "A detailed list of the debtor's monthly living expenses, i.e. food, clothing, shelter, utilities, taxes, transportation, medicine, etc." The intake form states that the non-filing spouse must provide this same information and that the purpose of the information is so that "the trustee, the court, and creditors can evaluate the household's financial position." PNC Ex. 54 KB 276.

197.    Benjamin's intake forms further state that Chapter Seven debtors must provide a schedule of their current income and defines 'current monthly income' as "including regular contributions to household expenses from non-debtors."  PNC Ex. 54 KB275, 279.

198.    Benjamin's Rules for Filing Bankruptcy requests disclosure of "regular monthly expenses" and states "The regular expenses should be as close as possible and should be based on a reasonably inquiry which you are required to undertake." PNC Ex. 53, Rule #3.

199.    Benjamin's Debt Assistance Initial Consultation Agreement requests disclosure of actual expenses.   PNC Ex. 55. ¶2.

200.    Benjamin's Questionnaire requests disclosure of numerous types of Debtor's actual expenses.  PNC Ex. 56 KB 100, 112-13.

201.    Schedule J asks for "your residence;" it does not ask for expenses for the house owned by a debtor. PNC Ex. 5, at  7.

202.    One day before Debtor's bankruptcy schedules were filed, Benjamin complained that Debtor had not given him any expenses and demanded that Debtor promptly provide his household expenses.  PNC Ex. 69.

203.    Benjamin's September 20, 2015 email did not mention the possibility of using the IRS standards.  Trial. Ex. 69.

204.    Benjamin did not provide evidence of any other cases where he has used IRS standards rather than actual household expenses on a Chapter Seven debtor.

205.    Other than citing generally to the BAPCPA, Benjamin did not cite to any case law or statute that allows the use of IRS standard expenses rather than actual household expenses.  Tr. 3/5/20 p. 135:19-136:6.

206.    Benjamin stated that BAPCPA was designed to prevent debtors from claiming they were unable to pay creditors because of unreasonably high household expenses.  P 136:15-23 ("So what some debtors were doing is they would well, let's go buy a mansions, you know and live large, and you know, I wont be able to pay back my bills.") Tr. 3/5/20 136:15-23.

207.    Benjamin stated that the means test was for "consumer" cases. Tr. 3/5/20 135:19-20.

208.    Benjamin testified that the means test is irrelevant in Debtor's case.  Tr. 3/5/20 187:14-18.

**D. Benjamin's Assertion that He Unilaterally Decided to Disclose Only $2,517 in Monthly Contributions For Expenses Paid by the Four Curragh Bars But Not the First Mortgage, HELOC, American Express Cards and Infiniti Lease**

209.    Debtor did not list the amounts paid by the Four Curragh Bars for the First Mortgage, HELOC, Debtor and his wife's American Express cards, and Debtor's 2015 Infiniti as contributions on his schedule I.  PNC Ex. 5  p. 4.

210.    Benjamin testified that the $2,517 consists of $1,503.16 for health insurance, $391.66 for vehicle insurance, life insurance of $432.75, and life insurance of $190.  Tr. 3/5/20 123:4–124:15.

211.    Benjamin claims he made the decision as to what to include in schedule I as a contribution.  Tr. 3/5/20 125:17-126:6.

212.    Benjamin testified that of all the expenses the Four Curragh Bars were paying, he only put the amounts that he determined were "regular contributions to household income" which is the $2,517 number on schedule I.  Tr. 3/5/20 173:23-174:12.

213.    Even though it was paid every month on behalf of Debtor and benefited his household and Debtor and his wife used the cards for personal purchases, Benjamin testified that he did not include Debtor's American Express in the "regular contributions to household income" because it was a company card.  Tr. 3/5/20,  174:13-175:1.

214.    Even though it was paid every month on behalf of Debtor and benefited his household, Benjamin testified that he did not include the monthly $6,200 payment on the Libman Mortgage in the "regular contributions to household income" because it was for the benefit of Debtor's children, not Debtor.  Tr. 3/5/20  175:15-23.

215.    Even though it was paid every month on behalf of Debtor and benefited his household, Benjamin testified that he did not include the monthly payment of $3,175.66 on the HELOC because it was a business loan.  Tr. 3/5/20, 175:24-176:16.

216.    Benjamin's intake forms provide that Chapter Seven debtors must provide a schedule of their current income and defines 'current monthly income' as "including regular contributions to *household* expenses from non-debtors.  PNC Ex. 54 KB275,279 (emphasis added).

217.    Benjamin's intake forms also note that the purpose of the disclosures is so that "the court, the trustee, and creditors can evaluate the *household's* financial position." PNC Ex. 54 (emphasis added).

218.    Benjamin's intake questionnaire asks for "other contributions *to household* expenses." PNC Ex. 56 KB104 (emphasis added).

**E.  Debtor's Alleged Reliance of Advice of Counsel**

19

219.    Debtor stated that he understood that he was supposed to list "regular contributions to *household* expenses" in his current monthly income but that he didn't do so.  Tr. 3/4/20 p 120:9-15.

220.    Debtor claims he told Benjamin that his sisters through the Four Curragh Bars paid his expenses, but doesn't know how Benjamin arrived at the $2,517.57 'contribution' number.  Tr. 3/5/20  43:14-16.

221.    Debtor claims he reviewed his schedules before filing. Tr. 3/5/20, 46:1-3.

222.    Debtor claims he did not ask Benjamin how he arrived at the $2,517 number.  Tr. 3/5/20,  43:17-18.

223.    Benjamin testified that Debtor, whom he considers a life-long friend, is a sophisticated businessman based upon the work Debtor has done, who he's done work with, and his education.  Tr. 3/5/20, 195:21-196-3.

224.    Debtor has been involved in at least four bankruptcies filed by entities with which he is affiliated. Tr. 3/5/20  196:4-15 (discussing EP Curragh and PLL cases filed by Benjamin); Av. Doc. 198-5 (*In re EP Curragh, LLC* 15-b-14710 (Bankr N.D. Ill) (filed by Benjamin and petition signed by Debtor)); Av. Doc. 198-6 (*In re PLL, LLC* 15-b-27969 (Bankr. N.D. Ill) (filed by Benjamin and petition signed by Debtor)); see also Av. Doc. 198-3 (*In re 9362 Joint Venture, LLC,* 12-b-19819 (Bankr N.D. Ill.) (petition signed by Debtor)); Av. Doc. 198-4 (*In 841 Joint Venture, LLC*, 14-b-14957 (Bankr. N.D. Ill.) (filed by Benjamin and petition signed by Debtor)).

225.    Debtor had access to, and was represented by, additional counsel besides Benjamin but did not amend his schedules.

226.    Theresa Benjamin was involved in this case on behalf of Debtor no later than August 31, 2015. Bk. Doc. 13.

227.    Attorney Konstantine T. Sparagis was involved in this bankruptcy no later than no later than March 3, 2016 when he filed a motion to quash PNC's 2004 discovery on behalf of entities related to the Four Curragh Bars.  Bk. Doc. 53.

228.    Lou Karneizis filed an additional appearance for Debtor on December 12, 2019. Av. Doc. 259.

**XII. Debtor's Assertion that the Payments for His Expenses are Loans.**

229.    Debtor testified that any living expense payments made on his behalf were booked as personal loans to Debtor.  Tr. 3/4/20, 133:2-3.

230.    Debtor's sister Sophia previously testified during a 735 ILCS 5/2-1402 citation exam that the payments made on Debtor's behalf by the Four Curragh Bars for Debtor's expenses were not booked accounting loans and were not on her balance sheet. Stipulation 8.

231.    Debtor's sister Sophia previously testified during her citation exam that she did not expect any repayment for the Four Curragh Bar's payment of Debtor's personal expenses.  Stipulation 8.

232.    In response to the question of whether the payments for Debtor's personal expenses were a gift, Sophia responded "I don't-- I don't know how you want to classify it or whatever." Stipulation 8.

233.    In support of his claim that he payment of his expenses by the Four Curragh Bars are loans Debtor, testified that his family had 'always done it this way' (always booked the payments as loans) and that the Four Curragh Bars cannot afford to pay him a w2 salary. Tr. 3/4/20, 51:24-52:11.

234.    Debtor and his sisters opened the Edison Park location in 2009. Tr. 3/4/20  40:4-5.

235.    PNC filed its two lawsuits which led to its Judgments against Debtor in 2009.  Av. Doc. 267 (Joint Pretrial Statement) its Ex. 1 ¶104.

236.    Debtor's sister Sophia previously testified during her citation exam that she receives a salary from the one of the Four Curragh Bars.  Stipulation 8.

237.    Debtor's sister Sophia previously testified that Debtor's other sister Lydia does not receive any loans from the Four Curragh Bars. Stipulation 8.

238.    Debtor did not introduce any evidence to show that Lydia does not receive a salary.

239.    One of the Four Curragh bars paid Debtor's wife a W-2 salary in 2014 and 2015. Tr. 3/4/20, 60:2-12.

240.    Debtor did not introduce any evidence, such as testimony from his sisters, income statements, or tax records to show that the Four Curragh Bars 'can not afford to pay him a salary'.

241.    Debtor did not offer any explanation as to why he would repay the alleged loans from the Four Curragh Bars when he is working in excess of forty hours a week.  Tr. 3/4/20, 49:23-51:4.

242.    There are no promissory notes for the alleged loans. Tr. 3/4/20, 142:12-15.

243.    The Four Curragh Bars are not charging interest for the alleged loans.  Tr. 3/4/20. 142:16-18.

244.    There is no collateral for the alleged loans.  Tr. 3/4/20, 142:19-21.

245.    There is no deadline for Debtor to make a payment on the alleged loans.  Tr. 3/4/20, 142:22-24.

246.    There are no installment payments due on the alleged loans.  Tr. 3/4/20, 142:25-143:1.

247.    There is no maturity date for the loans.  Tr. 3/4/20, 143:2-3.

248.    The Four Curragh Bars use BusinessWorks which is accounting software.  Tr.  3/4/20 129:8-12.

249.    BusinessWorks keeps track of accounts payable and accounts receivable.  Tr. 3/4/20 129:14-16.

250.    Debtor testified that when a bill comes in to the Four Curragh Bars, the bookkeeper would classify and

enter it in the accounting software.  Tr. 3/4/20 130:16-22.

251.    Debtor testified that it was possible some invoices would be reclassified at a later date.  Tr. 3/4/20 130:16-22.

252.    Debtor testified that if an expense was paid on his behalf, it would be classified as a receivable from Debtor.  Tr. 3/4/20 132:23 – 133:19.

253.    Debtor testified that BusinessWorks can generate a balance sheet showing the amount Debtor owes for the alleged loans.  Tr. 3/4/20 134:11-20.

254.    Debtor testified that the alleged amount he owes each year is a running balance that is not re-set each year.  Tr. 3/4/20 134:21-23.

255.    Debtor testified that he could look up the balance he owes on the loans in BusinessWorks and pull a balance sheet.  Tr. 3/4/20 143:11-21.

256.    Debtor testified that these year end balance sheets from BusinessWorks would show what Debtor owed to the various entities related to the Four Curragh Bars.  Tr. 3/4/20  144:11-14, 152:23-153:2, 154:19-21.

257.    During discovery, PNC requested documents related to the alleged loans and Debtor produced year end balance sheets for Skokie Curragh, LLC, The Curragh – Holland, The Curragh – Edison Park, and EPC Properties, LLC.  PNC Ex. 65-68; Tr. 3/4/20  153:8-14, 144:24-145:4.

258.    On its 2015 balance sheet Skokie Curragh, LLC listed $7,007.28 in accounts receivable owed by Debtor.  PNC Ex. 65.  3.

259.    Debtor testified that this was the correct amount he allegedly owed Skokie Curragh, LLC.  Tr 3/4/20, 144:11-17.

260.    Debtor then changed his story and said it possible the balance sheets he produced were not the final year end balance sheets.  Tr. 3/4/20, 152:23-153:14.

261.    Debtor said he could not look at the balance sheets and determine how much he owned because he is not an accountant.  Tr. 3/4/20, 155: 7-11.

262.    On its 2015 balance sheet the 'Curragh Edison Park' listed $7,026.50 in accounts receivable owed by Debtor. PNC Ex. 67, at 3.

263.    On its 2015 balance sheet Holland Pub, LLC listed $38,032.96 in accounts receivable owed by Debtor.  PNC Ex. 67, at  4.

264.    On its 2015 balance sheet EPC Properties, LLC listed zero in accounts receivable owed by Debtor.  PNC Ex. 68, at 4.

265.    The four balance sheets show a total of $52,066.74 that Debtor owes to the Four Curragh Bars and related entities.

266.    For the time period 2009 forward, Debtor testified that he does not believe any repayments have been made on the alleged loans from the Four Curragh Bars.  Tr. 3/4/20, 142:9-11.

267.    Debtor did not assert that any payments were made prior to 2009.

268.    For the one year before Debtor filed bankruptcy the approximate total of all of the expenses paid by the Four Curragh Bars is $226,289.40 (supra ¶108) compared to the aggregate $52,066.74 in receivables listed on the four balance sheets.

269.    Since Debtor's family has 'always done it this way' (¶___) and the Edison Park Curragh opened in 2009 (__¶__), and no payments have been made (__¶__) the balance Debtor owed to the Four Curragh Bars should be at least approximately $1,223,688 ($203,949.60 times six years)

270.    Debtor did not list the amounts he allegedly owes to the entities related to the Four Curragh Bars on his Schedule F.  Bk. Doc. 16.

271.    Debtor filed an amended schedule F on March 8, 2019, but still didn't list the amount he allegedly owes to the entities related to the Four Curragh Bars on his Schedule F.  Bk. Doc. 118.

272.    Debtor never produced Business Works journals depicting the data from which the annual balance sheet Debtor receivables was derived.

**XIII. Miscellaneous**

273.    In response to PNC's motion for summary judgment, Debtor filed an affidavit (Doc. 182-17 ¶22) asserting his use of  card x71002 for personal expenses was as follows:

2/19/15-3/22/15:          $767.34;
3/23/15-4/21/15:          $1,177.97;
4/22/15-5/22/15:          $208.51;
5/23/15 to 6/21/15:       $77.81;
6/22/15 to 7/22/15:       $1,872.79;
7/23/15 to 8/21/15:       $70.11.

2/19/15 – 8/21/15 Total:  $4,174.53

274.    Subsequently, when this Court directed Debtor to designate each purchase as business or personal, Debtor (PNC. Ex. 64) listed the following expenses for 2/19/15 to 8/21/15, as "P" blank, or unknown (which total does not include items that are labeled B which should be P such as restaurants, gas, tolls, and Starbucks, supra 69) which total $10,392.96 ($1,732/16 per month) more than stated in his affidavit:

2/19/15-3/22/15:          $717.82

| | |
|---|---|
| 3/23/15-4/21/15: | $3,184.81 |
| 4/22/15-5/22/15: | $3,372.94 |
| 5/23/15 to 6/21/15: | $647.17; |
| 6/22/15 to 7/22/15: | $2,747.66 |
| 7/23/15 to 8/21/15: | $3,897.09 |

2/19/15 – 8/21/15 Total:  $14,567.49

275.    Debtor's wife handles the household budget.  Tr. 3/5/20 36:20-22.

276.    Benjamin put a lot of planing in to Debtor's bankruptcy.  Tr. 3/5/20 146:6-145:1

277.    Debtor listed some of the Four Curragh Bars and related entities as creditors but he did not list all of the entities that paid his expenses.  Compare PNC. Ex. 4 p. 8 to Stipulations 1, 3 (showing payment by Edison Park Acquisition, LLC and Curragh Glen, LLC which were not listed on schedule F).

278    Debtor listed the amount of loan as unknown for EPC Properties, LLC, Holland Pub, LLC and Skokie Curragh, LLC.  PNC. Ex. 4 p. 11-13.


**PNC BANK N.A.'S PROPOSED CONCLUSIONS OF LAW**

**I.      JURISDICTION**

This Court has jurisdiction to hear and determine this Complaint pursuant to Title 28, § 157(b)(2)(J) of the

United States Code and Internal Operating Procedure 15(a) of the United States District Court for the Northern District

of Illinois. Venue of this proceeding is in the United States District Court for the Northern District of Illinois pursuant to

Title 28, § 1409(a). PNC is a Creditor with standing to prosecute this Complaint pursuant to Title 11 U.S.C.A. §§ 101(5),

(10)(A), 727(a).

**II. APPLICABLE LEGAL STANDARDS ON DISCHARGE**

**A.      Entitlement to a Discharge Generally**

Discharge in bankruptcy is a privilege, not a right.  *In re Brahos*, 589 B.R. 381 (Bankr. N.D. Ill. 2018).  The denial

of discharge simply leaves promises of payment made by debtor in place.  As summarized in *In re Holstein*, 299 B.R.

211, 226 (Bankr. N.D. Ill. 2003) (granting summary judgment denying discharge) discharge is for honest but

unfortunate debtors who must be fully forthcoming about their financial affairs. *See also, Peterson v. Scott (In re Scott)*, 172 F.3d 959, 968 (7th Cir.1999) (noting that "complete financial disclosure is a condition precedent to the privilege of discharge").

### B.   Burden of Proof for Denial of Discharge

Plaintiff has the burden of proving every element of his objections to discharge by a preponderance of the evidence. *In re Scott*, 172 F.3d at 966–67. Pursuant to Rule 4005 Fed. R. Bankr. P, plaintiff bears the burden of proving his objection to the debtor's discharge. However, once the plaintiff has established that the acts complained of occurred, the burden of production shifts to the debtor who must then come forward with a "credible explanation of his actions." *In re Stamat,* 395 B.R. 59, 69-70, N.D.Ill. 2008) *citing  In re Costello*, 299 B.R. 882, 894 (Bankr.N.D.Ill.2003). The debtor cannot prevail if he is unable to offer credible evidence after the plaintiff has established a prima facie case. *In re Stamat*, 395 B.R. at 73, *citing*, *In re Sapru*, 127 B.R. 306, 314 (Bankr.E.D.N.Y.1991).

In this adversary proceeding PNC asserts that Debtor should be denied a discharge under §§ 727(a)(2)(A), 727(a)(4)(A) and §727(a)(3). The law and the facts supporting denial of discharge under each section follow.

### III.   Debtor's Discharge Should be Denied Under §727(a)(2)(A)

### A.  Applicable Law

To obtain a denial of discharge pursuant to §727(a)(2)(A), a creditor must show that (1) the debtor (2) transferred, removed, destroyed, or concealed (3) the debtor's property, (4) with the intent to hinder, delay, or defraud a creditor (5) within one year of bankruptcy. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002). Concealment consists of "failing or refusing to divulge information to which creditors were entitled." *In re Self*, 325 B.R. 224, 237-38 (Bankr. N.D. Ill. 2005). Concealment includes a debtor's failure to disclose an asset or income on his bankruptcy schedules. *In re Mosher*, 417 B.R. 772, 782 (Bankr. N.D. Ill. 2009) (money from consulting work that debtor directed clients to pay to defunct business was income for debtor). "Concealment will also be found when a debtor purports to transfer an asset, making it appear as if he no longer owns it, but he in fact retains an interest in the asset." *In re Self*, 325 B.R. at 237-38.

Concealment can occur even if creditors are not harmed. *In re Mosher*, 417 B.R. at 785.

Since debtors rarely declare their purpose to defraud creditors, intent may be proved by circumstantial evidence or by inferences drawn from a debtor's course of conduct. *In re Costello*, 299 B.R. at 896. Courts must deduce fraudulent intent by examining the totality of facts and circumstances surrounding the transaction in question. *Id.* The act of concealing an asset alone can be sufficient to find fraudulent intent on the part of the Debtor. *In re Johnson*, 551 B.R. 384, 407 (Bankr. N.D. Ill. 2016). Intent need not rise to the level of intending to defraud. Rather intent to hinder or delay is sufficient. *In re Simley*, 864 F.2d 562, 568 (7th Cir. 1989); *In re Swisher*, 2017 WL 5634594 (Bankr. C.D. Ill. 2017). Fraudulent intent can also be demonstrated by showing the debtor acted with "reckless disregard," or "the state of mind present when a debtor does not care about the truth or falsity of a statement," *In re Mosher*, 417 B.R. at 785 citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 2009).

The presence of 'badges of fraud' will warrant the inference of intent. *Id.* "These include lack of consideration for a transfer, a familial relationship between the parties, the debtor's retention of possession and benefit of the transferred property, and the debtor's financial difficulties at the time of the transfer." *Id.* While just one of these badges is sufficient to find fraudulent intent, the presence of several factors "indicates strongly that debtor possessed the requisite intent." *In re Holstein*, 299 B.R. at 230 (denying discharge based on presence of badges of fraud).

While §727(a)(2)(A) has a one year limit, under the doctrine of continuing concealment  "where property is transferred more than one year before bankruptcy, a discharge may nonetheless be denied if the concealment of any retained interest in that property continues into the statutory one-year period, coupled with the requisite intent." *In re Self*, 325 B.R. at 238 (invoking continuing concealment to deny discharge where debtor retained control or an interest in property despite transferring property to his wife); *Holstein*, 299 B.R. 211, 230 (denying discharge based upon continuing concealment). "Even if a debtor transfers legal title to the property, his continued use of the property is sufficient to constitute a continuing concealment." *Id.* "If a creditor can establish that the debtor retained either control or an equitable interest in the property, courts have denied discharge under the doctrine of continuing concealment."

26

*Id.*

## B. The Evidence Warrants Denial of Discharge Under § 727(a)(2)(A)

### 1. Debtor Concealed Income

The financial transactions that justify denial of Debtor's discharge are largely uncontested. Debtor identified no income for 2014 and 2015 on his SOFA or Schedules I and J. FOF ¶105. Despite that he disclosed no income, Debtor admits he works forty plus hours per week managing, operating and performing full-time essential services for the Four Curragh Bars. FOF ¶21-26. In exchange, pursuant to an arrangement with his sisters, instead of receiving salaried compensation, The Four Curragh Bars or related entities pay Debtor's living expenses in lieu of salary. FOF ¶27,30.

Debtor admits the Four Curragh Bars, the related entities and EPA paid the following recurring monthly expenses on his behalf associated with the Residence during the Relevant Time: a) $6,270.22 for the First Mortgage, FOF ¶ 38-39, b) $3,175.66 for Debtor and his wife's HELOC obligation; FOF ¶44-45, c) Real Estate Taxes; FOF ¶46. Debtor also admits he had exclusive use of an Infiniti automobile leased by one of the Curragh Bars for $720.00 per month during the Relevant Time. FOF ¶71.

Debtor further admits all charges made during the Relevant Time on American Express card x4005, a card in Debtor's name, were made exclusively by his immediate family members, were for Debtor or his wife or kids' personal expenditures, and were paid by the Four Curragh Bars, EPA or related entities. FOF ¶¶47-53,65. During the Relevant Time $57,557.68 ($4,796.47 per month) in Debtor's personal expenditures charged to AMEX card X4005 were paid by the Four Curragh Bars, EPA or related entities. FOF ¶64-65.

Debtor also admits he is an authorized user of American Express Card Ending in x71002, and that he made personal expenditures using that card that were paid by the Four Curragh Bars, EPA or related entities. FOF ¶¶47,54-62. During the Relevant Time Debtor admits his personal expenditures of at least $12,069.24 ($1,005.77 per month) were made on AMEX card X71002 and paid for by the Four Curragh Bars, EPA or related entities on his behalf. Stip. 6. PNC contends Debtor's classification of certain charges made using AMEX card x71002 as "business" is not credible

and if gas, coffee, and food charges are added back as "personal" at least an additional $873.59 in monthly personal charges were paid on Debtor's behalf during the Relevant Time.   FOF ¶69.  Further, adding the amounts Debtor classified as "unknown" or that he left blank (rather than classifying as business) in the amount of $20,197.22 (see "Miscellany" in Stip 6, see also PNC Ex. 64, FOF¶68), and the $879.59 brings the total amount of personal expenses to $3,562.46 per month.

Without any evidence, Debtor claims all of the personal expenses paid by the Four Curragh Bars, EPA or related entities are loans.  FOF ¶31.  Debtor testified that personal expenditures paid on Debtor's behalf were reconciled using the Curragh Bars' BusinessWorks accounting software and those expenditures were booked as receivables due the Curragh entity making the payment from Debtor. FOF, ¶253,256. But, other than Debtor's self-serving testimony about how reconciliation in BusinessWorks should have occurred, Debtor presented neither documentary evidence from Business Works, nor witness testimony that any of Debtor's personal expenses paid by the Four Curragh Bars, EPA or related entities were actually booked as loans to Debtor.   Debtor testified that payments of his living expenses constitute *bona fide* loans to him by the Curragh Bars and related entities rather than income. FOF ¶31. But Debtor had five years to substantiate his *bona fide* loan contention with credible evidence and utterly failed to do so. The living expenses paid on Debtor's behalf are income, not loans, under applicable law. Courts have examined factors such as

> "(1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan," though such factors are non-exclusive and no single factor is dispositive.

*In re Killian*, 422 B.R. 903, 909 (Bankr. N.D. Ill. 2009); *In Carmel*, 134 B.R. 890, 897 (Bankr. N.D. Ill. 1991); see also *U.S. v. Simon*, 727 F.3d 682, 693 (7th Cir. 2013).

Here, Debtor failed to introduce any credible evidence of any of the factors that could allow this Court to conclude living expenses advanced on Debtor's behalf are *bona fide* loans. Debtor has no salary, at least $9 Million in

28

unsatisfied judgments and no ability to repay any of the purported loan. Debtor admits there are no notes, collateral, fixed payment schedules or maturity dates for any of the purported loans. FOF ¶242-247.  Sophia Leongas denies the payment for Debtor's living expenses are carried on Curragh books as loans and says she expects no repayment from Debtor. FOF ¶ 230-31. Debtor admits since 2009 he has not made any repayment of any purported loan. FOF ¶266. No evidence was introduced suggesting anyone ever demanded repayment from Debtor. And the arrangement, by Debtor's own admission, is that his living expenses are paid in exchange for his full-time management of and performance of essential services for the Four Curragh Bars. Indeed Debtor listed "Restaurant Manager" as his occupation on his 2013 tax return.  FOF ¶24. Debtor's arrangement with his sisters was continuous from at least 2011 until this bankruptcy was filed. His "receivable" due Curragh Bars would necessarily have to exceed $600,000 by the time Debtor filed his voluntary petition. Debtor introduced no credible accounting evidence of "receivables" anywhere close to this figure. FOF ¶257-265 (showing a total as of December 31, 2015 of $52,066.74.) These payments are simply nothing more than income disguised as loans for purpose of keeping that cash flow out of the hands of creditors and to avoid payment of income taxes

And the amounts are staggering. The First Mortgage, HELOC and Infiniti lease payments (FOF¶38,44,71) alone total $10,165.88 monthly, almost $122,000 total during the Relevant Time. The average monthly payment on AMEX Card x4005 during the Relevant Time adds another $4,796.47 to that figure. FOF ¶65 And Debtor's average admitted monthly personal charges on AMEX Card x71002 of at least $1,005.77 and more appropriately $3,562.46   (once obviously personal charges and the purchases he classified as unknown or left blank are added back in) adds further to the total ling expense payments made on Debtor's behalf. All told Debtor had $18,857.45 of monthly living expenses paid on his behalf during the Relevant Time. FOF ¶107-108.

Debtor's arrangement with his sisters attempted to disguise $18,857.45 in monthly income as "loans" and constitutes concealment sufficient to deny Debtor's discharge. *In re Mosher*, 417 B.R. at 782;  *In re King* , 272 B.R. 281, fn 4 (Bankr. N.D. OK. 2002); 26 U.S.C. §61(a)(1); 11  U.S.C. § 102(c)(1).  This arrangement constitutes concealment under

29

§727(a)(2)(A); *In re Mosher*, 417 B.R. at 782 ("Similarly, [debtor's] income from the Imron consulting project was concealed by having it deposited into the IST Account."); *In re Coady*, F.3d 1312, 1314-17 (11th Cir. 2009) (upholding denial of discharge where debtor was the sole person responsible for managing and operating business held in his wife's name and the business paid debtor's expenses rather than paying him a salary); *In re Ogalin*, 303 B.R. 552, 561-62 (Bankr.  Conn. 2004) ("the record at trial also revealed a different, independently-disqualifying, pattern of misconduct vis-a-vis creditors—an effort by [debtor] to hide his actual wage income from taxing authorities, and other creditors, by having a large portion of the value of such wages transferred to his benefit through the Corporation's unreported direct payment and/or reimbursement of his personal expenses.").

Similar to *Mosher, Coady,* and *Ogalin*, Debtor's efforts to hide his income by having living expenses of $18,857.45 per month in lieu of receiving a salary constitutes concealment and his discharge therefore should be denied.

### 2.      Debtor Concealed the Payments Made on his behalf By Failing to List the Payments on Schedule I or J or in his SOFA.

There is no dispute Debtor failed to list the payments made by the Four Curragh Bars, EPA, or related entities for the First Mortgage, HELOC, Debtor and his wife's American Express cards, and Debtor's car lease on Debtor's schedule I and J or in his SOFA.  FOF ¶90-98,102,103,105,106.  These payments are at least $18,857.45 per month.  The payments should have been scheduled as regular monthly contributions on Schedule I and as income on Debtor's SOFA. Debtor also should have scheduled the amounts as household expenses that were being paid on schedule J.  The failure to disclose these payments on his bankruptcy schedules constitutes a concealment of Debtor's income.  *In re Mosher*, 417 B.R. at 782; *In re Coady*, F.3d at 1314-17; *In re Ogalin*, 303 B.R. at 561-62.

### 3.      Debtor Concealed his Continued Equitable Interest in the Residence

Debtor failed to disclose his interest in his $1.8 million Residence which was transferred to a trust for the benefit of his three minor children two months before Debtor filed bankruptcy.

Debtor and his wife took title to the Residence in 2009. FOF¶152.  Facing foreclosure, in 2011, Debtor entered in

an agreement with a long time friend, Jody Libman.  FOF¶33,37.  Pursuant to the agreement, Libman would buy the Residence from Debtor and his wife through a short sale and Libman would allow Debtor to continue to live in the Residence rent free as long as Debtor paid all of the expenses for the Residence.  FOF¶33,37.  In compliance with this agreement Debtor caused the Four Curragh Bars or related entities to pay the First Mortgage and HELOC.  FOF ¶39,45Stip. 1,2.  As a result Debtor, his wife, and his three kids have resided continually at the Residence since 2009. FOF¶152.

On June 5, 2015, two months before filing this bankruptcy, despite that the fruits of Debtor's labor pay all of the expenses for the Residence, the Residence was transferred into a trust for which the beneficiary is EGIO, LLC which is owned by Debtor's children. FOF ¶33,37.  In spite of the fact that the trust, and ultimately, Debtor's children now held the interest to the Residence, nine months after Debtor filed this bankruptcy, the equity in the Residence was used to pay off Debtor's $536,648.13 HELOC. FOF¶149-150; PNC Ex. 38-2.

The transfer to the trust, rather than to Debtor, whose labor was paying for the Residence, and Debtor's failure to list the Residence, and the equity in the Residence which was used to repay his obligation on the HELOC nine months after filing bankruptcy, on his bankruptcy schedules constitutes concealment.  Debtor did not list the Residence on his schedules.  FOF¶151. At a minimum, given that he has resided in the Residence since 2009, it's a continuing concealment.  *In re Martin*, 698 F.2d 883, 885 (7th Cir. 1983) (upholding continuing concealment ruling where debtor transferred title to trust for which his parents were beneficiaries but continued to reside at the real estate and paid the mortgage payments for the real estate); *In re Matter of Kauffman*, 675 F.2d 127 (7th Cir. 1981); *In re Hayes*, 229 B.R. 253, 257 (1st Cir. 1999).

### 4.    Debtor Concealed Payments from EPA

Debtor did not disclose the payments from EPA to his wife on his Schedule I or J, or on his SOFA. FOF, ¶115,123,124.  Debtor's wife received $68,000 from EPA between January of 2014 and March of 2015 which amount excludes the $100,000 Debtor alleges was paid to his wife by mistake. FOF, ¶117,118,120. Debtor admits Sharise

performed no services for EPA and was not owed any money by it. FOF ¶134. Debtor offered no evidence explaining why Sharise received $68,000 from EPA or why those payments were not scheduled as income on his SOFA. Failure to disclose and schedule the $68,000 paid by EPA to Sharise, mostly on checks Debtor signed, constitutes concealment of income warranting denial of discharge. *In re Mosher*, 417 B.R. at 782; *In re Coady*, F.3d 131 at 1314-17..

Indeed from July of 2014 to July of 2015, Debtor's wife PRCB Account, excluding the claimed $100,000 mistake, shows deposits averaging $16,074.47 per month in contrast to her *gross* disclosed monthly salary of $6,250.01on schedule I.  PNC. Ex. 5; FOF ¶115. Debtor did not explain this discrepancy.

Additionally, while Debtor listed his wife's 2013 income as zero (FOF ¶124), Sharise' PRCB Account records show she received $21,100 in checks signed by Debtor from Debtor from an account owned by 635 Belden, LLC, $21,000 from EP Curragh, LLC, and $16,500 in cash deposits during this time.  FOF¶125-27.

## 5.   Debtor Concealed Additional Household Expenses

In addition to failing to disclose the $18,857.45 per month in expenses paid by the Four Curragh Bars in exchange for Debtor's work on his bankruptcy schedules, Debtor did not list additional household expenses on either of his schedule Js.  Debtor did not list approximately $4,553.52 per month in household expenses his wife paid during the Relevant Time from her PRCB Account.   These monthly household expenses consisted of:

e.   $2,310.82 for three of Debtor's wife's credit cards (Nordstrom, Macy's, and Chase) FOF ¶77.

f.   $728.52 for a U.S. Bank loan FOF ¶77.

g.   $1,080.70 to a dance studio entitled Studio 22 High Tek Dance Studio. FOF ¶77.

h.   $433.49 for Debtor's Park Ridge County Club membership.. FOF ¶77.

Debtor was aware of these household expenses, failed to schedule them, and did not explain this failure. FOF ¶78.

## IV.   Debtor's Discharge should be Denied Under §727(a)(4)(A)

## A.   Applicable Law

For a creditor to prevail under § 727(a)(4)(A), it must establish: (1) the debtor made a statement under oath, (2)

the statement was false, (3) the debtor knew the statement was false, (4) the debtor intended to defraud, and (5) the statement was material to the case. *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014). This includes omissions. *In re Abramovich*, 2017 WL 4776710 * 3 (Bankr. N.D. Ill. 2017). "A chapter 7 debtor has a continuous, affirmative duty to fully disclose assets and liabilities in his schedules." *Id.* Under §(a)(4) a showing of reckless indifference to the truth is sufficient to establish intent. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011) (upholding denial of discharge based upon debtor's failure to disclose previously transferred income and assets). As with (a)(2) violations, intent can be inferred from circumstantial evidence or by inferences base on an entire course of conduct. *In re Mosher*, 417 B.R. at 781. "A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Id.* The purpose of 727(a)(4) is enforce Debtor's obligations to make full and candid disclosure to those that have an interest in the administration of the bankruptcy estate. *In re Mosher*, 417 B.R. at 781.

## B. The Evidence Warrants Denial of Discharge under §727(a)(4)(A)

Debtor's failure to disclose: i) the $18,857.45 per month payments as income, contributions to household expenses, and the underlying monthly expenses that make up the $18,857.45 in payments, ii) the money his wife received from EPA, iii) Debtor's continuing interest in his Residence, and iv) the household expenses his wife paid from her PRCB Account, in his bankruptcy schedules constitute a false oath. *In re Mosher*, 417 B.R. at 781 ("filing of false schedules with material omissions or representations with an intent to mislead creditors as to the debtor's financial condition constitutes a false oath under 727(a)(4)); *In re O'Neil*, 245 B.R. 550, 554 (Bankr. N.D. Ill. 2000) (overstatement of rent by $400 (thereby reducing amount available to pay creditors by $400 per month sufficient to deny discharge pursuant to 727(a)(4)).

What is more, Debtor failed to amend these omissions after they were brought to light at the 341 meetings. This failure establishes intent. *In re Mathern*, 137 B.R. 311 (Bankr. Mn. 1992) ("Perhaps more strongly than anything, fraudulent intent is evidenced by their failure to amend their schedules to include the omitted assets after the

filing...Standing alone, this evidence would meet the intent element of § 727(a)(4)(A)"); *In re Cole*, 378 B.R. 215, 222

(N.D. Ill. 2007); *In re Reese*, 203 B.R. 425, 432 (Bankr. N.D. Ill. 1997).

As an additional false oath, statements in the affidavit Debtor filed in opposition to PNC's motion for summary

judgment were not true. Debtor filed an affidavit claiming his personal use of the American Express card x71002 from

2/19/15-8/21/15 totaled        $4,174.53.   FOF ¶273.   Later, after this Court directed Debtor to identify personal

charges for twelve months of American Express charged, Debtor identified total personal charges of $14,567.49 for the

same time period.   FOF¶273-74.

Debtor also provided a false affidavit during the bankruptcy proceedings with respect to document production.

Debtor filed an affidavit stating his document production was complete but then later, produced 1,311pages of emails

after court orders directing him to do so.   FOF153-158.

## V.      Debtor's Discharge should be Denied Under §727(a)(3)

### A.      Applicable Law

"Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide

creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with

substantial completeness and accuracy for a reasonable period past to present." *In re Self*, 325 B.R. at 240 (production

of only a few "select" bank statements supported denial of discharge); see also *Union Planters Bank N.A. v. Connors*, 283

F.3d 896 (7th Cir. 2002); *In re Manasse*, 125 F.2d 647, 648 (7th Cir. 1942). "Among the factors that a court should

consider in making [the decision of whether Debtor's records are adequate] are the size, complexity, and nature of the

debtor's business; the debtor's education and sophistication; his business experience; and his "personal financial

structure." *In re Drabik*, 581 B.R. 554, 561 (Bankr. N.D. Ill. 2018).  Sophisticated debtors are held to a higher standard of

record keeping.  *Union Planters Bank N.A. v. Connors*, 283 F.3d at 899-900.  Intent to defraud is not an element.  *In re*

*Drabik*, 581 B.R, at 561.  The trustee is not required to issue 2004 subpoenas and go after information to reconstruct

Debtor's financial situation; "it is the Debtor's duty to preserve financial information and provide it to the trustee." *In re*

*Drabik,* 581 B.R. at 561.

###   B.   The Evidence Warrants Denial of Discharge Under § 727(a)(3)

The bank records of the Four Curragh Bars, related entities, EPA and Debtor's wife are not sufficient to 'provide creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness.' As set forth above, Debtor failed to disclose the $18,857.45 per month in payments the Curragh Bars pay for Debtor's expenses. In addition to not disclosing the monthly payments in his schedules, Debtor did not provide adequate records showing, or related to his financial condition, including records related to these payments. PNC did not discover evidence of these payments by the Four Curragh Bars and the payments from his wife's PRCB Account until it obtained documents from third party financial institutions in response to its 2004 subpoenas in the underlying bankruptcy and then reviewed thousands of pages of bank records.

Not only did Debtor fail to produce these records that would allow PNC to piece together his financial picture, he resisted PNC's efforts to obtain them. In response to PNC's 2004 subpoenas that eventually allowed PNC to piece together the $18,857.45 per month that the Four Curragh Bars pay for Debtor's living expenses, i) Debtor filed an objection) and ii) Debtor's wife and the Curragh Bars filed a motion to quash. FOF ¶154. The Court denied the motion to quash and overruled the objection (FOF ¶154)and PNC eventually received bank records relating to Debtor's wife, The Four Curragh Bars, EPA and American Express from PRCB, Belmont Bank, Bridgeview Bank and American Express. From these PNC, after sifting through thousands of pages, was able to patch together Debtor's financial picture, and discovered the payments by the Four Curragh Bars, related entities and EPA on Debtor's behalf. FOF, ¶¶38,44,47,74,137-143.

Debtor's efforts to prevent PNC and this Court from discovering the $18,857.45 per month in payments (as well as the $4,553.53 in household expenses paid by Debtor's wife and the money Debtor's wife received from EPA) ultimately disclosed by the Bridgeview, Belmont Bank, American Express, and PRBC account records, alone, is grounds to deny discharge. *In re Craig*, 252 B.R. 822, 826 (Bankr. S.D FL 2000) (granting summary judgment where debtor

failed to produce records in response to discovery.)

Moreover, the only records related to the $18,857.45 monthly payments by the Four Curragh Bars and Debtor's wife's expenses, that PNC is aware of are the bank accounts records for the Four Curragh Bars, EPA and Debtor's wife. FOF, ¶¶38,44,47,74,137-143.  These records, putting aside the fact that PNC had to issue subpoenas to third parties to obtain them and Debtor fought that subpoenas, are not adequate to meet Debtor's duty to produce documents that provide "enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank N.A. v. Connors*, 283 F.3d at 896 (stating "neither the court nor a creditor is required to reconstruct a debtor's financial situation by sifting through a morass of checks and bank statements.").  As demonstrated by the bank records introduced into evidence at trial and by stipulation (FOF, ¶¶38,44,47,74, 137-143)PNC (and now this Court) have had to 'sift through a morass of checks and bank statements' for multiple entities affiliated with the Four Curragh Bars, Debtor's wife, as well as credit card statements to arrive at the $18,857.45 per month that is paid for Debtor's household living expenses in exchange for Debtor's performance of full-time essential services for Curragh Bars.

Debtor's finances are clearly entangled with the Four Curragh Bars but Debtor failed to present records sufficient to ascertain his financial status. Debtor claims all personal expenditures were timely reconciled in BusinessWorks as "loans" to Debtor, and added to the "receivable" due Curragh Bars but since filing this bankruptcy five years ago, Debtor has failed to produce any documents supporting that claim. FOF, ¶¶253,255.

Debtor's admitted failure to segregate his personal and business expenses in the Four Curragh Bar's bank account statements and two American Express cards, alone, is grounds for denial of discharge.  *In re Sgambati*, 584 B.R. 865, 880 (Bankr. N.D. Ill. 2018) (denying discharge and stating "Although Mr. Sgambati used "whichever card was on top" when making credit card purchases, for purposes of his schedules the debtor should have broken down his credit card debt between business and personal amounts. He failed to do so for his initial filing, and failed to make those distinctions in any of his three amendments. He offered no reason why that clarity was not provided"); *In re Bub*, 502

36

B.R. 345 359 (E.D. N.Y. 2013) (discharge denied based upon debtor's failure to disclose personal expenses charged to business credit card and paid for by business).

Additionally, during the Relevant Time, Debtor received at least $28,700 in cash from the Curragh Bars and failed to disclose these amounts on his bankruptcy schedules (FOF¶113) and has not produced any records tracking the use or whereabouts of this cash. FOF 113-14.

### VI.   Debtor's Purported Defenses Have No Merit

Debtor failed to meet his burden as to all three defenses he raised, those being: that the payments are for the benefit of his wife and kids rather than himself, Debtor relied on advice of counsel, and the payments are loans.  Once Plaintiff establishes the elements to deny discharge the burden shifts to debtor to make a credible explanation of his conduct.  *In re Stamat*, 395 B.R. at 69.  Courts are reluctant to accept a Debtor's self-serving statement of intent as the best evidence of that intent.  *In re Hansen*, 325 B.R. 746, 760 (Bankr. N.D. Ill. 2005) (denying discharge despite advice of counsel defense).

Discharge should be denied where a debtor's denial of intent to hinder, delay, and defraud is implausible, *In re Chavin*, 150 F.3d at 726 (summary judgment denying discharge affirmed where debtor failed to list his ownership in corporation and $1.6 million in income); *In re Boba*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002), or where a Debtor displays a reckless disregard for the truth.  *In Abramovich*, 2017 WL 4776710 (Bankr. N.D. Ill. 2017), or where badges of fraud lead to only one possible inference.  *In re Holstein*, 299 B.R. at, 230 (granting summary judgment where debtor transferred property to insider for inadequate consideration at a time he was facing judgments, but retained control of the property).

### A.   The $18,857.45 Monthly Payments of Debtor's Expenses Benefited Debtor.

Debtor's assertion that the approximate $18,857.45 per month in  payments made by the Four Curragh Bars were for the benefit of only Debtor's wife and kids, and, as such, he was not required to disclose the expenses on his bankruptcy schedules, has no merit.

Debtor asserts the payments are not for his benefit (FOF¶189 (Benjamin stating that Debtor did not have any actual expenses), but, confusingly also contends that the payments were booked as a loan to him.  FOF¶ 229.  Therefore this testimony is contradictory and not credible.  FOF ¶229.  There is no explanation as to why the payments would be a loan to Debtor if they're not for his benefit.

Regardless, the evidence makes clear the $18,857.45 monthly payments were for Debtor's benefit.  First, as set forth above the approximate $16,695.72 were made in exchange for Debtor's forty plus hours per week managing and providing essential services to the Four Curragh Bars. FOF ¶241. Second, each payment clearly benefited Debtor. Debtor's household in 2015 consisted of Debtor, his wife, and their three minor children. FOF ¶148. While Debtor's Residence was supposedly transferred to a trust for which an LLC owned by his minor children was the beneficiary two months before Debtor filed bankruptcy, Debtor was obligated to pay all expenses (mortgages, taxes, utilities, upkeep) for the Residence.   FOF ¶37.   Third,   Debtor is a borrower on the HELOC, and therefore obligated to pay the HELOC. FOF ¶41. Debtor did not provide any evidence that the HELOC was anything other than a personal loan to Debtor and his wife who are the borrowers.   Fourth, Debtor and his wife used the two American Express cards for personal purchases, and Debtor's name was on the accounts.   FOF ¶ 51,52,58,66. Indeed, the American Express bills were addressed to Debtor.  FOF ¶47-52,54-58.  Additionally Debtor exclusively drove the 2015 Infiniti paid for by the Four Curragh Bars.  FOF ¶71.  Consequently, the $18,857.45 in monthly expenses was paid for Debtor's benefit.

> **B.      Debtor Cannot Invoke the Advice of Counsel Defense and the Defense is Not Supported by any Credible Evidence**

As a preliminary note, Debtor forfeited his advice of counsel affirmative defense by failing to raise it until three years after filing his answer and affirmative defenses (av. doc. 36).   *In re Line Capital, Inc.*, 312 B.R. 368, 378 (Bankr. N.D. Ill. 2004).

Even if not waived the defense is baseless. A debtor, not his or her attorney, is responsible for the contents of the debtor's bankruptcy schedules which are sworn under oath. *In re Hansen*, 325 B.R. at 760 fn 10 (denying discharge

despite advice of counsel defense).  As stated by the Seventh Circuit:

> People who sign insurance applications omitting vital information often blame the insurance agent; people who sign contracts containing clauses that in retrospect prove disadvantageous often say that they didn't read the fine print; people who sign tax returns omitting income or overstating deductions often blame their accountant or tax preparer. But these arguments never go anywhere. People are free to sign legal documents without reading them, but the documents are binding whether read or not.

*Novitsky v. Am. Consulting Eng'rs, LLC*, 196 F.3d 699, 702 (7th Cir.1999).  To that end Debtor cannot invoke the advice of counsel defense where the alleged advice clearly contradicts what is called for by the bankruptcy forms.  *In re Brahos*, 589 B.R. 381, 398 (Bankr. N.D. Ill. 2018) (rejecting advice of counsel defense and holding questions No. 8 and 13 of the SOFA clearly called for disclosure of the assignment and the advice not to disclose it was therefore clearly wrong).  Advice of counsel does not relieve a debtor of consequences of their acts.  Rather, "[t]he remedy for bad legal advice lies in malpractice litigation against the offending lawyer." *Cannon-Stokes v. Potter*, 453 F.3d 446, 448-49 (7th Cir. 2006) ("a debtor in bankruptcy is bound by her own representations, no matter why they were made, at least until the debtor moves to amend the disclosures and pay the creditors their due"); *See also In re Stone*, 504 B.R. 908, 914 (C.D. Ill. 2014).

Courts that have entertained the advice of counsel defense have held that it does not *per se* defeat intent; rather it merely "may tend to negate an inference of intent."  *In re Brahos*, 589 B.R. 381, 398 (Bankr. N.D. Ill. 2018) (stating that the 7th Circuit's endorsement for the first time of the advice of counsel defense was "lukewarm at best.") citing to *In re Kempff*, 847 F.3d 444 (7th Cir. 2017).  Cases that have considered an advice of counsel defense have held that in order to invoke the defense, the debtor must fully disclose all information to his attorney, *In re Rosenzweig*, 237 B.R. 453, 458 (Bankr. N.D. Ill. 1999), and the reliance must be reasonable. *In re Baker*, 205 B.R. 125, 132 (Bankr. N.D. Ill. 1997).

### 1.    Debtor Did Not Disclose All of His Income, Assets, and Expenses to Benjamin

First, Debtor did not disclose all of his income, assets, and expenses to Benjamin, and therefore he cannot invoke the advice of counsel defense.  *In re Rosenzweig*, 237 B.R. at 458.  Benjamin testified that Debtor did not tell him about the approximate $2,000 per month Debtor's wife spends on her own credit cards or the $1,200 per month his wife spends on dance lessons for their daughter at Hi-Tec. FOF ¶185.  Benjamin also testified that he does not believe Debtor

gave him the PRCB Account documents, told him about the $728.52 monthly U.S. Bank loan expense, or Debtor's Park Ridge Country Club membership. FOF ¶186. Additionally, Debtor did not give Benjamin any documents showing the loan balances of the alleged loans from the Four Curragh Bars. FOF ¶188.

What is more, Debtor did not introduce any evidence (other than his and Benjamin's oral testimony) to support the claim that he disclosed all of his assets, income, and expenses to Benjamin, and the only admitted documentary evidence supports the conclusion he did not. Debtor did not offer any testimony from his wife (who he said handles the finances in his household FOF ¶275), his sisters, or his accountant (he relies on his accountant FOF ¶176) in support of his claim that he made a full disclosure to Benjamin. Further, Debtor also did not introduce any documentary evidence such as emails, text messages, letters, or other documents to support his claim that 'told Benjamin everything.'

Of greater significance, the only admitted documents severely discredit Debtor's claim that he provided Benjamin with all information concerning his finances. Benjamin's intake form that Debtor completed does not disclose any payments from the Four Curragh Bars, let alone $18,857.45 per month. FOF ¶177. In his answer to the Questionnaire, Debtor did not list any employment, spouse employment, business income, contributions to household expenses, residences, expected tax refunds, or credit cards. FOF ¶177. Debtor testified he completed the form to the best of his ability. FOF ¶172. Further, in an email dated September 20, 2015 at 4:04 P.M., the same night Benjamin filed Debtor's schedules A-H and SOFA, and the night before he filed schedules I and J –which was over a month after Debtor filed this bankruptcy - Benjamin admonished Debtor that he was still missing a substantial amount of information. FOF ¶179-182. Specifically, in the September 20, 2015 email Benjamin stated in relevant part:

> You list Jody as someone we have a lease with though you told me in August to remove him from notices so what is the lease terms, dates.
>
> The HELOC is listed as 2013 debt but you supposedly did not own any real estate in 2013. – Jody did.
>
> BUDGET:
>
> We have Sharise income for the budget but no expenses. What is the elect bill, gas, utilities, insurance, the

household expenses you listed zero for everything, how can that be

What is the number for the mortgage or rent payment? You say you live for free? How is that – if you rent to who?  If mortgage payment Shari is making how is that number paid with you making zero, as I am sure its more than her check.

The Questions in the questionnaire I sent in August and resent several times that you did not answer prevents us from preparing proper schedules….I would like to file tonight but the business questions were answered half ass and the rest of the questionnaire you just finished the other day is finished with answers that leave more questions than answers

I am not filling it out for you and filing it – you will be signing under penalty of perjury.  Get me answers…

FOF ¶182. At trial, Benjamin admitted he was frustrated with Debtor at this point.  FOF ¶181.  Debtor and Benjamin did not provide any evidence that Debtor provided the information after this September 20, 2015 4:04 P.M. email before his schedules were filed later that night and the following day

### 2.    Debtor's Reliance On Any Advice to Not Disclose The Payments was Unreasonable

Second, Debtor's alleged reliance on Benjamin's advice to disclose the payments as income and to not list his actual household expenses was not reasonable.  *In re Baker*, 205 B.R. at 132 (debtor's failure to list fish tanks, of which he was clearly aware, as assets based on attorney's advice, was not reasonable). *In re Matter of Thompson*, 11-11192, 2017 WL 3575850*4-5 (Bankr. N.D. Ga. 2017) (alleged advice of counsel not to disclose substantial amount of income in the form of debtors' business paying for debtor's personal expenses was "patently unreasonable").

Debtor cannot reasonably rely on any advice that he was not required to disclose the $18,857.45 per month paid on Debtor's behalf by the Four Curragh Bars because both the intake forms Benjamin gave to Debtor and the bankruptcy schedules Debtor signed make clear he was required to disclose this information.  The forms Debtor received from Benjamin are clear that Debtor was required to disclose his household income and actual household expenses.  FOF ¶196 (Debtor must provide "A detailed list of the debtor's monthly living expenses, i.e. food, clothing, shelter, utilities, taxes, transportation, medicine, etc." The intake form further states that the non-filing spouse must provide this same information and that the purpose of the information is so that "the trustee, the court, and creditors

can evaluate the household's financial position."); FOF ¶197 (debtors must provide a schedule of their current income and defines 'current monthly income' as "including regular contributions to household expenses from non-debtors."); FOF ¶198 (disclosure of "regular monthly expenses" and states "The regular expenses should be as close as possible and should be based on a reasonably inquiry which you are required to undertake.") FOF ¶199, FOF ¶200. Debtor admitted he received these forms. FOF ¶164,168,170,172.

Further, Schedules I and J make clear Debtor was required to disclose his household income and actual expenses. Debtor admitted he reviewed his bankruptcy schedules before filing. FOF¶221. Schedule I is clear that it requires Debtor to state his employer and the salary he receives from that employer. PNC Ex. 5. If that wasn't clear enough, schedule I also includes paragraph 11 for contributions to household expense. Id. Despite this clear language, Debtor did not list any of the $18,857.45 monthly payments made by the Four Curragh Bars as income or contributions to household expenses, and he only listed $2,517.57 per month in contributions to expenses. FOF ¶209-210. Remarkably, Debtor testified he was aware he was supposed to disclose all regular contributions to household expenses, he reviewed his schedules, did not know how Benjamin arrived at the $2,517.57 number, but did not ask Benjamin about the number. FOF ¶111,220.222

Schedule J is likewise equally clear. Nothing in schedule J purports to allow the use of standard IRS expenses rather than actual expenses. It states: "Estimate Your Ongoing Monthly Expenses. Estimate your expenses as of your bankruptcy filing date…" Trial Ex. 5. Further, paragraphs 4-6 calls for all expenses related to "your residence." Id. FOF¶201.

Additionally, the SOFA, on its page 8 makes clear that it requires disclosure of gross income from employment, trade, or profession, or from the operation of the debtor's business, including part-time activities either as an employee or independent trade or business. PNC. Ex. 4 p. 18.

Debtor is a sophisticated businessman. Benjamin in fact stated that Debtor is a sophisticated business man. FOF ¶223. He possesses a college degree from Michigan State in hotel/restaurant management. FOF ¶3. He claims to have

42

been in the restaurant business all of his life with his family.  FOF¶4. He spends at least forty hours a week working for the Curragh Bars FOF ¶21-25 and he is also a real estate developer FOF¶24 who resides in a house that appraised for $1.8 million a few months after Debtor filed this bankruptcy. FOF ¶149.

What is more, during the time of his alleged financial hardship, Debtor was represented by, or consulted with three attorneys at least one accountant who prepared his annual taxes.  FOF¶176,226-28.  Further, in addition to his own bankruptcy, Debtor has participated in at least four bankruptcies on behalf of LLCs in which he managed or had an interest.  FOF¶224.  As such his reliance on Benjamin's supposed advice was not reasonable.

### 3.    Benjamin's and Debtor's Testimony Regarding Benjamin's Supposed Advice is Not Credible

Benjamin and Debtor are "lifelong" friends. FOF ¶161.  Benjamin admitted that a lot of planning went into Debtor's bankruptcy.  FOF ¶276. Their status as lifelong friends who put a substantial amount of planning into Debtor's bankruptcy discredits their entire testimony.

More to the point, Debtor and Benjamin did not provide any evidence, other their own testimony, that Benjamin advised Debtor to use the standard IRS expenses and not to disclose his income.  Debtor and Benjamin did not introduce any emails, letters, text messages, memorandums, time slips or file notes from Benjamin's office to support the allegation that Benjamin gave this advice.  Additionally, no one else from Benjamin's office testified that this advice was given.

What is more, the only written admitted evidence on the subject matter severely discredits their testimony. Debtor filed this bankruptcy on August 15, 2015 but did not file his schedules at that time.  PNC Ex. 4,5.  On September 20, 2015, the night Benjamin filed schedules A-H and the SOFA, and the night before Benjamin filed schedules I and J, Debtor had not provided a substantial amount of information about his income and expenses to Benjamin.  FOF ¶179-182.

Further puncturing the defense, Benjamin's intake forms emphasize compete disclosure of household income and contributions to household expenses, as well as disclosure of actual household expenses.  FOF ¶196 (Debtor must

provide "A detailed list of the debtor's monthly living expenses, i.e. food, clothing, shelter, utilities, taxes, transportation, medicine, etc." The intake form further states that the non-filing spouse must provide this same information and that the purpose of the information is so that "the trustee, the court, and creditors can evaluate the household's financial position."); FOF ¶197 (debtors must provide a schedule of their current income and defines 'current monthly income' as "including regular contributions to household expenses from non-debtors."); FOF ¶198 (disclosure of "regular monthly expenses" and states "The regular expenses should be as close as possible and should be based on a reasonably inquiry which you are required to undertake.") FOF ¶199, FOF ¶200. Benjamin did not provide a plausible reason as to why he would ask for actual expenses (and sternly admonish Debtor the night he filed some of Debtor's schedules for failing to give him actual expenses FOF ¶179-182) and then use the IRS standard expenses.

Further, Benjamin, who has been practicing bankruptcy law for thirty years (FOF¶160), did not cite to any specific authorities that would allow the use of standard IRS expenses on a chapter 7 schedule J, or identify any specific cases where he has done so in the past. Indeed, such use is not permitted. *In re Johnson*, 400 B.R. 639, 651 (Bankr. N.D. Ill. 2009) ("Schedule J requires a statement of the debtor's actual expenses, rather than the allowances specified in § 707(b)(2)"). Additionally, the committee notes state "Revised Schedules I and J seek to obtain a full picture of the debtor's economic situation—to the extent that debtor receives income or has expenses." See also the Instructions for form J which provide "Schedule J: Your Expenses (Official Form 106J) provides an estimate of the monthly expenses, as of the date you file for bankruptcy, for you, your dependents, and the other people in your household whose income is included on Schedule I: Your Income(Official Form 106I)." There is nothing that allows the use of standard IRS expenses. Rather, IRS expenses are relevant when analyzing the means test. *In re Foster*, 05-B-50448, 2006 WL 2621080 fn 2 (Bankr. N.D. IN. 2006) ("The deductions listed on Form B22C are allowed by reference to I.R.S. national and local standards; the expenses on Schedule J are a calculation of the expenditures actually made by the debtors."). Debtor also did not introduce any evidence to show the numbers listed on his second schedule J are in fact the IRS standards from 2015.

The number of non-disclosures and the amount of money are too large to find Debtor and Benjamin's

44

unsupported testimony credible. *In re Rosenzweig*, 237 B.R. at 458 (involving debtor who was experienced

businessman and denying advice of counsel defense); *In re Bostrom*, 286 B.R. 352, 636 (Bankr. N.D. Ill. 2002)

(omissions were too numerous and large to invoke advice of counsel defense and describing debtors as "experienced

and articulate business people").

> **4. Debtor Failed to Establish that the $18,857.45 Per Month in Payments by the Four Curragh Bars and Money from EPA Are Loans.**

Debtor did not meet his burden to 'explain his actions' and establish that the Payments from the Four Curragh

Bars and EPA are loans. To determine whether a transaction is income disguised as a loan:

> Courts have examined factors such as "(1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan," though such factors are non-exclusive and no single factor is dispositive.

*In re Killian*, 422 B.R. at 909; *In Carmel*, 134 B.R. at 897; see also *U.S. v. Simon*, 727 F.3d at 693. Loans from an employer

to an employee, especially, in a closed corporation, are inherently suspicious. *In re Killian*, 422 B.R. at 910. One of the

primary facts the courts consider in determining the validity of a purported loan is whether, when the funds were

advanced, the parties intended repayment. *Id*. The repayment must be unconditional and not contingent upon a future

event. *Id*; *Simon*, 727 F.3d at 693.

First, as set forth in section ___, the payments by the Four Curragh Bars are income because Debtor provides

services to the Four Curragh Bars which in exchange pay his bills. Additionally, Debtor's testimony demonstrates the

payments are not loans. Debtor testified there is no written note, no interest, no repayment schedule, no collateral, and

that he had never made a repayment. FOF ¶241,266. Further reinforcing the fact that the payments are income,

Sophia Leongas, during her citation exam previously testified that she did not book the payments as loans, and that she

did not expect repayment. FOF ¶230-31.

Moreover, Debtor did not provide any evidence, other than his own self-serving testimony, that the payments

are loans. Debtor did not have his sisters (Sophia and Lydia), wife, accountant, or the bookkeeper at the Four Curragh Bars Shelley Dulmage testify. None of Debtor's proffered exhibits document the hundreds of thousands of dollars paid for Debtor's obligations on Debtor's behalf being booked as "loans" or treated as such. No witnesses corroborated Debtor's self-serving testimony that such payments on his behalf were booked and treated as loans.

Instead of producing documentation showing all of the payments being booked as loans, Debtor produced alleged year end summaries which purport to show the balances Debtor owes under a notation of 'accounts receivable P. Leongas'. FOF  ¶257-265. These statements are conclusory in that they don't show the individual payments that led to the computed totals.  More importantly,  the total amounts in those summaries are nowhere near what they should be based upon Debtor's claim that the bars have paid his expenses since 2009 and that he has not made any repayments. FOF ¶265-69.

Further, Debtor did not produce any records for EPA despite claiming that the payments to Debtor's wife from EPA were loans.  FOF ¶135. Debtor testified that EPA paid the American Express card x71002 because the charges were related to construction.  FOF.  142.  But, Debtor made personal charges that were paid by EPA.  FOF ¶58-60.  Moreover EPA paid card x4005 which used primarily for Debtor and his wife's household purchases.  FOF ¶140.

 Additionally, Debtor's sworn statement that the balances for the alleged loans are "unknown" further leads to the conclusion that the assertion that the payments by the Four Curragh Bars are loans was a *post hac* attempt to allow Debtor to file bankruptcy and hide the income he received from the Four Curragh Bars.  Debtor testified that BusinessWorks was used to track of all of the payments that were made by the Four Curragh Bars for his personal expenses and that he could obtain the loan balance from the software FOF ¶252-56.  Debtor listed some of the Four Curragh Bars and related entities as creditors but he did not list all of the entities that paid his expenses.  FOF ¶277. For the entities Debtor disclosed on schedule F, however, he listed the loan balance as "unknown." FOF ¶278.  Indeed Benjamin testified that Debtor did not give him the balances. FOF ¶188.  The only reasonable conclusion for why the loan balance would be "unknown" is that Debtor fabricated the claim about the payments from the Four Curragh Bars

46

being loans.  At a minimum the failure to list the loan balances and to disclose all of the entities who paid expenses is grounds for denial of discharge.  *In re Rosenzweig*, 239 B.R. at 910 (discharge denied where debtor failed to schedule $25,000 loan); *In re Cohen*, 561 B.R. 476, 496 (Bankr. N.D. Ill. 2016) (discharge denied where debtor failed to list family members who were creditors).

Debtor's testimony is further defeated by the fact that his sister and wife received W-2 salaries and that neither of his sisters had loans with the Four Curragh Bars.  Debtor asserted at trial that the Four Curragh Bars have 'always done it (paid his expenses rather than pay his a salary) this way' and the bars cannot afford to pay him a W-2 is easily.  FOF ¶233.  Despite the claim that 'we've always done it this way,' and that the bars cannot afford to pay him a w2 salary, Debtor's sister Sophia Leongas and his wife Sharise both received salaries, and Sophia and Lydia do not receive loans from the Four Curragh Bars.  FOF ¶236-38. And the fact remains the Curragh Bars and related entities paid more than $200,000 on Debtor's behalf During the Relevant Time, so of course they could afford to pat Debtor a salary. FOF ¶108.  The only reason to structure Debtor's compensation the way it is structured is to avoid creditors and taxation.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant Debtor Paul Leongas as to all counts of its complaint and grant such other relief to which Plaintiff is entitled.

Respectfully submitted,

PNC Bank, National Association
By:    s/ Matthew L. Hendricksen

John F. Sullivan.
Matthew L. Hendricksen
Plunkett Cooney, P.C.
221 N. LaSalle Street, Suite 1550
Chicago, IL 60601
Telephone: (312) 670-6900
mhendricksen@plunkettcooney.com

Open.26645.73625.24312994-1