**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 15 B 27967 |
| | ) | |
| PAUL L. LEONGAS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| _____ | ) | |
| | ) | |
| PNC BANK, N.A., | ) | Adversary No. 16 A 00489 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL L. LEONGAS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on the four-count adversary complaint filed by PNC Bank,

N.A. ("PNC") against Paul L. Leongas (the "Debtor"), seeking denial of the Debtor's discharge

under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(6).[1] Based on the evidence and testimony

presented at a two-day trial held in March 2020 and a review of all relevant documents, exhibits,

arguments, and case law, and for the reasons set forth below, the Court finds in favor of PNC and

against the Debtor on Counts I, II, and III of the complaint.[2] As such, the Debtor's discharge will

be denied.

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

[2] In Count IV of the complaint, PNC objects to the Debtor's discharge pursuant to § 727(a)(6)(A). However,
in the Joint Pretrial Statement filed on February 24, 2020 (Adv. No. 16 A 00489, Dkt. 267) and in PNC's Proposed
Findings of Fact and Conclusions of Law filed on June 5, 2020 (*id.*, Dkt. 304), PNC altogether failed to address
§ 727(a)(6)(A). As a result, the Court dismisses Count IV for lack of prosecution. The Court also notes that PNC did
not mention § 727(a)(2)(B) or § 727(a)(4)(D) in its Proposed Findings of Fact and Conclusions of Law. Nevertheless,

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## BACKGROUND

The Debtor is a well-educated businessman who has worked as both a real estate developer and a restaurant manager. (Tr. No. 1 at 47:17–18, 88:5–22.[3]) He obtained a college degree in restaurant and hotel management and has worked in the restaurant industry for most of his life. (Dkt. 267 at 7 ¶ 3 & 4;[4] Tr. No. 1 at 29:23–30:5.) During the relevant time period,[5] the Debtor and his sisters managed four Irish-themed restaurants and bars (the "Pubs"). (Dkt. 267 at 10–11 ¶¶ 38–40; Dkt. 304 at 3 ¶¶ 24–26; Tr. No. 1 at 50:6–11, 88:5–22; Tr. No. 2 at 72:24–73:2.) Located in Holland, Michigan and Edison Park, Skokie, and Glenview, Illinois, the Pubs were owned by the Debtor and his family members, through various entities. (Dkt. 267 at 8 ¶¶ 7–20; Tr. No. 1 at 30:16–36:11, 38:15–20.)

- The Holland Pub and the Edison Park Pub were owned and operated by an LLC of which the Debtor and his sister Sophia Leongas ("Sophia") were the members. (Dkt. 267 at 8 ¶¶ 8 & 9; Tr. No. 1 at 31:5–16.)

- The property on which the Holland Pub operated was owned, in turn, by an LLC of which both the Debtor and Sophia were the members. (Dkt. 267 at 8–9 ¶¶ 17 & 18; Tr. No. 1 at

---

because those provisions were addressed in the Joint Pretrial Statement, they will be considered in this Memorandum Opinion.

[3] Transcript references are to the transcripts of the adversary proceedings of March 4, 2020 ("Tr. No. 1") and March 5, 2020 ("Tr. No. 2"), which can be found at Dockets 299 and 300, respectively, in Adv. No. 16 A 00489.

[4] Unless otherwise noted, all docket references are to Adv. No. 16 A 00489. Docket 267 is the parties' Joint Pretrial Statement. It consists of several parts, each of which is separately numbered. For ease of reference, the page numbers referred to therein are the relevant pages of the entire docket entry, which consists of fifty-nine pages.

[5] As discussed below, the relevant time period for purposes of this Memorandum Opinion is August 16, 2014 to August 16, 2015, the year before the Debtor filed his chapter 7 bankruptcy petition. (*See* Dkt. 304 at 1 ¶ 7.)

31:17–25.) The property on which the Edison Park Pub operated was owned by an LLC of which Sophia was the sole member. (Dkt. 267 at 8 ¶¶ 15 & 16; Tr. No. 1 at 33:7–16.)

- The Skokie Pub was owned and operated by an LLC of which three members each had a one-third interest: (1) an entity related to Glenn Udell, the Debtor's friend and attorney; (2) the Estate of Sheldon Kaufmann; and (3) EGIO Consulting LLC ("EGIO"), of which the only member is a trust whose sole beneficiaries are the Debtor's three children. (Tr. No. 1 at 34:20–35:22.) The property on which the Skokie Pub operated was owned by an LLC with the same three members.[6] (Dkt. 267 at 9 ¶¶ 19 & 20; Tr. No. 1 at 37:16–38:9.)

- Finally, the Glenview Pub was owned and operated by an LLC of which the Debtor's sister Lydia Leongas was the sole member. (Dkt. 267 at 8 ¶¶ 11 & 12; Tr. No. 1 at 38:15–20.) The property on which that pub operated was leased. (Tr. No. 1 at 38:21–23.)

For purposes of this Memorandum Opinion, all of the various business entities described above will be referred to as the "family businesses."

PNC holds two state-court judgments against the Debtor, entered on July 25, 2013 and October 31, 2014, totaling $9,403,155.49. (Dkt. 36 at 3–4 ¶ 9; Dkt. 175-53;[7] Dkt. 267 at 7 ¶ 1.) The judgments arose from two loans made by PNC's predecessor, National City Bank, N.A., to PLL, LLC ("PLL") and 9362 Joint Venture, LLC ("9362 Joint Venture"), two limited liability companies of which the Debtor was a member. (Dkt. 36 at 3 ¶ 7; Dkt. 267 at 25 ¶¶ 199 & 200.) The Debtor was the guarantor on both of those loans. (Dkt. 36 at 3 ¶ 8; Dkt. 267 at 25 ¶ 199.) The loan to PLL was made so that it could purchase and improve the property on which the Edison Park Pub operated. (Dkt. 175-3 at 18:1–24; Dkt. 267 at 16–17 ¶ 104.) The loan to 9362 Joint Venture was made for the purpose of land development. (Dkt. 175-3 at 19:10–18.)

---

[6] Until January 2014, the Debtor owned a one-third membership interest in both the LLC that owned the Skokie Pub and the LLC that owned the property on which that pub was located. (Dkt. 304 at 2 ¶ 13; Tr. No. 2 at 68:9–69:18.) On January 21, 2014, the Debtor transferred his one-third interests in both LLCs to EGIO. (Dkt. 304 at 2 ¶ 14; Tr. No. 2 at 15:11–19, 16:24–17:3, 68:9–69:18.)

[7] On November 13, 2018, PNC filed a motion for summary judgment in this adversary proceeding (Dkt. 166), which was subsequently fully briefed by the parties. Thereafter, the Court denied the motion, finding that there were certain issues of fact requiring a trial. The Court indicated, however, that the motion and related materials would be considered at trial as evidence in support of the parties' positions. As such, this Memorandum Opinion will contain citations to pleadings and other documents filed in connection with the motion for summary judgment.

On July 1, 2009, after the loans had been called, PNC began foreclosure proceedings against the Edison Park property. (Dkt. 267 at 16–17 ¶ 104.)  In April 2013, PNC served a citation to discover assets on the Debtor in connection with his obligations on the loans. (Dkt. 1 at 2 ¶ 10; Dkt. 267 at 9 ¶ 24.) Thus began a flurry of discovery litigation between the parties that spanned a period of years. At one point during that time, the Debtor responded to the citation, indicating that he did not have any income or assets; in his response, he did not list any support payments or loans from family members.[8] (Dkt. 1 at 2 ¶ 12 & Ex. A; Dkt. 175-1; Dkt. 267 at 9 ¶¶ 25 & 27.) The citation remained pending on August 16, 2015, the date on which the Debtor filed his voluntary petition for relief under chapter 7. (Dkt. 1 at 3 ¶ 17.)

**The Debtor's Compensation**

Although the Debtor had consulted for and/or managed the four Pubs on a full-time basis since at least 2009, he did not receive a "traditional salary" for the work that he performed. (Dkt. 267 at 10–11 ¶¶ 35 & 38–40; Dkt. 304 at 3 ¶¶ 24–27; Tr. No. 1 at 88:5–89:3.) Specifically, the Debtor testified, since 2009, he had never received income as either a W-2 employee or an independent contractor. (Tr. No. 1 at 46:18–47:15.) Rather, the family businesses had supported the Debtor by directly paying his living expenses, as well as those of his family. (Dkt. 1 at 3 ¶ 13 & 5–6 ¶¶ 25–27; Dkt. 267 at 24 ¶¶ 185 & 186; Dkt. 304 at 10 ¶¶ 107 & 108; Tr. No. 1 at 49:17–21, 72:24–73:10, 138:17–22, 141:7–10, 161:2–162:13, 165:24–166:2, 233:14–20.) According to the Debtor, this arrangement was consistent with the way the family businesses had always compensated him. (Tr. No. 1 at 49:17–52:11.) The arrangement was particularly necessary from 2009 going forward, the Debtor said, because the businesses could not afford to pay him a W-2 salary. (*Id.* at 50:15–20.) They were, however, able to pay the Debtor's wife Sharise Leongas

---

[8] The "Income and Asset Form" completed by the Debtor, and attached to the complaint as Exhibit A, is dated January 19, 2015, more than one-and-a-half years after the citation had been served. (Dkt. 1, Ex. A.)

("Sharise") such a salary in the amount of $75,000 per year, at least in 2014 and 2015. (Bankr. Dkt. 16 at 18;[9] Bankr. Dkt. 18 at 3–4; Tr. No. 1 at 60:2–61:4.) Other than Sharise's paychecks, the Debtor maintained that the only source of support for him and his family came from monetary assistance from the family businesses. (Dkt. 267 at 24 ¶¶ 185 & 186.)

To further explain why he was working for the Pubs without receiving a salary, the Debtor testified that his parents and sisters had invested hundreds of thousands of dollars with him in various real estate ventures, much of which was lost as a result of the 2009 financial crisis. (Tr. No. 1 at 48:25–49:8.) The Debtor also said that his father, who had been instrumental in running the family businesses, had suffered a debilitating stroke in 2008. (*Id.* at 49:8–13.) Accordingly, the Debtor felt "obligated" to work for his family by managing the Pubs on a full-time basis, both to repay his family for the investments that they had made with him and to help his sisters operate the businesses. (*Id.* at 48:25–49:15.)

As to the payments made by the family businesses to cover the Debtor's living expenses, the Debtor testified that he considered those payments to be loans that he planned to pay back. (Dkt. 267 at 24 ¶¶ 185 & 186; Tr. No. 1 at 48:23–50:1, 51:24–52:11, 143:6–8.) As discussed in more detail below, some of the payments were actually booked as "loans"—and classified as "accounts receivable"—in the books and records of the businesses. (Dkt. 267 at 24 ¶¶ 185 & 187; Dkt. 318–321; Tr. No. 1 at 52:9–11, 132:23–134:20, 144:3–150:3.) The figures reflected in the books and records, however, were significantly less than the amounts paid by the family businesses for the Debtor's living expenses. (*See* Dkt. 318–321; *see also* Tr. No. 1 at 144:3–150:3.) And, despite the Debtor's characterization of the payments as loans, there were no promissory notes executed, no interest charged, no collateral provided, no installment payments due, and no maturity

---

[9] All references to "Bankr. Dkt." are to Bankr. No. 15 B 27967.

5

date or other deadline set for repayment of the advances. (Tr. No. 1 at 142:12–143:3; Tr. No. 2 at 13:1–12.) At the time of the trial, the Debtor had not paid back any of the "loans." (Tr. No. 1 at 142:9–11.)

**The Debtor's Residence**

The Debtor and his family have lived at 921 Broadway Avenue in Park Ridge, Illinois (the "Residence") since 2009. (Dkt. 267 at 7 ¶ 6 & 13 ¶ 70.) Until 2011, the Debtor and his wife Sharise owned the Residence as tenants by the entirety. (Tr. No. 1 at 66:8–11, 83:14–23.) In 2011, when the house was about to go into foreclosure, Jody Libman, the Debtor's childhood friend, purchased the Residence from the lender, Bank of America, in a short-sale transaction in which the house, on which there was a $1.6 million mortgage, was sold to Libman for $840,000. (*Id.* at 67:24–69:6; Dkt. 267 at 27 ¶ 218.) In order to effectuate that purchase, Libman obtained a first mortgage from Bridgeview Bank, taking title in his own name. (Tr. No. 1 at 69:23–70:7.) The Debtor and Libman had agreed that as long as the Debtor, or someone on his behalf, paid all of the expenses in connection with the Residence, including the mortgage, real estate taxes, insurance, and utilities, Libman would purchase the Residence to save it from foreclosure and the Debtor and his family could continue to live there. (*Id.* at 70:8–71:13.)

In addition to Libman's first mortgage, Bridgeview Bank held a junior mortgage secured by the Residence related to a home equity line of credit (the "HELOC") extended to the Debtor and Sharise in the original principal amount of $536,648.13. (Dkt. 311; Tr. No. 1 at 67:7–10, 73:6–76:4.) When Libman acquired title to the Residence, he permitted the HELOC to continue as a lien on the property. (Tr. No. 1 at 73:7–10, 79:1–2.) Although the Debtor alleges that the proceeds of the credit line were used for business purposes (*id.* at 86:16–25, 226:10–17), he testified that he

and his wife were the borrowers and that he was personally obligated to make payments on the HELOC (*id.* at 73:19–74:6, 226:20–25).

In October 2011—and every month thereafter that Libman held title to the Residence—one of the family businesses made his monthly mortgage payment on behalf of the Debtor. (Dkt. 302 at 2 ¶ 2; Dkt. 324; Tr. No. 1 at 72:17–73:5, 165:24–166:2, 238:25–239:4; Tr. No. 2 at 28:25–29:12.) During the relevant time period, the amount of that payment was $6,270.22. (Dkt. 302 at 2 ¶ 2; Dkt. 324; Tr. No. 1 at 238:25–239:4.) Similarly, one of the family businesses made the monthly HELOC payments on the Debtor's behalf until that credit line was paid off. (Dkt. 302 at 1–2;  Dkt. 323; Tr. No. 1 at 226:23–25, 227:18–24; Tr. No. 2 at 28:25–29:12.) During the relevant time period, the amount of the HELOC payment was $3,175.66. (*Id.*)

On June 5, 2015, about two months before the Debtor filed his chapter 7 case, Libman quit claimed the Residence to Judith Iovino, the Debtor's mother-in-law, as trustee for the 921 South Broadway Land Trust (the "Land Trust"), which is the only member of EGIO and whose sole beneficiaries are the Debtor's three children.[10] (Tr. No. 1 at 35:15–22, 36:12–37:12, 83:24–84:13; Dkt. 182-1 at 12 ¶ 84; Dkt. 304 at 3 ¶ 33; *see also* Dkt. 267 at 8 ¶ 14 & 27 ¶ 220.) Subsequently, on May 6, 2016, while the Debtor's bankruptcy case was pending, his wife Sharise and his friend/attorney Glenn Udell obtained a loan of more than $1.3 million from Bridgeview Bank to pay off both Libman's first mortgage and the HELOC on the Residence.[11] (Tr. No. 1 at 84:14–85:12; Dkt. 302 at 8 ¶ 9; *see also* Dkt. 310.) Sharise and Udell are the obligors on the corresponding

---

[10] The Debtor alleges that EGIO was created by his attorney as part of the Debtor's estate planning. (Dkt. 306 at 11; *see also* Tr. No. 2 at 16:24–18:1.) In support of this allegation, the Debtor cites to portions of the trial transcripts; however, none of the cited testimony indicates when or why the estate planning was done.

[11] Citing, in part, to Bridgeview Bank's loan approval document entitled "Underwriter's Analysis and Approval," dated January 15, 2016, PNC alleges that the amount of the loan obtained by Sharise and Udell was $1,325,852.47. (Dkt. 304 at 14 ¶ 149.) The document, however, reflects a proposed loan amount of $1,377,356.68. (Dkt. 310.)

promissory note. (Tr. No. 1 at 85:9–12.) At the time that the loan was made, the appraised value of the Residence was $1,846,000. (Dkt. 310.)

**The Debtor's Other Living Expenses**

During the relevant time period, the family businesses also paid for the Debtor's other living expenses. Among them, the businesses paid for the health insurance of both the Debtor and his family members. (Tr. No. 1 at 140:21–141:10.) In addition, $720 was paid each month to lease a late-model Infiniti that was driven exclusively by the Debtor. (*Id.* at 167:18–23.)

Most notable, however, the family businesses paid most of the expenses incurred on two American Express cards in the Debtor's name[12]—one which was used by the Debtor and the other by his wife.[13] (*Id.* at 124:13–125:6, 138:17–22, 160:17–162:13; Dkt. 302 at 4–5 ¶ 5 & 6.) According to the testimony at trial, Sharise, who managed the family's finances, used one card primarily for household purchases and expenses. (Tr. No. 1 at 124:23–126:1, 161:2–5; Tr. No. 2 at 80:13–16.) Although the Debtor claimed that the other card was used principally for business purposes (*id.* at 124:13–17), the monthly credit card statements contain numerous entries reflecting personal expenses (*see* Dkt 317). In fact, the documentary evidence shows that the Debtor and Sharise used both cards to purchase, among other things, groceries, gasoline, legal services, sporting goods and apparel, entertainment, home furnishings, prescriptions, cosmetics, restaurant meals, clothing, medical products and services, and airline tickets for many family trips. (Dkt. 317; Dkt. 331; Tr. No. 1 at 127:25–128:20, 140:13–141:10, 161:2–16, 256:20–257:11.) According to the Debtor, the family businesses would pay the American Express invoices, and these payments

---

[12] The card used primarily by the Debtor was held in both his name and the name of Irish Spirits LLC, a company dissolved in 2006 that had previously been doing business as Curragh Irish Pub. (Tr. No. 1 at 94:13–15, 122:25–124:17; *see* Dkt. 317.) The card used principally by Sharise was held in the Debtor's name only. (*See* Dkt. 331.)

[13] As discussed below, some of the expenses incurred on the American Express cards were paid by Edison Park Acquisition, LLC.

would then be reflected—in the accounting software used by the businesses—as loans to the Debtor.[14] (Tr. No. 1 at 128:24–129:19, 130:16–21, 132:23-133:10, 138:17–25.) Despite this claim, the Debtor did not provide any documentary evidence—other than some balance sheets discussed below—to support his testimony that personal charges made on the credit cards were reconciled by the family businesses and classified as loans to him.

During the relevant time period, Sharise also made numerous payments for household and other personal expenses using a checking account that she maintained at Park Ridge Community Bank (the "PRCB Account"). (Tr. No. 2 at 80:22–85:25; Dkt. 312; Dkt. 329.) Among others, Sharise made payments from the PRCB Account totaling over $11,000 for the year preceding the bankruptcy filing both to the Park Ridge Country Club for the family's membership there and to a dance studio where the Debtor's daughter took lessons. (Tr. No. 2 at 84:15–85:21; Dkt. 312-3; Dkt. 329-4.)

**Cash Received by the Debtor**

The Debtor received eight checks made payable to "cash," totaling $28,700, from the various family businesses during the relevant time period. (Dkt. 302 at 5 ¶ 7; *see* also Tr. No. 1 at 262:7–268:16.) At trial, the Debtor was unable to explain what he did with any of the money and did not produce any records related to the use or whereabouts of the cash. (Tr. No. 1 at 262:12–268:19.) He surmised, however, that the money could have been used for a number of business purposes—to fill the ATM machine, to pay employees, or to cure overdrafts in various bank accounts. (*Id.* at 262:19–263:3.) Although the Debtor testified that he did not know whether any

---

[14] The American Express invoices for the two cards were sent to both the Debtor and the Edison Park Pub. (Tr. No. 1 at 129:20–130:14.) According to the Debtor, when such an invoice came in, the bookkeeper at the Edison Park Pub would "grab[] it," classify it as a business or personal expense, enter it into the computer system, and then pay it online through an "Automat[ed] Clearing House" ("ACH"). (*Id.* at 130:16–25, 131:24–132:10.) The Debtor testified that he and his sisters, among others, were able to initiate these ACH payments at the Pubs. (*Id.* at 131:1–23.)

of the cash transactions were used to pay his obligations or those of his family members (*id.* at

268:23–25), he also stated, "with certainty," that he did not pocket the money for his personal use

(*id.* at 264:12–17). He further testified that it was "possibl[e]" that Sharise also received cash from

the Pubs. (*Id.* at 269:2–4.)

### Edison Park Acquisition, LLC

In addition to working for the Pubs, the Debtor managed a construction project at the

Edison Park property for Edison Park Acquisition, LLC ("EPA"), starting in early 2014. (*Id.* at

186:11–15, 190:5–8.) Owned and managed solely by the Debtor's friend and attorney Daniel

Touhy (*id.* at 219:24–220:5; Dkt. 175-3 at 47:1–15), EPA owned the property on which the Edison

Park Pub was located[15] (*see* Tr. No. 1 at 178:7–18). On December 31, 2013, EPA sold that real

estate to EPC Properties, LLC ("EPC"), of which the Debtor's sister Sophia was the sole member.

(*Id.* at 33:7–16, 178:7–18; Dkt. 267 at 8 ¶¶ 15 & 16.)

The Debtor claims that he did not receive a salary or any direct payments from EPA for the

work that he did on the construction project. (Tr. No. 1 at 191:4–192:6.) However, from January

1, 2013 to August 16, 2015, Sharise received at least $160,000 from EPA in the form of four

checks.  (Dkt. 302 at 3–4 ¶ 4; Dkt. 312-1 at 16 & 18; Dkt. 312-2 at 12 & 13; Tr. No. 1 at 192:7–

8.) Two of those checks were for $10,000 each, and a third was in the amount of $15,000. (Dkt

302 at 3–4 ¶ 4; Dkt. 312-1 at 16; 312-2 at 12 & 13; Tr. No. 1 at 200:15–19, 210:13–24, 244:21–

---

[15] Throughout these proceedings, PNC has posited that the manner in which Touhy came to have an ownership interest in EPA and his subsequent purchase of the Edison Park real estate were fraught with fraud. In its motion for summary judgment, PNC alleged, among other things, that "[f]rom documents and records received by PNC, it appears [that the] Debtor and his attorney/friend Daniel Touhy . . . may have orchestrated a scheme whereby Touhy would hold title to EPA even though [the] Debtor operated as the true owner in order to shield the assets from [the] Debtor's creditors." (Dkt. 166 at 2.) The evidence that PNC submitted on this point, however, is confusing, convoluted, and somewhat off the mark, as the transactions occurred in the context of a confirmed state court foreclosure sale and involved entities in which the Debtor may have had only indirect beneficial interests. The Court will not make any specific findings regarding these transactions but notes the issues only for purposes of determining whether the Debtor intentionally submitted false and misleading financial information or otherwise engaged in wrongful behavior that would lead to the denial of his discharge under § 727(a) of the Bankruptcy Code.

25.) The fourth check, for $125,000, was sent in error, the Debtor said, and, accordingly, $100,000 was immediately transferred to EPC, the intended recipient of the money. (Dkt. 312-1 at 18; Tr. No. 1 at 258:22–259:12, 260:11–261:8; Tr. No. 2 at 52:7–53:1.) The Debtor admits that $25,000 was retained from the original $125,000 and used to pay household expenses. (Tr. No. 1 at 259:13– 17.) The two checks for $10,000 each were signed by the Debtor on Touhy's behalf, with his authorization.[16] (*Id.* at 191:16–18, 200:15–24, 210:15–211:2.) Sharise did not provide any services to EPA, and EPA did not owe her any money. (*Id.* at 201:9–17, 260:9–11.) The Debtor contends that the funds that Sharise received from EPA were loans. (*Id.* at 200:25– 201:2, 262:13–263:9.) No evidence of such loans was presented.

During the relevant time period, EPA paid a total of at least $11,967.27 on the first mortgage on the Residence and at least $6,351.32 on the HELOC. (Dkt. 326 at 8 (Check No. 1111) & 11 (Check No. 1109); Tr. No. 1 at 204:1–15, 205:23–207:18.) Funds that the Debtor and his wife received from EPA were also used to pay the real estate taxes on the Residence.[17] (Dkt. 304 at 4 ¶ 46; Dkt. 329-4 at 5.) In addition, EPA made at least one payment on behalf of 5331 Cicero, LLC, a company of which the Debtor was a member. (Dkt. 302 at 2–3 ¶ 3; Dkt. 326 at 8 (Check No. 1110); Tr. No. 1 at 202:8–203:11.) At least $194,508.42 of EPA funds went to pay the Debtor's American Express card, and $34,674.03 of EPA funds were used to pay the card primarily used by Sharise. (Dkt. 302 at 2–3 ¶ 3; *see also* Dkt. 304 at 12–13 ¶ 140.) Although EPA paid for both business and personal expenses on the two cards, the Debtor testified that the personal expenses would later be reconciled and booked as loans to him. (Tr. No. 1 at 246:22–247:21, 250:4–22.)

---

[16] At the time, Touhy had given the Debtor authorization to sign Touhy's name on checks written from EPA's account at Belmont Bank. (Tr. No. 1 at 191:16–18.)

[17] Sharise's check, made payable to the Cook County Treasurer, was dated July 18, 2014, about one month before the start of the relevant time period. (Dkt. 329-4 at 5.)

11

According to the Debtor, EPA made the payments on the American Express card that he used because the expenses that were paid were related to the Edison Park real estate construction project. (*Id.* at 192:11–14.) The Debtor did not produce any documents to support this allegation, however, and testified that he had not seen any documentation establishing that reconciliation of expenses had taken place. (*Id.* at 252:2–13.) In an affidavit previously filed by the Debtor, he claimed that he had never received funds from EPA. (Dkt. 146-14 at 2 ¶¶ 5 & 6.)

**The Debtor's Bankruptcy Schedules**

On August 16, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. (Bankr. Dkt. 1.) Five weeks later, on September 20 and 21, 2015, the Debtor filed his schedules and Statement of Financial Affairs ("SOFA"). (Bankr. Dkt. 16 & 18.)

On his SOFA, the Debtor listed no employment income for himself for 2014 or 2015. (Bankr. Dkt. 16 at 18.) The statement reflected, however, $75,000 for Sharise's employment income in 2014, for accounting work that she did at one of the Pubs during that year, and $37,500—the approximate amount that she had earned at the time of filing—in 2015. (*Id.*; *see also* Tr. No. 2 at 26:3–27:6, 118:7–16.) Likewise, on his schedule I, the Debtor listed no wages, salary, commissions, or overtime pay; no employer; and no gross income or monthly take-home pay. (Bankr. Dkt. 18 at 3–4; Tr. No. 1 at 103:8–13.) Nor did he list any "[f]amily support payments that [he], [his] non-filing spouse, or a dependent regularly receive[d]" (line 8c) or any "[o]ther monthly income" (line 8h). (Bankr. Dkt. 18 at 4.) Rather, on line 11—"all other regular contributions to the expenses" listed in schedule J—the Debtor scheduled a monthly "[c]ontribution from Holland Pub/Sophia Leongas" in the amount of $2,517.57. (*Id.*; Tr. No. 1 at 103:20–104:8) Together with

Sharise's monthly net take-home pay of $4,956.05,[18] schedule I shows a combined monthly income of $7,473.62. (Bankr. Dkt. 18 at 4.)

As for schedule J, two versions were filed. (*Id.* at 5–8; *see also* Tr. No. 2 at 133:17–135:5.) The only expenses listed on the first schedule J were for monthly insurance payments made on the Debtor's behalf: $1,503.16 for health insurance, $391.66 for vehicle insurance, and $432.75 for term life insurance. (Bankr. Dkt. 18 at 5–6; Tr. No. 1 at 105:11–106:12; Tr. No. 2 at 123:15–124:4.) The second schedule J reflected the remaining $190 monthly payment, for additional life insurance, bringing the total to $2,517.57, the figure listed on schedule I as the "contribution from Holland Pub/Sophia Leongas." (Bankr. Dkt. 18 at 8; Tr. No. 2 at 124:5–15.)

Also shown on the second schedule J were several other monthly expenses—$1,877 for "rental or homeownership expenses"; $680 for "[h]ome maintenance, repair, and upkeep expenses"; $345 for "[e]lectricity, heat, natural gas"; $45 for "[w]ater, sewer, garbage collection; $150 for "[t]elephone, cell phone, Internet, satellite, and cable services"; $1,199 for "[f]ood and housekeeping supplies"; $140 for "[c]lothing, laundry, and dry cleaning"; $70 for "[p]ersonal care products and services"; $100 for "[m]edical and dental expenses"; $140 for "[t]ransportation"; $75 for "[e]ntertainment, clubs, recreation, newspapers, magazines, and books"; $500 for "[c]ar payments for [v]ehicle 1"; and $50 for "[a]uto repairs/[m]aintenance" (recorded on the line for "[o]ther")—for total expenses of $5,561. (Bankr. Dkt. 18 at 7–8.) Many of those entries, however, were not actual expenses.[19] Rather, they represented IRS standard expenses for a household of five. (*Id.* at 8; Tr. No. 1 at 108:13–109:1, Tr. No. 2 at 43:19–44:7.)

---

[18] Sharise's gross monthly income of $6,250.01 corresponds to an annual salary of $75,000.12. (*See* Bankr. Dkt.18 at 3–4.)

[19] Debtor's counsel testified that the $500 monthly car payment was an actual expense—for Sharise's Mercedes. (*See* Tr. No. 2 at 180:22–25; *see also id.* at 93:5–15.)

On his schedule F, the Debtor included dozens of creditors holding unsecured nonpriority claims in his bankruptcy case. (Bankr. Dkt. 16 at 8–14.) Among them, the Debtor listed the Holland Pub and EPC (the LLC that owned the real estate on which the Edison Park Pub was located and of which the Debtor's sister Sophia was the sole member) as creditors that had made "personal loans" to him in "unknown" amounts. (*Id.* at 11 & 12.) Although he also listed the Skokie Pub as a creditor with a claim in an "unknown" amount, the nature of that alleged debt was not specified. (*Id.* at 13.) Debtor's counsel testified that he asked the Debtor for the amounts of the claims but that he listed them as "unknown" because he was not given exact figures.[20] (Tr. No. 2 at 128:17–129:13, 146:19–25, 163:9–25.) Those three entries—for the Holland Pub, EPC, and the Skokie Pub—were the only indications on the Debtor's schedules that any amounts were owed by the Debtor to the family businesses.

The testimony and the documents introduced into evidence were scant as to how much of the Debtor's alleged loans were booked as such by the Pubs and related family businesses during the relevant time period. Only five balance sheets were produced for the family businesses in that regard. Together, four of the balance sheets, each dated December 2015, showed just $52,066.74 in accounts receivable owed by the Debtor in that year: $38,032.96 to the Holland Pub (Dkt. 320 at 5); $7,007.28 to the Skokie Pub (Dkt. 318 at 4); $7,026.50 to the Edison Park Pub (Dkt. 320 at 4); and $0.00 to EPC (Dkt. 321 at 5). (*See also* Tr. No. 1 at 144:3–16, 149:13–150:3, 152:8–12.) A fifth balance sheet dated December 2014, for the Holland Pub, reflected $37,932.96 that the Debtor owed to that pub in that year. (Dkt. 319 at 4; Tr. No. 1 at 146:12–21.) Although the relevant time period includes only August 16 to December 31 of 2014, including the entire amount from

---

[20] The amounts of fifteen of the thirty claims listed on schedule F are specified as "unknown." (Bankr. Dkt. 16 at 8–14.)

the fifth balance sheet results in a total of just $89,999.70 booked as loans to the Debtor for the year preceding the bankruptcy filing.

### The Bankruptcy Filing

Attorney J. Kevin Benjamin filed the chapter 7 petition and related documents on behalf of the Debtor. (Tr. No. 2 at 98:16–19.) At trial, Benjamin testified that he has been life-long friends with the Debtor, is familiar with the Debtor's family's financial "situation," and knows all of the people with whom the Debtor has done business. (*Id.* at 99:13–15, 120:3–8, 148:5–6, 150:7–13, 153:19–21, 154:3–13, 169:24–25, 195:24–196:3.) In particular, Benjamin testified that he has known Libman and Udell since childhood. (*Id.* at 153:22–154:2.) In addition to this bankruptcy case, Benjamin also represented entities related to the Debtor and the family businesses in chapter 7 corporate cases.[21] (*Id.* at 196:4–15; *see also* Dkt. 267 at 25 ¶ 198; Dkt. 304 at 20 ¶ 224.)

Prior to the preparation and filing of the bankruptcy petition, Benjamin provided the Debtor with four documents to review and complete. The Debtor admitted that he received all four. (Tr. No. 1 at 89:19–90:22, 92:16–21, 95:16–96:11, 117:5–118:1.)

The first document, entitled "Rules for Filing Bankruptcy," explained that the information given by the Debtor—and provided in the bankruptcy petition and during the case—had to be "complete, accurate, and truthful, at all times." (Dkt. 313 at 2 ¶ 1.) The document also requested the complete and accurate disclosure of "every debt . . . owe[d]" by the Debtor and his family members, as well as a monthly budget based on the Debtor's "Current Monthly Income" and "regular monthly expenses." (*Id.* at 2 ¶¶ 2 & 3.) As to the latter, the "Rules" explained that "[t]he regular expense[s] should be as close as possible and should be based on a reasonable inquiry which [debtors] are required to undertake." (*Id.* ¶ 3.) Based on the language in the document, the

---

[21] *See In re 841 Joint Venture, LLC*, Bankr No. 14 B 14957; *In re EP Curragh, LLC*, Bankr. No. 15 B 14710; *In re PLL, LLC*, Bankr. No. 15 B 27969.

Debtor testified that he knew it was important to fully and accurately disclose all of his debts. (Tr. No. 1 at 92:14–93:21.)

The second document provided, among other things, information about the chapter 7 bankruptcy process. (Dkt. 314.) The document explained that chapter 7 debtors must provide a schedule of their "current monthly income" and indicated that that term includes "regular contributions to household expenses from nondebtors." (*Id.* at 8.) The document also discussed the obligation of debtors—and their non-filing spouses—to disclose "[a] detailed list of [their] monthly living expenses, i.e., food, clothing, shelter, utilities, taxes, transportation, medicine, etc." (*Id.* at 5.) According to the document, all of this information was required so that "the court, the trustee and creditors c[ould] evaluate the household's financial position." (*Id.*)

The third document, entitled "Debt Assistance Initial Consultation Agreement," required debtors to provide their bankruptcy attorney with "accurate, honest, full and fair disclosure of financial information concerning, at a minimum, average income over the previous 6 months from all sources, monthly living expenses, the type and amount of all debts . . . , and a disclosure of all assets and property owned." (Dkt. 315 ¶ 2.)

Finally, the fourth document was a "Questionnaire," which the Debtor completed online on August 13, 2015 "to the best of [his] knowledge." (Dkt. 316; Tr. No. 1 at 95:16–96:20; *see also* Tr. No. 2 at 158:8–17.) The Debtor did not disclose on the Questionnaire any employment for himself or his spouse, income (business or otherwise), expenses, contributions to household expenses, transfers of property by him or his spouse within the last two years, residences, expected tax refunds, bank accounts, or credit cards. (Dkt. 316.) According to the Debtor, some of the questions were not answered—in full or in part—because he needed to meet with Benjamin to "really go over" them. (Tr. No. 1 at 96:25–98:5; Tr. No. 2 at 39:11–40:15.)

16

Both the Debtor and Benjamin testified as to the information that the Debtor provided to Benjamin before the preparation and filing of the schedules and SOFA. Specifically, the Debtor testified that, prior to talking to Benjamin, he consulted with his wife, who managed the household budget, so that he could give Benjamin accurate and complete information. (Tr. No. 2 at 36:20–37:5, 80:13–21.) In meetings with Benjamin before the filings, the Debtor said, he disclosed his household's income, loans, and actual expenses, as well as transfers of interests in property that he had made within two years prior to the Petition Date. (*Id.* at 16:16–19:2, 36:15–19, 45:17–25, 79:1–4, 85:22–25, 86:3–4.) According to the Debtor, he also explained to Benjamin that the family businesses paid for the mortgages on the Residence, the monthly installments on the cars that he and Sharise drove, and the personal expenses incurred on his and Sharise's American Express cards. (*Id.* at 28:25–29:15, 32:24–34:10, 35:13–22, 43:6–13, 50:9–12.)

Benjamin, in turn, testified that the Debtor disclosed to him all assets, liabilities, income, and expenses in connection with the bankruptcy case and told him that the family businesses were paying for his and his family's living expenses. (*Id.* at 122:24–123:11, 143:12–23, 151:2–24, 172:9–16.) Benjamin also testified, however, that he did not remember the Debtor telling him that Sharise was using an American Express card in the Debtor's name, that there were personal expenses on the American Express cards being paid by the family businesses, or that Sharise was paying thousands of dollars each month on household expenses using personal credit cards. (*Id.* at 132:13–24, 178:5–11, 182:14–19.) In particular, Benjamin testified that he did not recall the Debtor's disclosure of Sharise's monthly payments for a U.S. Bank loan, the family's Park Ridge Country Club membership, or dance lessons for their daughter. (*Id.* at 181:15–182:9, 183:22–184:8.) Benjamin further testified that the Debtor gave him neither records related to Sharise's

PRCB Account nor dollar amounts of the purported loans that he owed to the family businesses. (*Id.* at 128:4–129:13, 163:9–13, 181:1–6.)

According to Benjamin, on September 20, 2015, he was frustrated with the Debtor because the Debtor had not provided him with the information that he needed to complete the bankruptcy documents. (*Id.* at 168:5–170:3.) Accordingly, Benjamin sent an email message to the Debtor in the late afternoon on that day seeking the missing information. (Dkt. 322.) In the message, Benjamin indicated that he "still ha[d] no answers [to] many important questions" and stated, in part, as follows:

> The HELOC is listed as 2013 debt but you supposedly did not own any real estate in 2013 – Jody [Libman] did.
>
> * * *
>
> We have Shari[']s income for the budget but no expenses.[22] What is the elect[ricity] bill, gas, utilities, insurance, the household expenses you listed zero for everything, how can that be[?]
>
> What is the number for mortgage or rent payment? You say you live for free? How is that – if rent to who[m]? If mortgage payment Shari is making how is that number paid with you making zero, as I am sure [it's] more th[an] her check.
>
> The questions in the question[n]aire I sent in August and resent several times that you did not answer prevent[] us from preparing proper schedules for you and we asked for and were granted additional time to answer that expired as you know last Tue[sday] or Wed[nesday]. No one has filed a motion to dismiss so I would like to file it tonight but the business questions were answered half ass[ed] and the rest of the question[n]aire you just finished the other day is finished with answers that leave more questions than answers.
>
> We can file some and file amendments I guess but I do not like to do it that way, if you think I am being hard on you wait until you see what happens if I file this half ass[ed] the[] way it will be now. These questions are going to be asked if not by the Trustee then by PNC or others so we are better off having answers.
>
> I am not filling it out for you and filing it – you will be signing it under penalty of perjury.

---

[22] According to the Debtor, his wife also "goes by Shari." (Tr. No. 1 at 103:19.)

18

\* \* \*

Get me the answers[.]

(*Id.*) Just hours after sending the email message above, Benjamin filed the bulk of the Debtor's schedules and the SOFA. (Bankr. Dkt. 16.) He filed the remaining schedules I and J the following day, on September 21, 2015. (Bankr. Dkt. 18.)

Benjamin testified at length as to why he prepared the schedules in the manner in which they were filed. The sole income reflected on schedule I consisted of the monthly insurance benefits of $2,517.57 provided by the family businesses to the Debtor and his family because, Benjamin said, those benefits were the only ones that he determined to be "consistent, actual expense[s]" and, therefore, "regular contributions" to household income. (*Id.*; Tr. No. 2 at 124:16–125:4, 173:23–174:12.) None of the other monthly payments made by the family businesses were included on schedule I. (Bankr. Dkt. 18.) Specifically, Benjamin explained that the payments made on the American Express cards used by the Debtor and Sharise were not contributions because the cards were "business card[s]." (Tr. No. 2 at 174:13–175:1.) He further explained that the payments made on the Libman mortgage and the HELOC did not appear on schedule I because the Debtor did not own any real property and thus had no mortgage; the monthly payment on the first mortgage was not being made for the Debtor's benefit but for the benefit of his children—the sole beneficiaries of the Land Trust; and the HELOC was a "business loan." (*Id.* at 175:2–176:16; *see also id.* at 141:8–142:1.) Additionally, Benjamin maintained throughout the proceedings that the payments made by the family businesses were loans and thus did not belong on schedule I. (*Id.* at 121:17–122:3, 130:3–4.)

As for schedule J, Benjamin testified that he filed two versions, both because the Debtor did not have any actual expenses and because Benjamin wanted to clearly convey that Sharise was

the one paying all of the expenses out of her accounts. (*Id.* at 133:17–134:17.) According to Benjamin, "[t]he separate nonfiling spouse [schedule] J is simply a more . . . detailed itemization . . . to make everything clear [as to] who is doing what," and he prepared that additional form "because it was a complicated situation." (*Id.* at 134:18–24.) Benjamin further testified that he used IRS standards for certain expenses on Sharise's schedule J because doing so was more appropriate in light of the fact that the IRS figures were less than the family's actual expenses. (*Id.* at 135:16–140:5.)

Benjamin testified that, as the Debtor's legal counsel, all of the decisions made in preparing the schedules and other bankruptcy documents were his "call." (*Id.* at 116:24–118:6, 125:17–126:6, 135:6–140:5, 144:13–23.) He also testified that, after discussing with the Debtor the possibility of amending the schedules following PNC's filing of its complaint, Benjamin decided not to make any changes because he believed that everything had been properly disclosed.[23] (*Id.* at 117:7–12, 126:19–127:17.)

Consistent with Benjamin's claim that he made all of the legal decisions in the preparation of the bankruptcy documents, the Debtor testified that he relied on Benjamin for his advice regarding the disclosure of the information on his schedules and SOFA. (Tr. No. 1 at 108:20–109:1, 111:20–23; Tr. No. 2 at 34:6–20, 44:8–22, 86:1–9.) He admitted both that he often did not know why or where various disclosures were made (Tr. No. 2 at 14:22–15:2, 35:23–36:14, 37:10–14, 43:14–18, 50:9–15) and that he did not question Benjamin's decisions (*id.* at 15:5–9, 43:14–18, 80:7–12, 86:8–9). Nevertheless, the Debtor testified that he and Benjamin discussed various aspects of the schedules and spent hours preparing them. (*Id.* at 31:8–11, 36:15–19, 39:22–40:10,

---

[23] The only exception is that on May 8, 2019, the Debtor filed an amended schedule E/F which included PNC's judgments totaling $9,403,155.49. (Bankr. Dkt. 118 at 3.) In the Debtor's original filings, the PNC judgments were not listed, but Daniel J. Hyman, PNC's receiver, was included on schedule F, and PNC appeared as a party to a pending mortgage foreclosure action under section 4 of the SOFA. (Bankr. Dkt. 16 at 11 & 20.)

43:19–45:7). The Debtor further testified that he reviewed the schedules with Benjamin before they were filed (Tr. No. 1 at 104:24–105:7; Tr. No. 2 at 36:15–19, 46:1–3, 78:22–25, 79:5–7), and he ultimately signed them under penalty of perjury (Bankr. Dkt. 16 & 18; Tr. No. 1 at 105:8–10).

### Document Production

On December 23, 2015, about four months after the Petition Date, PNC served a subpoena on the Debtor, requesting the production of various financial records, including documents related to the Residence, the Land Trust, the Debtor's bank accounts, his assets, and payments that were made for his living expenses. (Dkt. 175-47; Dkt. 182-1 at 13 ¶ 88; *see also* Dkt. 304 at 14 ¶ 153.) Of particular interest, PNC sought the Debtor's email messages concerning his income, assets, and finances. (*See* Dkt. 304 at 14 ¶¶ 153 & 155–158.)

Despite the Debtor's strenuous objection (*see* Bankr. Dkt. 36), PNC subsequently sought—and was granted—permission to serve subpoenas on American Express, Belmont Bank, Bridgeview Bank, and Park Ridge Community Bank (*see* Bankr. Dkt. 33 & 43). After the subpoenas were issued, the Debtor's family members, the family businesses, and others filed a motion to quash them. (Bankr. Dkt. 53.) That motion was denied, and the third parties were ordered to turn over the requested documents, although the Court limited the scope of production to January 1, 2013 and thereafter. (Bankr. Dkt. 70.)

On April 27, 2016, the Debtor filed an affidavit of completeness, attesting that he had produced all documents responsive to PNC's requests. (Dkt. 175-48.) Despite that declaration, many of the documents had not been produced. Accordingly, PNC thereafter filed a series of motions seeking to compel production of the remaining documents. (Dkt. 66, 99, 218, 219; Bankr. Dkt. 64.) Eventually, on October 9, 2017, the Debtor produced over 1,300 pages of email messages dating back to 2015. (Dkt. 182-1 at 13 ¶ 92.)

**DISCUSSION**

On July 25, 2016, PNC filed the instant adversary complaint, objecting to the Debtor's discharge under various provisions of section § 727(a) of the Bankruptcy Code. According to PNC, the Debtor is not entitled to a discharge because he failed to disclose the true state of his financial affairs. Specifically, PNC argues that the Debtor engaged in a continuing course of actions in which he intentionally concealed his income and assets in order to defraud his creditors, failed to produce required financial information, and knowingly and fraudulently made false oaths and accounts in connection with his financial situation.

Section 727(a) denies a discharge to a debtor who has been unscrupulous in various ways. The bankruptcy system is designed to help the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (internal quotation omitted). Consequently, no discharge is available to the debtor who has been "less than honest." *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Although the denial of a discharge is a "drastic" remedy, *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003), discharge in bankruptcy is a privilege, not a right, *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). A debtor who has not been honest and forthcoming—particularly in connection with the bankruptcy itself—does not deserve that privilege. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *see also Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 674 (7th Cir. 1995) (noting that "Congress concluded that preventing fraud is more important than letting defrauders start over with a clean state").

Objections to discharge under § 727(a) are construed strictly against creditors and liberally in favor of the debtor. *Sullivan v. Ratz*, 551 B.R. 338, 345 (N.D. Ill. 2016). A creditor seeking denial of discharge bears the burden of proving each of the elements of the applicable claim by a

22

preponderance of the evidence. *Scott*, 172 F.3d at 966–67; *Muhammad v. Reed (In re Reed)*, 542 B.R. 808, 823 (Bankr. N.D. Ill. 2015); *see also* Fed. R. Bankr. P. 4005; *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) (explaining that "proof by a preponderance of the evidence means that the 'trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question'"). Once the plaintiff "has established that the acts complained of occurred, the burden of production shifts to the debtor who must then come forward with a "credible explanation of his actions." *Neary v. Stamat (In re Stamat),* 395 B.R. 59, 69–70 (Bankr. N.D Ill. 2008), *aff'd*, 2009 WL 2916834 (N.D. Ill. Sept. 2, 2009), *aff'd* 635 F.3d 974 (7th Cir. 2011).

### Count I: Objection to Discharge Under § 727(a)(2)

In Count I of the complaint, PNC seeks denial of the Debtor's discharge under § 727(a)(2). Specifically, PNC alleges that the Debtor concealed his income and assets by failing to disclose both his interest in the Residence and the payments made by the family businesses and EPA for the Debtor's mortgage payments and other living expenses. According to PNC, the Debtor engaged in this continuing course of actions—both before and after the filing of the petition—in order to delay and defraud PNC.

A debtor's discharge may be denied under § 727(a)(2) when the debtor, "with intent to hinder, delay, or defraud a creditor . . . , has transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition[,] or (B) property of the estate, after the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2). The purpose of the statutory provision is to prevent the discharge of a debtor who tries to avoid paying his creditors by concealing or otherwise disposing of his assets. *See Layng v. Hicks (In re Hicks)*, Bankr. No. 15 B 26479, Adv. No. 16 A 00320, 2017 WL 1160871, at *12 (Bankr. N.D. Ill. Mar. 24, 2017). To prevail under § 727(a)(2), a plaintiff must establish two elements: "an

23

act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd on other grounds sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004).

### 1. The Act: Concealment of Income and Property

PNC's arguments under § 727(a)(2) focus on the Debtor's alleged concealment of both his income and his interest in the Residence in which he lives. Concealment, for purposes of the statutory provision, consists of "failing or refusing to divulge information to which creditors [are] entitled." *Neary v. Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (internal quotation omitted); *Jeffrey M. Goldberg & Assocs. v. Holstein (In re Holstein)*, 299 B.R. 211, 228– 29 (Bankr. N.D. Ill. 2003) (internal quotation omitted), *aff'd*, 2004 WL 2075442 (N.D. Ill. Aug. 31, 2004); *see also Scott*, 172 F.3d at 967 (explaining that concealment includes "fraudulently transferring or withholding knowledge or information required by law to be made known" (internal quotation omitted)). The deliberate withholding of information about assets from a debtor's schedules or testimony at a 341 meeting can constitute concealment of those assets. *Ruter v. Schryver (In re Schryver)*, 558 B.R. 856, 875 (Bankr. N.D. Ill. 2016); *Layng v. Urbonas (In re Urbonas)*, 539 B.R. 533, 556 (Bankr. N.D. Ill. 2015).

The timing of the concealment determines whether the objection falls under subsection (A) or (B). "The elements under § 727(a)(2)(B) are 'substantially the same' as those under § 727(a)(2)(A). Unlike § 727(a)(2)(A), however, which relates to a debtor's actions in the year prior to the petition date, § 727(a)(2)(B) addresses a debtor's actions *after* the filing of the petition." *Grochocinski v. Campbell (In re Campbell)*, 475 B.R. 622, 636 (Bankr. N.D. Ill. 2012) (citation omitted). The concealment of assets generally continues from the first instance until such concealment is discovered. *Groth v. Krueger (In re Groth)*, 36 F.2d 41, 42 (7th Cir. 1929) (finding

24

that a debtor "'concealed' the property at all times up to the day of its discovery"). As such, an asset can be concealed both pre- and post-petition if the concealment continues across the petition date. Although this timing puts the concealment within both subsections (A) and (B), courts have typically found that only one or the other applies. *See Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 178 (Bankr. C.D. Ill. 2004) (denying a § 727(a)(2)(B) objection because the concealment was already addressed under § 727(a)(2)(A)). The Seventh Circuit has not explicitly spoken on this distinction, but courts in other circuits have consistently held that failure to disclose assets in connection with the filing of a bankruptcy petition constitutes a post-petition concealment, because the assets are not truly concealed until the debtor fails to disclose them in the petition. *Montedonico v. Beckham (In re Beckham)*, No. 08-8054, 2009 WL 1726526, at *7 (B.A.P. 6th Cir. June 19, 2009); *see also McDermott v. Kerr (In re Kerr)*, Bankr. No. 15-30531, Adv. No. 15-03085, 2017 WL 3880875, at *12–14 (Bankr. N.D. Ohio, Aug. 30, 2017); *Mendelsohn v. Singh (In re Singh)*, 568 B.R. 187, 202 (Bankr. E.D.N.Y. 2017).

PNC alleges violations under both subsections (A) and (B) of § 727(a). Notwithstanding this invocation of both provisions—or the consistent holdings of the courts discussed above—most of PNC's arguments address events that occurred during the one-year "look-back" period, and the parties have generally agreed throughout the course of these proceedings that the relevant time for purposes of § 727(a)(2) is the year preceding the Debtor's filing of his bankruptcy petition. (*See, e.g.,* Dkt. 302; Tr. No. 1 at 181:8–13, 188:10–14, 227:18–22, 238:25–239:4; Tr. No. 2 at 5:6–7:9.) Accordingly, the Court's analysis will center on the twelve months prior to the Petition Date, but this focus will not preclude consideration of relevant post-petition activities or those that took place before the look-back period.

25

## A. Concealment of Income

There is no dispute that the Debtor worked on a full-time basis at the Pubs during the relevant time period and disclosed no income from that work on his schedule I. Nor does the Debtor dispute that the family businesses paid the substantial living expenses for him and his family—before, during, and after the relevant time period. Despite these concessions, the Debtor's schedule I reflected no employer for him and disclosed only Sharise's gross monthly income of $6,250.01 for the accounting work that she did at one of the Pubs, as well as monthly insurance benefits of $2,517.57 made as a "[c]ontribution from Holland Pub/Sophia Leongas."

Although the Debtor testified that he understood that he was supposed to include regular contributions to household expenses in his monthly income on schedule I (Tr. No. 1 at 120:9–12), he did not disclose the monthly payments made by the family businesses of $6,270.22 for the mortgage payment on the Residence, $3,175.66 for the HELOC, or $720 for the car that he drove. Nor were amounts listed on any of the Debtor's bankruptcy documents for the payment of property taxes, utilities, and upkeep on the Residence, for the personal expenses incurred on the two American Express cards used by the Debtor and Sharise, or for the various expenditures paid through Sharise's PRCB checking account. In fact, the PRCB Account, itself, was not disclosed anywhere in the Debtor's bankruptcy documents. The payments that Sharise received from EPA as income, as well as those made by EPA on the first mortgage, the HELOC, and the American Express cards, were also not reflected as income.

Likewise, neither version of schedule J disclosed expenses for the first mortgage on the Residence, the HELOC, or the car that the Debtor drove. Nor did the schedules reflect the actual amounts of the real estate taxes, utilities, and maintenance for the Residence or the amounts spent

26

by the Debtor and his wife on personal household items that were paid with the two American Express cards or through Sharise's PRCB Account.

The Debtor offers various explanations as to why the payments made by the family businesses were not disclosed as income on schedule I. Specifically, the Debtor argues that those payments were not included because: (1) he did not receive a W-2 salary; (2) he did not own the Residence or the car that he drove—and thus had no obligations being paid on his behalf for either of them; (3) the payments were made to benefit the Debtor's family—not him; and (4) the payments were loans from the businesses that the Debtor intended to repay. All of these arguments are without merit.

First, that the Debtor did not receive a W-2 salary is wholly irrelevant. Although line 2 of schedule I directs debtors to list "monthly gross wages, salary, and commissions," lines 8 and 11 are the pertinent ones here. Line 8c, in particular, requires disclosure of "[f]amily support payments that [the debtor], a non-filing spouse, or a dependent regularly receive[s]." Line 11, in turn, directs the debtor to "[s]tate all other regular contributions to the expenses . . . list[ed] in [s]chedule J," including "contributions from an unmarried partner, members of [the debtor's] household, [his] dependents, [his] roommates, and other friends or relatives." The Debtor listed "$0.00" on line 8c for family support payments and disclosed $2,517.57 on line 11 as the monthly contribution from "Holland Pub/Sophia Leongas" for the insurance benefits paid by the family businesses. Based on the extensive documentary and testimonial evidence, as well as the trial stipulations made by the parties (*see* Dkt. 302), the regular payments made on behalf of the Debtor—for the mortgage, the car, and the expenses incurred on the American Express cards—far exceeded the figure reflected on line 11. Thus, the Debtor's failure to disclose the bulk of the contributions constitutes a concealment for purposes of § 727(a)(2).

Along the same lines, the Debtor's second argument also misses the mark. That the Debtor did not own the Residence or the car that he drove does not obviate the requirement to disclose on schedule I the regular monthly payments made by the family businesses on Libman's first mortgage, the HELOC, and the car driven by the Debtor. The Debtor lived with his family in the Residence, and he drove the car at issue. All of the regular payments made by the family businesses on the house and car were made on the Debtor's behalf and should have been disclosed as income.

The Debtor's third argument—that he was not required to disclose the payments because they were made for his family's benefit, not his—is both curious and confounding. It is also inaccurate. As discussed above, the regular monthly payments made by the family businesses on the mortgages and the car allowed both the Debtor and his family to continue living in the Residence and permitted the Debtor to continue using the car. Similarly, the regular payments made on the American Express credit cards enabled both the Debtor and his family to, among other things, entertain, dine out, furnish the Residence, and purchase a wide variety of goods and services, including numerous airline tickets for family vacations. The Debtor's contention that he did not benefit from the payments is a nonstarter.

Finally, the Debtor's argument that the payments constituted loans from the family businesses which the Debtor planned to pay back is unconvincing. To determine whether a transaction is income disguised as a loan, courts examine a number of factors, including:

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

*In re Killian,* 422 B.R. 903, 909–10 (Bankr. N.D. Ill. 2009) (internal quotation omitted) (explaining

that courts should "look beyond the labels that parties use . . . to the underlying substance of a transaction to determine whether a purported loan is in fact something else"); *see also Carmel v. United States (In re Carmel)*, 134 B.R. 890, 897 (Bankr. N.D. Ill. 1991). Although no single factor is dispositive, one of the primary factors that courts consider in determining if an advance is truly a loan is whether the parties actually intended repayment when the funds were tendered. *Killian*, 422 B.R. at 910; *Carmel*, 134 B.R. at 897; *see also United States v. Simon*, 727 F.3d 682, 693 (7th Cir. 2013).

In this matter, the Debtor has failed to present any credible evidence to allow the Court to conclude that the funds advanced by the family businesses were loans. The Debtor admitted at trial that no promissory notes were executed in connection with the transactions, no interest was charged, no repayment schedule was set, and no collateral was provided. The Debtor further conceded that he had not paid back any of the advances. His testimony that he actually intended repayment was not credible, and, with more than $9 million in unsatisfied judgments to PNC alone, there was no reasonable likelihood that the Debtor *could* repay the advances. Moreover, despite the Debtor's characterization of the payments, Sophia Leongas did not consider them loans. Indeed, when she was expressly asked in January 2017, during her third-party citation examination in a related state court case, whether the funds advanced were loans to the Debtor, she described the payments as "family taking care of each other" and said that she was "not expecting any kind of money back." (Dkt. 302 at 5–7 ¶ 8.)

Digging in his heels, the Debtor maintains—pursuant to his claim that the contributions were loans—that the payments made by the family businesses were disclosed—not on schedule I, but on schedule F. There, among the creditors with unsecured nonpriority claims in the Debtor's bankruptcy case, Holland Pub and EPC were listed with claims described as "personal loans" in

29

amounts "unknown"; the Skokie Pub was included as a creditor as well, with an unspecified claim also in an "unknown" amount. In support of his testimony that these loans reflected all of his personal expenses that he intended to repay, the Debtor produced only five balance sheets for the family businesses, which showed merely $89,999.70 booked as personal loans to the Debtor for the relevant time period. This figure is nowhere near the total amount actually paid by the businesses on the Debtor's behalf. In fact, the payments made on the first mortgage loan, the HELOC, and the Debtor's car lease alone—without including any other living expenses paid by the family businesses—totaled $121,990.56 per year. The Debtor's failure to provide any amounts on schedule F—or accurate amounts on the balance sheets presented at trial—provided a false picture of his financial condition.

In sum, the substantial funds paid by the family businesses were regular contributions to the expenses of the Debtor and his family and, thus, should have been disclosed on the Debtor's schedule I as income. The contributions were not loans, and disclosing them as such—and in unknown amounts—on schedule F was incorrect, inaccurate, and misleading. The Debtor's failure to properly disclose the payments constitutes concealment. Accordingly, PNC has satisfied the first element of § 727(a)(2) as to the Debtor's income.

### B.  Transfer and Concealment of the Residence

PNC also alleges that the Debtor transferred and concealed the ownership of the Residence. As above, the Debtor does not dispute the facts regarding the transfers and ownership of the property. Specifically, the Debtor testified that he and Sharise owned the Residence until 2011, when Libman purchased it in a short-sale transaction. According to both the testimonial and documentary evidence, two transfers of the Residence subsequently took place, one shortly before and the other not long after the Debtor filed his bankruptcy case. On June 5, 2015, Libman quit

claimed the property to the Debtor's mother-in-law, as trustee for the Land Trust of which the Debtor's three children are the sole beneficiaries. Eleven months thereafter, on May 6, 2016, the Residence was transferred again, to the Debtor's wife and his friend Glenn Udell, who were able to obtain a loan of over $1.3 million to pay off both Libman's mortgage and the HELOC.

The Debtor readily admitted that he and Libman agreed that all of the expenses related to the Residence—the mortgage, property taxes, insurance, utilities, and others—would be paid either by the Debtor or on his behalf and that, in exchange, the Debtor and his family would be able to continue living in the Residence. Every month during the relevant time period, the family businesses or EPA paid Libman's mortgage in the amount of $6,270.22, as well as the HELOC in the amount of $3,175.66 and other expenses with respect to the Residence. And every month— before, during, and after the relevant time period—the Debtor, his wife, and his children lived in the Residence.

Although legal title to the Residence was transferred from the Debtor and Sharise to Libman in 2011 and from Libman to the Land Trust in 2015, the Debtor and his family continued to treat the Residence as their own. Mortgage payments for the property were made on behalf of the Debtor and his family, they maintained and furnished the home, and the equity in the Residence was used to ultimately pay off the first mortgage and the HELOC.

This continued use of the Residence by the Debtor constitutes a concealment for purposes of § 727(a)(2). *See Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127, 128 (7th Cir. 1981) (holding that "transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment"). Indeed, a concealment exists "when a debtor purports to transfer an asset, making it appear to the world that he no longer owns it, but in fact retains an interest in the asset." *Holstein*, 299 B.R. at 229. Although

§ 727(a)(2)(A) imposes a one-year limitations period, "under the doctrine of continuing concealment, where property is transferred more than one year before bankruptcy, a discharge may nonetheless be denied if the concealment of any retained interest in that property continues into the statutory one-year period, coupled with the requisite intent." *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 238 (Bankr. N.D. Ill. 2005) (internal quotation omitted); *see also First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983) (holding that discharge should have been denied under § 727(a)(2), where the debtor provided a down payment for a condominium purchased in his father's name but subsequently lived on the property and made the mortgage payments on a continuous basis); *Kauffman*, 675 F.2d at 128. PNC has established that the Debtor retained control and use of the Residence after its transfer. Thus, the Debtor concealed the property under the doctrine of continuing concealment pursuant to § 727(a)(2). *See Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 895 (Bankr. N.D. Ill. 2003) (explaining that where the creditor "can establish that the debtor retained either control [of] or an equitable interest in the property, courts have denied discharge under the doctrine of continuing concealment").

Given all of the evidence presented, particularly with respect to the Debtor's income and the Residence, the Court finds that PNC has sustained its burden of proof on the first element of its § 727(a)(2) claim.

### 2. Intent to Hinder, Delay, or Defraud Creditors

The second element required under § 727(a)(2) is intent. A debtor's discharge will not be denied unless the complaining creditor "demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor[;] [the] intent to defraud must be actual and cannot be constructive." *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017) (internal

quotation omitted). The issue of a debtor's intent is a question of fact to be determined by the court. *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989).

Because a debtor is unlikely to admit his fraudulent intent, a finding of actual intent may be inferred from the surrounding circumstances. *McWilliams,* 284 F.3d at 790–91; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998); *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996). Certain factors, or "badges" of fraud, "may warrant the inference." *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 744 (Bankr. N.D. Ill. 2004). These include a familial or close relationship between the parties; the debtor's retention of possession, benefit, or use of property; a lack of consideration for the transfer; the debtor's financial condition; and the general chronology of the events and transactions in question. *McWilliams*, 284 F.3d at 791; *Olbur*, 314 B.R. at 744. Also relevant here is "the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors." *McWilliams*, 284 F.3d at 791. While just one of these badges is sufficient to establish fraudulent intent, the presence of several factors "indicates strongly that [the] debtor possessed the requisite intent." *Holstein*, 299 B.R. at 230 (internal quotation omitted). In deciding whether a debtor has acted with intent for purposes of § 727(a)(2), the court should consider the debtor's "whole pattern of conduct." *Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005) (internal quotation omitted).

PNC alleges that the Debtor should be denied a discharge because the substantial contributions from the family businesses and the Debtor's interest in the Residence were concealed in order to hinder, delay, and defraud his creditors. Not surprisingly, the Debtor disputes the suggestion that he concealed anything or intended to hinder or defraud anyone. He argues, however, that, if the Court finds that there were omissions in his bankruptcy documents, those

33

omissions were not intentional or knowing but, rather, legal decisions made by Benjamin about how to report income, expenses, and alleged loans. Before turning to this argument, the Court examines the badges of fraud as they apply to this matter.

### A.  Badges of Fraud

The cumulative evidence here establishes virtually all of the badges of fraud required for a finding that the Debtor intended to hinder, delay, or defraud his creditors. First, the key transfers—those in connection with the Residence and the contributions to pay the expenses of the Debtor and his family—were all made either by or to the Debtor, his family members, or his close friends and associates. Additionally, the initial transfer of the Residence, as discussed both above and below, was made in such a way as to allow the Debtor and his family to retain use and benefit of the property. There was no evidence that Libman received any consideration for or derived any benefit from the transfer at the time it was made.

The general chronology of the events at issue and the course of conduct after the making of the subject transactions also warrant the inference that the Debtor intended to delay or defraud his creditors. At the time of the initial transfers, the Debtor was facing serious financial problems. The real estate crisis had wreaked havoc on his various business ventures, causing him to lose tremendous amounts of money, and, after calling its two loans on which the Debtor was the guarantor, PNC began foreclosure proceedings against the Edison Park property. Pursuant to the Debtor's bankruptcy documents, lenders were also pursuing foreclosure actions against other properties in which he had an interest. From the onset of the Debtor's financial difficulties, he started working on a full-time basis at the Pubs, and the family businesses began paying for all of his and his family's living expenses. In 2011, Libman, the Debtor's close, personal friend, purchased the Residence, thereby saving it from foreclosure, and, with no apparent benefit to him,

34

allowed the Debtor and his family to continue living in the home as long as Libman's mortgage and all of the other expenses related to the Residence were paid either by the Debtor or on his behalf.

Based on this chronology and the other badges of fraud discussed above, PNC argues that the Debtor transferred the Residence to Libman and arranged for his living expenses to be paid by the family businesses in order to shield his income and assets from both creditors and taxing entities. Such an arrangement, PNC suggests, left creditors and taxing bodies with no salary to garnish, no property upon which to foreclosure, and no income against which to levy.

The Debtor disagrees. As to the Residence, he contends that the transfer to Libman was made only to ensure that he and his family had a stable place to live. Despite this claim, the transfer to Libman, under the parties' unconventional agreement, allowed the Debtor to retain the benefits of homeownership without holding legal title to the property. The subsequent transfer of the Residence to the Land Trust gave the interest in the home to the Debtor's children, and the third transfer of the property to Sharise and Udell allowed the Debtor's wife to use the equity in the Residence to obtain a loan and ultimately put the property back into the hands of the Debtor's family.

As for the payment of his and his family's living expenses by the family businesses, the Debtor's arguments and testimony were both inconsistent and implausible. On the one hand, the Debtor testified that he never received a salary from the family businesses—although he worked at the Pubs for most of his life—and that the unusual financial arrangement was consistent with the way the family businesses had always compensated him. (Tr. No. 1 at 52:7–8 ("This is just the way we've always done it.")) At the same time, however, the Debtor testified that he considered the payments to be loans that he planned to repay. His attempt to explain why he would be taking

35

loans for work that he was doing—to repay his family members for losses on investments that they had made with him and to help his sisters operate the Pubs after their father had had a stroke—was unconvincing and illogical. And although the Debtor testified that the unorthodox compensation structure began in 2009 when his financial difficulties first arose, those payments continued for many years—before, during, and after the relevant time period and well beyond the aftermath of the real estate crisis. Finally, the Debtor testified that the family businesses could not afford to pay him a W-2 salary. However, he offered nothing to support this claim, and, given the extensive evidence of the substantial living expenses of the Debtor and his family, it is possible—and, in fact, probable—that the amounts paid by the businesses for those expenses far exceeded what he would have received as a W-2 salary.

With one last gasp, the Debtor argues that he did not have any motive to conceal his income and assets and that any errors or omissions were inadvertent and inconsequential. According to the Debtor, this lack of motive weighs against a finding of fraudulent intent. This argument is baseless. The evidence shows that the considerable number of both disclosures and omissions were, in fact, deliberate and significant. The question of whether the Debtor "stood to gain anything from them has little relevance." *See Hansen*, 325 B.R. at 761. Bankruptcy is a "give-and-take process, and for debtors to receive the benefits of the Code they must make complete disclosure to their creditors and the [t]rustee." *Id.* (internal quotations omitted).

Based on the aggregate evidence, the presence of multiple badges of fraud, and the Debtor's "whole pattern of conduct," the Court concludes that the Debtor possessed the intent required for the denial of his discharge under § 727(a)(2). In particular, the Court finds that the Debtor's testimony regarding the transfers of the Residence and the payment of his living expenses by the family businesses was inconsistent, dubious, and self-serving. *See id.* (noting that courts are

reluctant to "'accept a debtor's own self-serving statement of his intent as the best evidence of that intent'"). Taking into account the Debtor's interest in the outcome of this matter and his conduct on the witness stand, the Court also finds that his testimony lacked credibility. *See Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 776 (Bankr. N.D. Ill. 2010), *aff'd*, 470 B.R. 808 (N.D. Ill. 2012) (explaining that the court is in "the best position to assess the credibility of the witnesses and weigh the evidence"); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002) (noting that the "'carriage, behavior, bearing, manner, and appearance of a witness—in short, his demeanor—is part of the evidence'"). Accordingly, the Court holds that PNC has sustained its burden of proof on the second element of its § 727(a)(2) cause of action.

### B. Reliance on Advice of Counsel

The Debtor argues, in the alternative, that any errors or omissions in his bankruptcy documents resulted from the advice, based on legal determinations, made by his counsel. Specifically, the Debtor testified that he provided all of the necessary financial information to Benjamin and relied on him to complete the schedules and SOFA. That reliance, the Debtor says, "completely vitiates any intent" under § 727(a)(2) and "exonerate[s] him[] from any culpability."[24] (Dkt. 306 at 27 & 38.)

It is well established that the debtor—not his attorney—is responsible for the contents of his schedules and SOFA. *Cannon-Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir. 2006) (explaining that a debtor is bound by his own representations, regardless of the reasons that they were made); *Hansen*, 325 B.R. at 760 n.10 (noting that when a debtor has signed his schedules and SOFA, he—

---

[24] PNC argues that the Debtor's contention that he relied on Benjamin's advice is an affirmative defense that he forfeited by failing to assert it in a timely manner. (Dkt. 304 at 38.) The Debtor seems to have raised the argument, however, not as an affirmative defense but as evidence of his lack of fraudulent intent. In any event, the Court need not address the issue because, as discussed below, the Debtor has failed to establish the elements required under the defense.

not his lawyer—is accountable for any errors or omissions); *Olbur*, 314 B.R. at 746–47 (same); *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig)*, 237 B.R. 453, 457–58 (Bankr. N.D. Ill. 1999) (same). "[B]ad legal advice does not relieve" a debtor "of the consequences of [his] own acts." *Cannon-Stokes*, 453 F.3d at 449. A bankruptcy attorney is the debtor's agent, and a debtor is "bound by the consequences of advice that [he] chooses to follow." *Id.* (noting that, otherwise, a client could simply say that she was "free to ignore any contract that a lawyer advised her to sign with her fingers crossed behind her back").

The Seventh Circuit recently announced for the first time, however, that "[a] debtor's testimony about advice from [his] bankruptcy attorney . . . may tend to negate fraudulent intent." *Kempff*, 847 F.3d at 451. Notwithstanding this rather "lukewarm" endorsement, *BMO Harris Bank N.A. v. Brahos (In re Brahos)*, 589 B.R. 381, 398 (Bankr. N.D. Ill. 2018), a debtor seeking to negate fraudulent intent pursuant to the advice-of-counsel defense must demonstrate: (1) that he fully disclosed all required financial information to his attorney, *Rosenzweig,* 237 B.R. at 458*,* and (2) that his reliance on the advice was reasonable, *Netherton v. Baker (In re Baker)*, 205 B.R. 125, 132 (Bankr. N.D. Ill. 1997); *see also Brahos*, 589 B.R. at 398 n.22 (stating that "[c]ourts of appeal[] that might otherwise accept advice of counsel as evidence negating fraudulent intent refuse to do so when the advice was clearly wrong"). *See also In re Breitling*, 133 F. 146, 148–49 (7th Cir. 1904) (explaining that, in order for a debtor to be protected by the advice-of-counsel defense, "the facts must be fully in good faith stated to counsel" and the debtor must believe that he was "correctly advised").

In this matter, the Debtor has not established that he provided all of the necessary financial disclosures to Benjamin or that his reliance on Benjamin's advice was reasonable. Accordingly, the Debtor may not negate his fraudulent intent under the advice-of-counsel defense.

### i.  Disclosure of Financial Information

The Debtor testified that he provided all of the required financial information to Benjamin prior to the preparation and filing of his petition, schedules, and SOFA. Echoing that claim, Benjamin testified that the Debtor disclosed to him all assets, liabilities, income, and expenses in connection with the bankruptcy case. He further testified that the Debtor told him that the family businesses paid for his household's living expenses, including the mortgages on the Residence, the monthly installments on the cars that he and Sharise drove, and all of the personal expenses incurred on their American Express cards.

Despite those disclosures, Benjamin was missing a substantial amount of important information, and, correspondingly, the bankruptcy documents contained significant errors and omissions. In fact, Benjamin testified at trial that the Debtor did not provide him with records related to Sharise's PRCB Account and failed to disclose numerous payments that had been made—and the corresponding expenses that had been incurred—during the relevant time period. Those included payments for thousands of dollars of household expenses made each month by Sharise using personal credit cards, as well as other monthly payments on, among others, an outstanding loan to U.S. Bank, the family's country club membership, and dance lessons for their daughter. As a result, these payments and expenses did not appear in the Debtor's schedules. Significantly, the Debtor also did not provide Benjamin with dollar figures for the alleged loans that the Debtor said were advanced by the family businesses. Consequently, those "loans" were listed in the schedules in amounts "unknown."

Although Benjamin accepted full responsibility at trial for the omissions and errors in the bankruptcy documents, the email message that he sent to the Debtor seeking information to complete the schedules and SOFA belies his claim that the Debtor made the necessary, accurate,

39

and full disclosures. The message was sent at about four o'clock in the afternoon on September 20, 2015, more than a month after the Petition Date, just hours before schedules A–H and the SOFA were filed, and only about twenty-four hours before the filing of schedules I and J. In the email, Benjamin reprimanded the Debtor for failing to provide him with answers to "many important questions." He suggested that the Debtor owned the Residence (Dkt. 322 ("The HELOC is listed as 2013 debt but you *supposedly* did not own any real estate in 2013—Jody [Libman] did" (emphasis added)); he questioned how the Debtor was able to live "for free" and why there were no household expenses listed in the documents that the Debtor had submitted; he asked how Sharise was able to make the monthly mortgage payment with the Debtor "making zero," because he was "sure" that the amount of that payment was "more th[an] [Sharise's] check;[25] he chided the Debtor for answering the "business questions" in a careless manner; he admonished the Debtor for the lengthy delay in providing information; and he reminded him that he—the Debtor—would be signing the documents under penalty of perjury. That Benjamin was still in need of a considerable amount of information at the proverbial eleventh hour prior to filing the schedules and SOFA contradicts both the Debtor's testimony that he and Benjamin expended considerable time preparing the schedules and Benjamin's claim that he spent "hours and hours going over and asking" for information before the filings (*see* Tr. No. 2 at 151:8-11).

Based on the foregoing, the Court finds that the Debtor did not fully disclose all required financial information to Benjamin. Thus, he has failed to satisfy the first element of the advice-of-counsel defense.

---

[25] Benjamin's certainty that Sharise's income alone was insufficient to cover the mortgage payments was inconsistent with his testimony at trial that the family was using her salary to pay the bills. (*See* Tr. No. 2 at 120:9–19, 134:12–17, 177:21–178:4.)

### ii. Reasonable Reliance

Nor has the Debtor established the second element—that he reasonably relied on Benjamin's legal advice in connection with the preparation and filing of the bankruptcy documents. Rather, the evidence demonstrates that the Debtor should have known both that Benjamin's advice was improper and that the various omissions should have been disclosed.

"Debtors are not expected to know all of the intricacies of the Bankruptcy Code," and therefore it is entirely appropriate for them to rely on counsel to determine how to complete the bankruptcy documents in a way that is "responsive to the statutory requirements." *Takada v. Isaacson (In re Isaacson)*, 564 B.R. 380, 385–86 (Bankr. N.D. Ill. 2017). Nevertheless, reliance on the advice of counsel "is not an impenetrable shield . . . when it is transparently clear that the advice is improper." *Dubrowsky v. Estate of Arnold Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 575 (E.D.N.Y. 2000); *see also Zizza v. Harrington (In re Zizza)*, 875 F.3d 728, 732 (1st Cir. 2017) (explaining that reliance on the advice of counsel is not a defense when it is "'transparently plain'" that the information omitted from schedules should have been disclosed); *Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017) (stating that a debtor must have acted "in good faith" and that "advice of counsel is no defense when it should have been obvious to the debtor that his attorney was mistaken"); *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1199 (9th Cir. 2010) (noting that "advice of counsel is not a defense when the erroneous information should have been evident to the debtor"); *Brahos*, 589 B.R. at 398 & n.22 (collecting cases).

In this matter, it should have been obvious to the Debtor that Benjamin had omitted information from the bankruptcy documents that should have been included. The Debtor is an educated, sophisticated businessman with a lifetime of experience in management and, as a real estate developer and investor, had engaged in numerous, complex financial transactions. He was

also no stranger to bankruptcy, having been involved in a number of chapter 7 corporate cases related to both him and the family businesses.

Further, the Debtor was familiar with the chapter 7 process. Prior to the preparation of the schedules and SOFA, the Debtor had received from Benjamin the four intake documents to review. The plain language in those documents requested the complete and accurate disclosure of financial information for both the Debtor and his family members so that the Court, the trustee, and the creditors could evaluate his household's financial situation. The documents also explained that the information sought from the Debtor had to reflect both actual expenses and current monthly income, the latter including regular contributions to household expenses from nondebtors. Based on the information in the documents, the Debtor testified that he understood the importance of full and accurate disclosure.

The Debtor also admitted that he reviewed the bankruptcy schedules before they were filed. According to his testimony, he believed that the schedules were complete, truthful, and accurate, even though schedule I reflected regular monthly contributions of only $2,517.57; his schedule J included expenses of merely $2,327.57; Sharise's schedule J listed expenses that were far less than the household's actual expenses; and half of the unsecured, nonpriority claims on schedule F had amounts specified as "unknown." Despite these and other omissions and errors, on September 20, 2015, the Debtor signed both the SOFA and the schedules (as to A–H), declaring under penalty of perjury that he had read the documents and that the information in them was "true and correct." He made the same declaration about the information in schedules I and J on September 21, 2015. He cannot now, "merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he . . . made under oath." *See Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987); *see also Baker*, 205 B.R. at 133 (drawing "an

interference that the omission of information from the bankruptcy schedules . . . was undertaken knowingly and fraudulently" because the debtors signed their bankruptcy documents certifying that each was "true and correct to the best of their knowledge").

Moreover, although the Debtor claims that all of the determinations in connection with the preparation of the bankruptcy documents were made unilaterally by Benjamin, the evidence suggests that the Debtor was involved in the decision-making process. Both he and Benjamin discussed the schedules at length, spent many hours preparing them, and reviewed them together before they were filed. The Debtor's testimony also suggests that some of the decisions were made jointly by him and Benjamin. (*See, e.g.*, Tr. No. 1 at 111:14–23 (testifying that "I sat down with Kevin. . . . I gave him everything, and this is what we came up with"); Tr. No. 2 at 31:2–7 (testifying that the payments made by the family businesses "weren't considered income, and that's why we chose not to put them on any schedules").)

As to his testimony in support of his advice-of-counsel defense, the Court finds that the Debtor's repeated claims that he relied on Benjamin's advice were unconvincing and did not ring true. Rather, they seemed contrived, rehearsed, and robotic. And, although he neither understood nor was expected to know why or where various disclosures were made in the bankruptcy documents, the Debtor testified that he did not question or otherwise challenge any of Benjamin's decisions. Considering the Debtor's close friendship with Benjamin, that testimony was simply not credible.

In sum, given his background and knowledge, as well as the circumstances in this matter, it should have been "transparently clear" to the Debtor that Benjamin had omitted required information from the schedules and SOFA and that those documents, as filed, did not present an accurate and complete picture of his financial situation. Because the Debtor's reliance on

43

Benjamin's legal advice was not reasonable, he cannot use the advice-of-counsel defense to negate his fraudulent intent.

To the extent that the Debtor believes that he got bad advice from Benjamin regarding how information should have been disclosed in his bankruptcy documents, that is a matter between the Debtor and his attorney, the remedy for which "lies in malpractice litigation against the offending lawyer."[26] *Cannon-Stokes*, 453 F.3d at 449.

For all of the reasons discussed above, the Court finds that PNC has established that the Debtor transferred and concealed his assets and income with an intent to hinder, delay, and defraud his creditors. Accordingly, the Court finds in favor of PNC and against the Debtor on Count I of the complaint, and the Debtor's discharge will be denied pursuant to § 727(a)(2).

### Count II: Objection to Discharge Under § 727(a)(3)

In Count II of the complaint, PNC seeks denial of the Debtor's discharge under § 727(a)(3). Specifically, PNC alleges that the Debtor failed to produce a number of financial documents that had been subpoenaed by PNC and that the records that were turned over were insufficient to provide a clear, complete, and accurate picture of the Debtor's financial situation. PNC also

---

[26] Benjamin made some curious and unusual determinations in the preparation of the Debtor's bankruptcy documents. First, the Court has already found, as discussed above, that Benjamin's decision to list the payments made by the family businesses as loans on schedule F—rather than as contributions on schedule I—was erroneous, given the circumstances of the case. Second, Benjamin's use of IRS standards for certain expenses, instead of the Debtor's actual expenses, is disconcerting. The explanations that Benjamin gave at trial for listing the IRS standard expenses on Sharise's schedule J and his admission that he "often" recommends the use of those standards to his clients (*see* Tr. No. 2 at 135:13–142:4, 185:14–195:6) also raise red flags. Perhaps most worrisome, Benjamin's claim that actual expenses need to be disclosed only to a debtor's attorney, not on schedule J itself (*id.* at 192:13–193:1), is legally inaccurate. *See re Johnson*, 400 B.R. 639, 651 (Bankr. N.D. Ill. 2009), *aff'd*, 382 F. App'x 503 (7th Cir. 2010) (explaining that schedules I and J are "designed to report the debtor's actual income and expenditures"); *In re Foster*, No. 05-50448, 2006 WL 2621080, at *1 n.2 (Bankr. N.D. Ind. Sept. 11, 2006) (stating that "the expenses on [s]chedule J are a calculation of the expenditures actually made by the debtors"). Finally, the Court questions Benjamin's staunch refusal to amend the Debtor's bankruptcy documents even though he acknowledged that the case would be difficult and contested and that the accuracy of the schedules would be challenged. (*See, e.g.*, Tr. No. 2 at 126:19–127:17; Dkt. 306 at 66–67.) The Court cautions Benjamin about the continued use of such practices and strongly suggests that he reconsider his methods and approaches in preparing bankruptcy documents on behalf of debtors.

alleges, in particular, that the Debtor did not produce documents demonstrating legitimate business purposes for the cash payments that he received from the various family businesses during the relevant time period.[27]

The obligation to keep and preserve records reflecting a debtor's financial condition is imposed by § 727(a)(3), which requires a denial of discharge if a debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" 11 U.S.C. § 727(a)(3). Intent to defraud is not an element under the statutory provision. *Costello*, 299 B.R. at 896–97.

Section 727(a)(3) ensures that a debtor will provide "enough information to ascertain [his] financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002) (internal quotation omitted). Accordingly, a debtor must maintain, preserve, and produce records of his financial condition. *Id.* Although records need not be kept in any particular manner, they must be sufficient to provide "'a true presentation of the debtor's financial affairs.'" *Hansen*, 325 B.R. 746, 761 (Bankr. N.D. Ill. 2005) (quoting *Scott*, 172 F.3d at 969). Neither the court nor creditors have an obligation to "reconstruct a debtor's financial situation," *Union Planters Bank*, 283 F.3d at 899, nor are they required, "in the absence of adequate records, to take a debtor's word for his financial dealings," *Hansen*, 325 B.R. at 761.

---

[27] In fact, the only specific allegations in Count II of the complaint are those related to the cash transactions. However, in the parties' Joint Pretrial Statement, PNC alleged various other instances of the Debtor's failure to produce financial documents under § 727(a)(3); thus, the Debtor should not have been caught unaware of PNC's additional claims at trial. The Court will consider all of PNC's allegations in this Memorandum Opinion.

Here, PNC has the initial burden of establishing inadequacy of the Debtor's records. *See Costello*, 299 B.R. at 897. Adequacy is determined on a case-by-case basis, *Hansen*, 325 B.R. at 761–62, and the Court has broad discretion in determining whether the Debtor's records are sufficient to satisfy § 727(a)(3), *see Costello*, 299 B.R. at 897. Among the factors to consider are the size, complexity, and nature of the Debtor's business; the Debtor's education and sophistication; his business experience; and his "personal financial structure." *See Hansen*, 325 B.R. at 762 (internal quotation omitted). Records are adequate if they "permit the court and creditors to trace the debtor's financial dealings." *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 576 (Bankr. N.D. Ill. 2000). If PNC can establish inadequacy of the Debtor's records, then the burden shifts to the Debtor to show that his failure to preserve or produce records was "justified under all of the circumstances of the case." *See* 11 U.S.C. § 727(a)(3); *see also Costello*, 299 B.R. at 897.

In this matter, PNC's attempts to obtain the Debtor's financial documents through typical discovery channels were rigorously challenged. On December 23, 2015, PNC served a subpoena on the Debtor, seeking the production of various documents, including those related to, among other things, the Residence, the Land Trust, the Debtor's bank accounts, payments that were made for the Debtor's living expenses, automobiles, insurance, gifts, wills and trusts, EPA's purchase of the Edison Park property, and the Debtor's assets. Although it is unclear which documents were produced pursuant to the subpoena, many remained outstanding. Thus, PNC subsequently sought authorization to serve subpoenas on America Express, Belmont Bank, Bridgeview Bank, and Park Ridge Community Bank. After overruling the Debtor's objection to that request, the Court entered an order permitting PNC to issue and serve the subpoenas. Following their issuance, a motion was filed by Sharise, Libman, Sophia, the family businesses, and others to quash the subpoenas.

46

Denying the motion, the Court directed the third parties to turn over the requested documents but indicated that the scope of production was limited to January 1, 2013 and thereafter. On April 27, 2016, about four months after PNC's subpoena had been served on the Debtor, he filed an affidavit of completeness, attesting that he had produced all documents in response to PNC's requests.

All documents had *not* been produced, however, and many other discovery disputes followed. A review of both the bankruptcy and adversary dockets shows that PNC had to file five separate motions to compel the production of documents, all of which were substantially briefed and hotly contested by the Debtor and his counsel. These disputes spanned a period of almost four years and required nearly 100 separate court appearances. Ultimately, after years of pursuit, PNC was able to gather numerous documents and records—including the Debtor's email messages concerning his income, assets, and finances—in its attempt to understand the Debtor's financial condition. These consisted of thousands of pages from the Debtor, various financial institutions, and other third parties.

Although the documents and records were finally provided to PNC, they were disorganized and muddled, requiring both PNC and the Court to sift through "a morass of checks and bank statements" in an attempt to reconstruct the flow of the Debtor's transactions. *See Union Planters Bank*, 283 F.3d at 899; *see also Scott*, 172 F.3d at 970. In fact, the only formal reports produced that contained any kind of processed data for the relevant time period were the five balance sheets for some of the family businesses. Those were of limited value, however, as the dollar figures that they contained for the alleged loans that the Debtor owed to the family businesses were far less than the amounts that those businesses actually paid for the living expenses of the Debtor and his family.

47

Even if the documents and records had been organized and orderly, the ones produced by the Debtor were insufficient to permit PNC to discern the Debtor's financial condition and "track his financial dealings with substantial completeness and accuracy." Only after those documents were "heavily supplemented by PNC's own searches" (Dkt. 267 at 4) was PNC able to more fully understand the transactions that had taken place. That the Debtor attempted to prevent PNC from obtaining those additional documents greatly concerns the Court.

Also troubling was the Debtor's failure to accurately segregate his personal and business expenses. Although the Debtor, at the Court's request, annotated the monthly statements for his American Express card with the letters "B" and "P" to indicate business and personal expenses, respectively (Dkt. 317; Tr. No. 1 at 127:9–24), many of the annotations were questionable. For example, the Debtor coded a charge for same-day surgery for his son as a business expense. (Dkt. 317 at 4.) When asked why, he testified that "all health-related issues" were paid by the family businesses because that was his "deal with [his] family." (Tr. No. 1 at 140:13–141:10.) The Debtor also coded a number of expenses that appeared to be personal in nature with a question mark. (*See* Dkt. 317.) Moreover, he failed to produce any documents to support his claims that expenditures that were ostensibly personal in nature were actually business expenses.

The Court acknowledges that § 727(a)(3) is generally not used to bar the discharge of "an ordinary consumer debtor." *Hansen*, 325 B.R. at 762. This matter, however, does not involve such a debtor. Rather, as discussed above, the Debtor here is an educated businessman who has worked in the restaurant industry for most of his life, managed and operated commercial entities, and participated in complex real estate transactions. Thus, it is not unreasonable to expect and require the Debtor to maintain and produce adequate records reflecting his financial affairs. *See Union*

*Planters Bank*, 283 F.3d at 900 (noting that "'[w]here debtors are sophisticated in business, . . . creditors have an expectation of greater and better record keeping'").

The Debtor offered no reasons—justified or otherwise—to explain his failure to produce records. Rather, he insists that his production was voluminous. Despite that claim, as discussed above, the Debtor never produced some key records, the documents that he did turn over were jumbled and disjointed, and, without PNC's dogged pursuit of additional information, the Debtor's financial picture would still be largely unknown.

As for the cash payments from the family businesses, the Debtor was unable to definitively explain at trial what he did with that money. Although he suggested that the cash was likely used for various routine business purposes, he also testified that he did not know whether any of the money went to satisfy his personal obligations or those of his family. Compounding the inconsistency of his responses regarding these transactions, the Debtor denied in the Joint Pretrial Statement that he ever received any cash payments from the family businesses (Dkt. 267 at 4), even though he stipulated to the existence of the checks payable to "cash" that he negotiated during the relevant time period (Dkt. 302 at 5). Notwithstanding what the money may have been used for, the Debtor did not produce any records related to the cash, nor did he explain his failure to do so.

In sum, the Debtor failed to produce adequate recorded information from which his financial situation and business transactions could be ascertained with any kind of accuracy. Further, the Debtor did not offer any reasonable justification for his failure to maintain or produce adequate financial records. Accordingly, the Court finds in favor of PNC and against the Debtor on Count II of the complaint, and the Debtor's discharge will be denied pursuant to § 727(a)(3).

### Count III: Objection to Discharge Under § 727(a)(4)

Finally, in Count III of the complaint, PNC objects to the Debtor's discharge under

subsections (A) and (D) of § 727(a)(4). According to PNC, the Debtor's discharge should be denied under § 727(a)(4)(A) because he knowingly made "false oath[s]" by providing misleading, inaccurate, or false information in his bankruptcy documents. PNC also alleges that the Debtor fraudulently withheld from the chapter 7 trustee recorded information related to the Debtor's property or financial affairs to which the trustee was entitled and thus should not be granted a discharge under § 727(a)(4)(D). The Court will address each statutory provision in turn.

### 1. False Oaths

First, PNC alleges that the Debtor made numerous false oaths throughout the pendency of his bankruptcy case. Specifically, in connection with his schedules, SOFA, and other bankruptcy documents, PNC contends that the Debtor: (1) failed to disclose his household's actual monthly expenses that were paid by the family businesses; (2) characterized those payments as loans instead of income; (3) concealed his continuing interest in the Residence; (4) failed to disclose the payment of substantial household expenses made by his wife from her PRCB Account; and (5) concealed the money that his wife received from EPA. PNC also alleges that the Debtor, among other things, provided a false affidavit of completeness in connection with PNC's request for document production; falsely claimed that he had not received any cash from the family businesses; and erroneously asserted at trial that he had disclosed all material information to Benjamin prior to the preparation of his bankruptcy documents. According to PNC, the Debtor knew that all of these statements were false, and he made them with fraudulent intent.

Section 727(a)(4)(A) enforces the debtor's "paramount and absolute" obligation to provide full and accurate information about himself and his affairs, *Urological Grp., Ltd. v. Petersen (In re Petersen)*, 296 B.R. 766, 790 (Bankr. C.D. Ill. 2003), by denying a discharge to a debtor who has "knowingly and fraudulently, in or in connection with the case[,] . . . made a false oath or

50

account[,]" 11 U.S.C. § 727(a)(4)(A). Indeed, to get a "fresh start" under the Bankruptcy Code, a debtor must "accurately and truthfully present [himself] before the [c]ourt." *Bostrom*, 286 B.R. at 359. "All assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly." *Hansen*, 325 B.R. at 757. The trustee and creditors are entitled to information that will permit them to evaluate the case. *Costello*, 299 B.R. at 899. "The very integrity of the bankruptcy court and the successful administration of the bankruptcy system rest upon compliance with the debtor's obligation of disclosure." *Petersen*, 296 B.R. at 790.

To prevail under § 727(a)(4)(A), PNC must demonstrate that: (1) the Debtor made a statement under oath; (2) the statement was material to the bankruptcy case; (3) the statement was false; (4) the Debtor knew that the statement was false; and (5) the statement was made with an intent to deceive. *See Stamat*, 635 F.3d at 978; *Hansen*, 325 B.R. at 758. Applying the facts in this matter to the elements of § 727(a)(4)(A), the Court finds that PNC have satisfied all five.

First, the Debtor made statements under oath, because a bankruptcy petition, schedules, a SOFA, deposition and trial testimony, and affidavits all constitute statements under oath for purposes of § 727(a)(4)(A). *See Korrub v. Cohn (In re Cohn)*, 561 B.R. 476, 494 (Bankr. N.D. Ill. 2016); *Hunt v. O'Neal (In re O'Neal)*, 436 B.R. 545, 561 (Bankr. N.D. Ill. 2010); *The Cadle Co. v. Stasch (In re Stasch)*, Bankr. No. 05-20789-BKC-RBR, Adv. No. 05-2103-BKC-RBR-A, 2008 WL 877209, at *10 (Bankr. S.D. Fla. Mar. 31, 2008).

Second, all of the information provided by the Debtor in his petition, schedules, statements, and related documents, as well as his testimony at trial, concerned his financial affairs and is therefore material to the bankruptcy case. *See Hansen*, 325 B.R. at 758; *Senese*, 245 B.R. at 574.

51

As to the third and fourth elements, many of the statements in the Debtor's filings were false, and he knew that they were false. As discussed at length above, the Debtor, an educated and experienced businessman who had reviewed the language in the intake documents, knew the importance of full and accurate disclosure; understood that schedules of his household's actual monthly expenses and "current monthly income"—including contributions from nondebtors—were required; and recognized the significance of attesting under oath to the accuracy of the information he provided. Despite this knowledge and understanding, the Debtor filed schedules which clearly did not reflect his household's actual expenses and included only a fraction of the contributions that the family businesses made to those expenses. The Debtor also provided an affidavit of completeness in response to PNC's request for documents, even though many of those documents had not been turned over. He denied that he ever received any cash payments from the family businesses, notwithstanding his stipulation that he negotiated eight checks payable to "cash" during the relevant time period. And, although the evidence established otherwise, he unconvincingly testified at trial that he gave Benjamin all documents and records required for the preparation of his schedules and SOFA. These and other omissions and inaccuracies, and the Debtor's knowledge of them, amply satisfy elements three and four.

The final element—"intent to deceive"—has also been met. As the Court previously set forth in detail, the Debtor's fraudulent intent can be readily inferred from the surrounding circumstances in this matter, as both the documentary and testimonial evidence overwhelmingly demonstrates nearly all of the badges of fraud. The analysis of the Debtor's intent under § 727(a)(2) applies here as well and will not be reiterated. Based on that analysis and all of the evidence, the Court finds that the Debtor's numerous omissions and misrepresentations were made with an intent to deceive for purposes of § 727(a)(4)(A).

Even considered separately, some of the Debtor's knowing  misrepresentations are serious and significant and could warrant a denial of discharge on their own. *See Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (B.A.P. 1st Cir. 1999) (finding that "all that is required for a denial of discharge is a single 'false oath or account'" under § 727(a)(4)(A)). Without question, all of the Debtor's misstatements and omissions here, examined together, establish a pattern of reckless indifference to the truth and the responsibilities of debtors to provide truthful, accurate, and adequate information. *See Olbur*, 314 B.R. at 745 (explaining that a single misstatement that is not "particularly serious" probably would be insufficient to support an objection to discharge but that there "'comes a point when the aggregate errors and omissions cross the line'"); *see also Sullivan v. Bieniek (In re Bieniek)*, 417 B.R. 133, 138 (Bankr. D. Minn. 2009) (stating that courts are "'often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive'").

Finally, the Court notes that the Debtor did not file amendments to remedy any of the misrepresentations and omissions in his schedules and SOFA. Although debtors are generally accountable for the representations that they make in their schedules, they may be "released if once the mistake is realized, there is a swift attempt to rectify the [error] and submit the proper information." *Isaacson*, 564 B.R. at 388; *see also Cannon-Stokes*, 453 F.3d at 449 (explaining that a debtor is "bound by [his] own representations, . . . at least until the debtor moves to amend the disclosures and pay the creditors their due"); *Bensenville Cmty. Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 165 (Bankr. N.D. Ill. 1992) (noting that an amendment may indicate an "innocent intent"); *but see Stamat*, 635 F.3d at 982 (stating that the debtors' amendments did not "negate a finding of intent or cure the initial failures"); *Costello*, 299 B.R. at 899–900 (explaining that "a

debtor cannot excise a false oath by making subsequent corrections to his bankruptcy petition" and that "'[if] debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive'"). Despite the Debtor's claim that his attorney was to blame for not amending the schedules—as well as for failing to prepare them accurately and completely—the Court's rejection of his advice-of-counsel defense equally applies here.

In sum, the Court finds that PNC has established all of the elements required under § 727(a)(4)(A). Accordingly, the Debtor is not entitled to a discharge under that statutory provision, and his discharge will be denied.

## 2.  Withholding of Information from the Chapter 7 Trustee

PNC also alleges that the Debtor knowingly and fraudulently failed to provide the chapter 7 trustee with financial information to which he was entitled. Specifically, PNC argues that the Debtor falsely testified at the 341 meeting about the nature of the payments made by the family businesses and that he failed to turn over to the trustee documentation related to those payments and the payments made by EPA, as well as his wife's bank statements, among others. In short, PNC contends that the Debtor neither presented a true picture of his financial situation at the 341 meeting nor produced to the chapter 7 trustee complete and accurate documents. As a result, PNC says, the Debtor's discharge must be denied under § 727(a)(4)(D).

Naturally, the Debtor denies all of these allegations. According to the Debtor, he testified about his finances fully and completely at both the first and second sessions of the 341 meeting and provided to the trustee all of the documents that he requested.

Section 727(a)(4)(D) provides that a debtor shall be denied a discharge if he "knowingly and fraudulently, in or in connection with the case[,] . . . withheld from an officer of the estate

54

entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]" 11 U.S.C. § 727(a)(4)(D). Trustees often lack the time and resources necessary to discover all transactions and assets of debtors. *Fiala v. Lindemann (In re Lindemann)*, 375 B.R. 450, 471 (Bankr. N.D. Ill. 2007). Thus, debtors in bankruptcy have "an affirmative duty to surrender to the [t]rustee . . . all recorded information relating to property of [the] estate . . . and are also obligated to cooperate by providing the [t]rustee . . . with all relevant documents and papers and fully answering the questions in the petition for relief and attached schedules." *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 998 (Bankr. N.D. Ill. 1992). Section 727(a)(4)(D) enforces this duty by denying a discharge to debtors who deliberately withhold records, books, documents, or other papers related to their property or financial affairs. *Lindemann*, 375 B.R. at 471–72. The requisite intent under the provision may be established by either circumstantial evidence or inference drawn from a course of conduct. *Id.* at 472.

In the Debtor's bankruptcy case, two sessions of the 341 meeting of creditors were held. In addition to the chapter 7 trustee, the Debtor, and Benjamin, counsel both for PNC and for Bridgeview Bank were also present at the initial session. All of those individuals, as well as counsel for the United States Trustee (the "U.S. Trustee"), also appeared at the continued session.[28]

The first session, held on September 29, 2015, was fairly brief, apparently due to various time constraints. Based on a review of the documents that the chapter 7 trustee had at that time, he noted that the Debtor's financial arrangement under which the family businesses paid for the living

---

[28] Although counsel for PNC made a few inquiries during the first session of the 341 meeting, he stated at the second that he was "reserv[ing] [his] questions for a 2004 examination." (Dkt. 175-3 at 55:10–12, 90:19–21.) The attorney for the U.S. Trustee also indicated that she was going to "continue [her] own investigation" by filing a 2004 motion. (*Id.* at 119:2–5, 120:8–9.)

expenses of the Debtor and his family seemed "suspicious." (Dkt. 175-56 at 16:21–24 ("I have to say, as a preliminary matter, this all looks extremely suspicious that you have some kind of interest in these entities."), 31:10–13 ("[Based] on the documents alone this whole thing looks very suspicious.").) Toward the end of the session, the trustee said that he would send Benjamin a list of documents that he needed before "delv[ing] into [matters] any more deeply." (*Id.* at 17:10–13, 30:17–24.) Prior to the second session of the 341 meeting, both PNC and the U.S. Trustee moved for, and subsequently received, extensions of time to file complaints objecting to the Debtor's discharge.[29] (Bankr. Dkt. 22, 24, 26, 30.) The first extension was granted to February 25, 2016. (Bankr. Dkt. 26, 30.)

On November 25, 2015, the second session of the meeting of creditors was held and lasted just over two hours. Much of the Debtor's testimony during that time was a tangled and truly bewildering narrative about the many real estate deals in which he had engaged and the foreclosure of various properties that followed. In response to questioning, primarily by the U.S. Trustee, about his compensation and income, the Debtor admitted that his sisters were "supporting" him by "pay[ing] some bills"—including his insurance—and giving him "a car to drive." (Dkt. 175-3 at 35:14–37:19.) He also conceded that his sisters were paying "the expenses on the [Residence]." (*Id*. at 60:8–18.) As for the nature of the payments, the Debtor claimed throughout his testimony that the support from his sisters constituted, alternatively, general "help," loans, and gifts. (*See, e.g., id.* at 36:19–22 ("They're helping me by lending me money."), 38:2–8 ("I don't know what you call it. It's definitely a loan to me. I don't know how they're putting it on their books but they definitely are helping me."), 55:20–23 ("My sisters help me pay for my bills."), 115:17–116:20 (noting that the money he was receiving could be characterized as gifts).) As for the amount of the

---

[29] The order granting PNC's motion also provided for an extension to file a complaint objecting to the dischargeability of debt under § 523. (Bankr. Dkt. 26.)

contributions from his sisters, the Debtor testified that he received a sum total of about $2,500 per month. (*Id.* at 57:1–13.) In response, the chapter 7 trustee expressed his confusion, questioning how a monthly payment of approximately $2,500 could cover all of the Debtor's expenses. (*Id.* at 60:19–22 ("So between your car and the mortgage on the house and all the other expenses for the house, it's only $2,500 a month? That doesn't seem to add up."), 61:8–12 ("[W]hat I'm saying is that if you add $500 a month for the car and the mortgage on the house and the expenses of the house, it's got to be more than $2,500.").) Prior to concluding the session, the trustee reiterated his confusion and summarized his concerns by stating the following: "Well, I have to tell you that this doesn't add up. I mean either you're getting loans that you're disclosing in your schedules, you're getting income that you're not paying taxes on, or you're getting gifts that nobody seems to be providing gift tax returns for."[30] (*Id.* at 117:5–10.)

The chapter 7 trustee required numerous additional documents from the Debtor after both sessions of the 341 meeting—including tax returns, the deed and other records related to the Residence, various operating agreements and organizational documents in connection with the Pubs, and information regarding the car that the Debtor drove. (Tr. No. 2 at 104:17–110:1; Dkt. 175-3 at 123:14–23; Dkt. 175-56 at 17:10–13, 30:17–24.) According to the testimony at trial, the Debtor turned over all of the requested documents, and the trustee made no additional demands for production. (Tr. No. 2 at 106:16–110:6.)

That the trustee did not request additional documents, however, does not necessarily mean that he was satisfied with the Debtor's production or that the Debtor disclosed all recorded information to which the trustee and his creditors were entitled. Indeed, much information was apparently missing. Following the conclusion of the second session of the 341 meeting, PNC and

---

[30] It is unclear from the transcript whether these words were actually spoken by the chapter 7 trustee or the U.S. Trustee. (*See* Dkt. 175-3 at 117:5–13.)

57

the U.S. Trustee obtained additional extensions of time to object to the Debtor's discharge, through July 25, 2016—almost one year after the Petition Date—because the details concerning the Debtor's transactions were still unclear. (Bankr. Dkt. 44, 47, 50, 52, 65, 68, 74, 75, 81, 82.) At the same time, PNC struggled to get documents via 2004 motions and third-party subpoenas. Ultimately, on July 25, 2016, PNC filed its adversary complaint objecting to the Debtor's discharge. On March 27, 2018, while the adversary proceeding was still pending, the chapter 7 trustee filed a no-asset report. (Bankr. Dkt. 117.)

Why the chapter 7 trustee did not file his own motions to extend time to object to the Debtor's discharge is a mystery to the Court.[31] Perhaps he was relying on the U.S. Trustee or PNC to file an adversary complaint if an objection to the Debtor's discharge was necessary.

What is clear, however, as has been extensively discussed above, is that the Debtor withheld a sizable number of documents related to his assets, income, and property, preventing both his creditors and the chapter 7 trustee from understanding his financial situation. Not only did the Debtor fail to voluntarily produce these documents, but he relentlessly challenged all of PNC's efforts to obtain them. Based on the collective evidence in this matter, the Debtor's knowing and fraudulent failure to provide the trustee with all relevant documents and papers to which he was entitled was a breach of the Debtor's "affirmative duty" to surrender those records. As such, the Debtor is not entitled to a discharge under § 727(a)(4)(D), and his discharge will be denied under that statutory provision.

In sum, PNC has met its burden under both subsections (A) and (D) of § 727(a)(4). Accordingly, the Court finds in favor of PNC and against the Debtor on Count III of the complaint.

---

[31] Only the order granting the U.S. Trustee's first motion provided an extension for both the U.S. Trustee and the chapter 7 trustee. (Bankr. Dkt. 30.)

**CONCLUSION**

Only an "honest but unfortunate debtor" is entitled to the privilege of a discharge.

The Debtor here is not honest. He engaged in a continuing course of actions in which he intentionally concealed his income and assets in order to defraud his creditors. He knowingly failed to produce adequate records to which both his creditors and the chapter 7 trustee were entitled so that they could accurately ascertain his true financial condition. And he made "false oaths" with an intent to deceive by providing misleading, inaccurate, and false information in connection with his bankruptcy case. In sum, the Debtor knowingly and fraudulently provided a false picture of his financial affairs in an effort to keep his income and assets out of the hands of both creditors and taxing bodies.

The Debtor is also not unfortunate, despite his claims to the contrary. During the relevant time period, the Debtor and his family were able to continue to live in a Residence valued at almost $2 million, the family businesses paid for all of the household's living expenses, the Debtor and his family maintained their membership at the local country club, they took numerous vacations, and they were generally able to maintain a more-than-comfortable lifestyle.

For all of the foregoing reasons, the Court finds in favor of PNC and against the Debtor on Counts I, II, and III of the adversary complaint. As such, the Debtor's discharge will be denied pursuant to §§ 727(a)(2), (a)(3), (a)(4)(A), and (a)(4)(D). Count IV will be dismissed for lack of prosecution. A separate order will be entered consistent with this Memorandum Opinion.

**Dated**: May 25, 2021

**ENTERED**:

_____
Janet S. Baer
United States Bankruptcy Judge